U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 APR -2 PM 12: 14

CLERK

BY_____ LAW_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| **CHRISTINA RAINVILLE,** | : | File No. --  $2:20$-cv· 51 |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **BOXER BLAKE & MOORE PLLC,** | : | |
| **formerly d/b/a** | : | |
| **ELLIS BOXER & BLAKE, PLLC,** | : | |
| **and** | : | |
| **BOXER BLAKE MOORE &** | : | |
| **SLUKA PLLC,** | : | |
| **Defendant.** | : | |

---

## COMPLAINT

---

Plaintiff Christina Rainville alleges as follows:

### NATURE OF THE CASE

1. This action involves unlawful discrimination against a highly profitable attorney

   employee, with a combination of age discrimination and disability discrimination, and the

   resulting constructive discharge of employment, in addition to claims for breach of

   Plaintiff's employment contract, breach of the covenant of good faith and fair dealing,

   and fraud in the inducement.

2. Plaintiff Christina Rainville was employed as Senior Counsel at Ellis Boxer & Blake

   PLLC (which, after Plaintiff left, changed its name to Boxer Blake Moore & Sluka,

   PLLC,  and then again changed its name to Boxer Blake & Moore PLLC) (collectively

referred to as the "Firm"), from June 1, 2016 until November 9, 2018, when she resigned involuntarily after being constructively discharged.

3.  The Firm discriminated against Plaintiff, who was born in 1962 and was over 50 years-old at all times relevant to this litigation, due to her age, by, among other things: forbidding her from engaging in the practice of criminal law (the only area of law that she had practiced previously in Vermont) due to a claimed "sort-of" conflict, while allowing a young associate with no criminal experience or training to take on a criminal representation; denying Plaintiff any and all opportunities to develop her law practice when those same opportunities were provided to <u>all</u> the younger lawyers; taking Plaintiff's work away; repeatedly lying to Plaintiff that there was insufficient work for her position and constructively discharging her – despite her being one of the most profitable lawyers at the Firm – because the Firm wanted what the managing partner described to her as a "newbie" lawyer instead of an older one; hiring a "newbie" young law school graduate immediately after Plaintiff's departure; and creating a hostile environment.

4.  While the Firm was discriminating against Plaintiff due to her age, the Firm further discriminated against Plaintiff after she suffered a work-related injury on December 4, 2017, as her supervising partner and the managing partner strategically shut down all conversations about her disability, failed to offer a reasonable accommodation, and coerced her involuntary resignation based on their repeated lies that there was not enough work to support her position – all in order to gain an unfair and unlawful advantage in the worker's compensation case that they reasonably anticipated.

5.  After coercing Plaintiff to involuntarily resign from employment with their repeated lies that there was insufficient work to support her position, and taking all of her work away, the Firm used that resignation in its defense in the worker's compensation case.

6.  Because of Defendant's unlawful actions, Plaintiff has suffered not just lost wages and other losses typical in these cases, but also the loss of her reputation as a lawyer and her ability to ever be employed as a lawyer again.

7.  Plaintiff received a Right to Sue letter from the E.E.O.C., dated January 16, 2019, which is attached hereto.

## PARTIES

8.  Plaintiff Christina Rainville is a lawyer admitted to practice in the states of Vermont and Pennsylvania, who worked as Senior Counsel at Ellis Boxer & Blake from June 1, 2016 until she resigned on November 8, 2018. At all times relevant to this dispute, Plaintiff was a resident of Jamaica, Vermont.

9.  Plaintiff is currently a resident of the State of Florida, at 1040 Highway 98 East, Unit 415, Destin, Florida 32541, and has been a resident of Florida since January of 2020.

10. Defendant Boxer Blake and Moore, PLLC (formerly d/b/a as "Ellis Boxer & Blake, PLLC" and "Boxer Blake Moore & Sluka, PLLC")  (the "Firm") is a law firm operating as a partnership limited liability corporation ("PLLC") under the laws of Vermont, at 24 Summer Hill Street in Springfield, Vermont. The Firm was known as "Ellis Boxer & Blake, PLLC" until December 31, 2018, at which point the Firm was renamed "Boxer Blake Moore & Sluka PLLC"; after which partner Justin Sluka left, and the Firm was renamed "Boxer Blake & Moore PLLC."

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §1331, as the action arises under the laws of the United States.

12. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1), as the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

14. Venue in this Court is proper under 28 U.S.C. § 1391 as the Firm is a resident of this District and a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment at the Firm

15. Plaintiff began her employment at the Firm on June 1, 2016, as "Senior Counsel."

16. At the time of her hire, Plaintiff was told that her role would be to manage partner Stephen Ellis' legal practice in the Springfield, Vermont area, while Mr. Ellis moved to Burlington (to be near his girlfriend) and he worked to develop an additional practice in the Burlington area.

17. At the time Plaintiff joined the firm, she had a strong reputation in Vermont (and nationally) as a criminal lawyer in the Vermont State Courts. She had tried 25 criminal jury trials in Vermont; handled 25 criminal appeals before the Vermont Supreme Court; had successfully argued a landmark criminal case before the United States Supreme Court; had published more than a dozen articles in the leading national journal for

juvenile law (one of her articles was cited as authority by the U.S. Court of Appeals for the Seventh Circuit, by Judge Posner); had published in the Vermont Bar Journal; had conducted trainings relating to criminal proceedings for children, both in Vermont and around the country; had testified numerous times before the Vermont Legislature on criminal matters and protecting children; and had been honored by the Governor at a public bill-signing ceremony for her work with the legislature on changing the statute of limitations for sexual crimes committed against children.

18. In contrast, while Plaintiff had extensive experience in civil litigation many years earlier when she lived in Pennsylvania, Plaintiff had no experience in civil litigation in Vermont at any time since she joined the Vermont bar in 2007, except for criminal post-conviction cases (which are criminal cases that are processed pursuant to the Civil Rules).

19. In light of the fact that Plaintiff had never done civil litigation in Vermont, and had only practiced criminal law in Vermont as a prosecutor, Mr. Ellis repeatedly told Plaintiff – both at the time of hire and throughout her employment -- that developing her own practice would take "a long time" and "at least five years."

20. During her first eighteen months at the firm, from June 1, 2016 through the day prior to her injury on December 3, 2017, Plaintiff's work was so exemplary that she was given a substantial raise.

21. All of her employment reviews were excellent.

22. In addition, on information and belief, Plaintiff was a highly profitable lawyer at the firm.

23. Plaintiff worked very long hours, had high billable hours, high fee receipts, and, due to her level of experience and prominence in the field of law generally, she was able to command an hourly billing rate that far exceeded all of the associates' regular billing

5

rates, and also far exceeded the normal billing rates of three or four of the five partners at the firm.

24. On information and belief, in terms of fee receipts compared to salary and expenses, Plaintiff was more profitable to the firm prior to her injury than any of the other non-partner lawyers, and, on information and belief, was more profitable than at least three of the five partners.

25. Multiple clients praised Plaintiff's work and wrote letters or emails to the partners praising her work prior to her injury.

26. One such email was sent to Plaintiff and Stephen Ellis just one month prior to Plaintiff's injury, on November, 3, 2017:

> Dear Tina,
>
> This is a formal thank you for helping us with the [redacted to protect client's identity] complaint.
>
> You are truly brilliant and we could not be more grateful for all the help that you gave us wading through the process and concluding with a beneficial outcome for all concerned.
>
> Ellis, Boxer and Blake is so very fortunate to have you on board and the state of Vermont is blessed to have you and your family living here.
>
> With deepest gratitude,
> [name redacted]

## Age Discrimination

27. Plaintiff's employment was subject to a written contract dated May 31, 2016.

28. The contract, which was drafted by the Firm, provided as follows:

> "Your job title will be 'Senior Counsel.' Initially, you will provide support for the other senior lawyers in the firm in specific matters assigned to you. **It is our expectation that you will assume primary responsibility for some matters in the very near future, and that you will work diligently to develop your own client base. You will also be expected to help train and mentor associate**

**lawyers and support staff.  We will endeavor to support you in these efforts.**
So long as you remain employed by our firm, you will practice law exclusively on
behalf of our firm and its clients."

(Emphasis added.)

29. While Plaintiff had joined the Firm planning to develop her own practice in addition to
managing Mr. Ellis' Springfield-area practice, the partners at the Firm immediately made
it impossible for her to do so, while they, in contrast, fully supported the efforts of <u>all</u> of
the younger lawyers to develop their practices.

30. The Firm's discriminatory treatment of Plaintiff due to her age began on or about the day
that she started at the Firm, on June 1, 2016 and continued until she left on November 9,
2018.

### The Firm Barred Plaintiff from Taking Criminal Cases for No Justifiable Reason

31. The Managing Partner, William Blake, told Plaintiff that she could not represent any
criminal clients in the state courts because he believed that the Firm had a conflict.

32. The purported conflict was that Mr. Blake handled a very small number of worker's
compensation cases pursuant to a contract with the Attorney General's Office.

33. Plaintiff explained to Mr. Blake that that was not a conflict, but Mr. Blake disagreed.

34. Plaintiff explained that the Vermont Supreme Court had held that State's Attorney's
Offices are County offices and that the employees are all county employees, and that
there could not be a conflict with a contract with the Attorney General's Office because
they were legally different entities.

35. Mr. Blake disagreed, and said something along the lines of it being a "sort-of conflict."

36. Plaintiff contacted Bar Counsel, Mike Kennedy, who advised in an email that there was no conflict that would bar Plaintiff from representing criminal defendants in the state courts.

37. Mr. Blake maintained his view that it was a "sort of" conflict despite Mr. Kennedy's opinion.

38. As a result, the Firm continued to bar Plaintiff from representing any criminal defendants in state courts.

39. Around the summer of 2017, partner Andrew Boxer met with Plaintiff to discuss the development of her practice.

40. Plaintiff told Mr. Boxer that the Firm's bar on handling criminal matters in state court was making it extremely difficult, and that Mr. Kennedy had said that such representation was not a conflict.

41. Mr. Boxer supported Mr. Blake's position, and suggested that Plaintiff could handle federal criminal cases.

42. Plaintiff explained that she was known as a state criminal lawyer, not a federal one, and that most lawyers who take on criminal work in the federal courts get known in the press for taking on defendants in high profile cases in state cases first.

43. Plaintiff also explained that she had never handled a federal criminal case and was unfamiliar with the rules.

44. Mr. Boxer suggested that Plaintiff apply for a position on the District Court's criminal defense panel.

8

45. Plaintiff said she would do so, but she told Mr. Boxer that it was unlikely she would get a position on the panel since she had never handled a criminal case in federal court and also because she was known as a prosecutor and not a defense lawyer.

46. Plaintiff applied for, but was not given a position on the District Court criminal defense panel.

### The Firm Paid to Advertise the Hiring of a New Associate When the Firm Had Not Done So for Plaintiff

47. Meanwhile, in approximately May of 2017 – a year after Plaintiff had been at the Firm -- the Firm hired a new associate, Stacey Adamski.

48. The Firm immediately paid to have cards printed that would be mailed out to members of the bar to announce that Ms. Adamski had joined the Firm.

49. The Firm had never done that for Plaintiff.

50. The Firm realized that the Firm was sending these cards to every member of the Bar in Vermont and that they had never done that for Plaintiff, so the Firm belatedly added Plaintiff's name on the card that they had printed for Adamski.

51. On information and belief, those cards were sent out one year after Plaintiff joined the Firm, and within weeks of Ms. Adamski joining the Firm.

52. Ms. Adamski, on information and belief, was under 40 years old.  In any event, she was substantially younger than Plaintiff.

53. The Firm did not advertise Plaintiff's arrival at the Firm in a timely manner because of her age.

### Partner Andrew Boxer Berates and Humiliates Plaintiff in Front of a Young Associate for No Reason Other than Her Age

54. Sometime in mid-2017, Mr. Boxer called Plaintiff to his office to have a discussion about a contingency fee case where the Firm had withdrawn from the case and the Firm was now going to file a claim as a creditor in the former-client's bankruptcy case.

55. Plaintiff had worked on the contingency-fee case, which had been brought by Mr. Ellis prior to Plaintiff joining the Firm.

56. Plaintiff had determined in the scope of her work that the client had been dishonest in his representations to the Firm, had also destroyed material records, and that there was no possibility of the Firm getting any recovery on the contingency-fee case. It was Plaintiff's discovery that caused the Firm to withdraw from the case.

57. Plaintiff met with Mr. Boxer and associate Oliver Abbott. Mr. Abbott is a 2012 law graduate, who, on information and belief, was in his 20's at the time.

58. The purpose of the meeting was to discuss the preparation of the claim to be filed in the bankruptcy court on the Firm's behalf.

59. Although Plaintiff had done nothing wrong in the underlying case and had only saved the Firm from putting more time into a case that had no value as well as from public embarrassment, Mr. Boxer was extremely hostile to Plaintiff in the meeting and repeatedly berated her for no reason in front of Mr. Abbott.

60. In a vicious tone of voice, Mr. Boxer directed that all of the work on the bankruptcy claim would be done by Mr. Abbott and that Plaintiff – who knew all of the facts that would support the bankruptcy claim and could have written the necessary documents in far less time – was "not to spend one minute more" than was absolutely necessary on the matter, and that Mr. Abbott was going to do all the work.

61. Plaintiff had never before, and still has never, been spoken to by anyone in the hostile and demeaning manner that Mr. Boxer spoke to her during that meeting in front of Mr. Abbott.

62. Plaintiff had done absolutely nothing to deserve that belittling treatment by Mr. Boxer, and there was no reason to assign the matter to a young associate when Plaintiff knew the facts, had the records on hand, and could have put the claim together very quickly.

63. Nor was there any basis or purpose for Mr. Boxer to demean and humiliate Plaintiff in the presence of a young associate.

64. Plaintiff reported Mr. Boxer's demeaning treatment of her in that meeting to the Office Manager and others.

65. On information and belief, Mr. Abbott was also upset by Mr. Boxer's treatment of Plaintiff during that meeting.

66. After the meeting, Plaintiff was cut off from the bankruptcy matter in its entirety. She was never given any drafts to review to confirm that they were factually accurate, and was never advised of the status of the matter.

### Partner Andrew Boxer Attacks Plaintiff's Age in Second Hostile Meeting

67. In December of 2017, Mr. Boxer called Plaintiff down to his office again.

68. Mr. Boxer demanded to know, in a hostile voice, how old Plaintiff was.

69. Plaintiff hesitated.

70. Mr. Boxer glared at her until she responded that she was 56.

71. Mr. Boxer then complained in a hostile, loud and demeaning tone of voice that "You're even older than I am!"

11

72. Mr. Boxer then called Plaintiff "an over-priced associate," and complained that she had not brought any new cases to the Firm.

73. Plaintiff reminded Mr. Boxer that she had brought in one significant new discrimination matter for Mr. Boxer's biggest client, where the client's emails showed that the client (a major insurance company) was going to give the matter to another law firm but was so impressed with Plaintiff's work that they decided to give it to Plaintiff instead.

74. Mr. Boxer complained that others were handling many more "files." Plaintiff understood Mr. Boxer to be referring to two young associates who only handled worker's compensation cases – which typically generated a small amount of legal fees per case – and whose client development efforts were supported fully by the Firm.

75. Plaintiff again brought up the fact that she was a renowned criminal lawyer who was not being allowed to do criminal work even though Mike Kennedy had said there was no conflict.

76. Again, Mr. Boxer refused to allow Plaintiff to take on criminal work.

77. Plaintiff told Mr. Boxer that she had recently published an article in the *Vermont Bar Journal*.

78. Mr. Boxer cut her off and nastily declared: "That's not how you get clients!"

79. Plaintiff started to tell Mr. Boxer that she had actually been contacted by a couple of different people about potential matters after the article had been published.

80. Mr. Boxer cut her off and angrily repeated, "That's not how you get clients!"

81. Plaintiff asked Mr. Boxer if the Firm would pay to have her advertise. He said, "Maybe."

82. Mr. Boxer became increasingly hostile, told Plaintiff that she had a year "to fix this," and ended the meeting.

83. After the meeting, Plaintiff was extremely upset and spoke to both the Managing Partner, William Blake, and her supervising attorney, Mr. Ellis.

84. Both men apologized for the things Mr. Boxer had said.  One said Mr. Boxer had "no tact," and the other said, "Andy can really be an a-----e."

85. Mr. Ellis also reaffirmed his prior statements that it takes five years to develop a practice.

86. Mr. Ellis also noted that Plaintiff was very profitable for the Firm, was doing excellent work, was liked by everyone, and that there would be no reason to let her go.

87. Mr. Ellis also said that, if the Firm could not afford her salary because the Firm was having financial problems, they could ask her to take a pay cut.

88. Mr. Blake noted that Plaintiff was doing good work, that everyone liked her, and that there was no reason for her to be let go.

89. After being reassured by Mr. Ellis (her supervisor) and Mr. Blake (the managing partner) that her job was not in jeopardy as Mr. Boxer had described, Plaintiff researched how much it would cost to advertise online with the Bennington County newspapers.

90. Although the cost started as low as $300, the partners refused her request for money to advertise her practice.

### While Refusing to Allow Plaintiff to Take on Any Criminal Clients Because of a Non-existing Supposed "Conflict," the Firm Allowed a Young Lawyer with Zero Criminal Experience to Take on a Criminal Representation

91. At some point after Plaintiff started at the Firm, the Attorney General's Office did not renew Mr. Blake's contract.

92. Thus, the "sort-of" conflict that served to bar Plaintiff from representing criminal clients was gone, but the Firm's bar, inexplicably, remained.

93. Plaintiff then learned that the prohibition of her handling criminal cases did not apply to younger lawyers.

94. Sometime in approximately January of 2018, Plaintiff learned that the Firm was allowing associate Stacey Adamski – a much younger lawyer who had zero criminal law training or experience – to handle a criminal case in the state courts despite the fact that Plaintiff, an expert in criminal law, was not allowed to do the same.

95. Ms. Adamski had taken on the criminal representation of a Spanish-speaking immigrant and had represented this Firm client in a Relief from Abuse hearing, and she was now representing the client in a criminal matter where charges had been filed against him for violating the Temporary Relief from Abuse Order  (the "Order") that had been issued at the hearing.

96. Plaintiff found out about this representation only because Ms. Adamski had no idea how to handle the matter, and she sought Plaintiff out for advice.

97. Defendants at Relief from Abuse hearings are typically represented by criminal lawyers because the ramifications from the hearing are criminal in nature and very serious.

98. Ms. Adamski was not competent to represent the client at the Relief from Abuse hearing.

99. Although Ms. Adamski recognized that the client required an English-language interpreter, and she thus requested that the court make an interpreter available for the hearing, no interpreter was available at the hearing.

100.     Ms. Adamski agreed to go forward anyway – knowing that her client would be unable to understand the proceeding, and that there was no one present who could explain the resulting Order to the client.

101.    Thus, the Firm's client was unlawfully deprived of his constitutional right to
understand what was being said in the hearing; unlawfully deprived of his constitutional
right to defend himself; and unlawfully deprived of his constitutional right to understand
the order that was ultimately issued against him.

102.    In addition, the Order was internally inconsistent in a common way that any
criminal lawyer would have addressed with the court to fix before the hearing ended.

103.    The Order barred the client from having contact with his wife, but allowed contact
with his young children who were in his wife's custody.  The Order did not explain how
he was to contact his children (who were too young to have cell phones) without having
unlawful contact with his wife.

104.    Shortly after the Order was issued, the Firm's client was arrested and charged for
having non-threatening contact with his wife when he spoke to her to inquire about his
child who was sick.

105.    Ms. Adamski told Plaintiff that the police had made a mistake in charging the
client because he had not threatened his wife and that she would get the charge dismissed.
She also said that she had spoken to, or was in the process of speaking to, the police
officer who brought the charge to get it dismissed.

106.    Plaintiff advised Ms. Adamski that that was not the law, and that any and all
contact was prohibited by the order, regardless of whether the contact was threatening in
nature, and without regard to whether one of his children was sick.

107.    Plaintiff also explained to Ms. Adamski that, because the Firm's client was an
immigrant, he would surely be deported if convicted of the offense, because a conviction

15

for violating a relief from abuse order is cause for immediate deportation. Thus, the client's American-citizen children would likely never see him again if he were convicted.

108.　　　Having zero criminal experience, Ms. Adamski realized that she did not have the ability to represent the client going forward, and she asked Plaintiff to take over the representation.

109.　　　As Ms. Adamski's representation had created an unspeakable disaster for the Firm's client, and a potential malpractice case for the Firm, Mr. Blake agreed to allow Plaintiff to take over the representation to try to get the charge dismissed.

110.　　　Plaintiff successfully got the charge dismissed due to the lack of an interpreter at the hearing and the internal inconsistency of the order, as well as additional evidence that demonstrated the likely falsity of the allegations against the client and his actual innocence of any type of abuse.

111.　　　The Firm did not explain to Plaintiff why Ms. Adamski was allowed to take on criminal matters when she had zero criminal experience or training, yet Plaintiff had been denied that opportunity for approximately 18 months, even after Mr. Blake's "sort-of" conflict had long gone away.

112.　　　The Firm allowed Ms. Adamski to take on the criminal representation because she was much younger than Plaintiff, and the Firm wanted to support the development of her practice because of her age.

113.　　　Despite the egregious manner in which Ms. Adamski handled the matter, and despite the very serious harm that the client suffered as a result – having criminal charges brought against him – Adamski suffered no consequence by the Firm for her mistakes.

114.     On January 24, 2020, the Vermont Supreme Court suspended Ms. Adamski from

the practice of law after finding that, in another matter, she had engaged in "dishonest

and deceitful actions toward members of [the Firm], intended in large part to maximize

her own financial interests at the firm's expense."

### The Firm Supported All of Its Younger Lawyers in Their Efforts to Develop Law Practices, While Denying All of Those Opportunities to Plaintiff Because of Her Age.

115.     It is inexplicable that the Firm would allow someone like Ms. Adamski to take on

a criminal matter without any experience in that area, while denying Plaintiff the

opportunity to do the same, other than the fact that Ms. Adamski was substantially

younger in age.

116.     This was also consistent with the Firm's support of all of the young lawyers at the

Firm.

117.     The Firm paid for every lawyer who did worker's compensation work, except

Plaintiff, to attend all of the worker's compensation conferences in Burlington.

118.     The Firm viewed those conferences as essential opportunities for the young

lawyers to meet with insurance carrier adjusters and to bring in new business to the Firm.

119.     While Plaintiff was at the Firm, the Firm paid to send Mr. Abbott and two

younger female associates to these conferences each year.

120.     Although Plaintiff also handled worker's compensation cases, the Firm never sent

Plaintiff to a single worker's compensation conference.

121.    The worker's compensation conference was viewed by the Firm as the most-important opportunity for the lawyers to get "face time" with the insurance adjusters who sent business to Vermont law firms.

122.    The firm scheduled lawyers' meetings both before and after the conferences, where partners Mr. Boxer and Mr. Ellis would advise the young associates on how to use the conference to bring in more work for the firm.

123.    Plaintiff attended the lawyer meetings, even though she was outwardly excluded from attending the conferences.

124.    In the December 2017 meeting with Mr. Boxer where Mr. Boxer complained that Plaintiff was "even older than I am," and he referred to the fact that two of the associates had brought in a higher number of "files," the two associates he referred to had been sent to multiple worker's compensation conferences at the Firm's expense, and the "files" that they brought to the firm were worker's compensation cases.

125.    On information and belief, the Firm did not send Plaintiff to the worker's compensation conferences because the Firm wanted to promote the young lawyers for client development opportunities and viewed Plaintiff as too old.

### Plaintiff Worked to Develop Her Practice with Google Ads, But the Firm Took Over and Cut Her Out of the Process, and then Used Her Work with Google Ads to Promote a Young Lawyer in a Field Where He Had No Expertise.

126.    Later in 2018, while Plaintiff was apparently still being barred from developing a criminal practice, Mr. Ellis asked Plaintiff to take on the representation of a family friend who was being investigated by the Vermont State Police on very serious criminal charges, with lengthy possible prison sentences.

127.    Plaintiff met with the client and quickly put together a detailed defense of
        deficiencies in the State's case, presented that information in writing to the Detective
        handling the investigation, and the investigation was closed without any charges being
        brought.

128.    Around this time, Plaintiff was hopeful that the Firm's bar on her doing criminal
        work would be released, and she began to explore Google Ads as a way that perhaps the
        Firm would allow her to advertise to develop her criminal practice.

129.    Plaintiff spoke at length to the Google Ad department over a period of days, and
        learned the complex structure of advertising on Google, which involved setting a budget
        (beginning at $300/month, which could be cancelled at any time) and then picking ad
        terms with varying and fluctuating prices.

130.    Plaintiff spoke to Mr. Ellis, and then spoke to all of the lawyers at a monthly
        lawyers' meeting, about Google Ads and how the process worked.

131.    Because Plaintiff believed that the Firm was unlikely to do any advertising for
        her, she put together a plan where the Firm could use Google Ads to advertise criminal
        work *and* employment law, with the hope that the Firm would allow some advertising for
        her as a part of the package.

132.    Mr. Ellis and others asked Plaintiff to look into it further, so she contacted Google
        Ads again, had more complex discussions, and sent a detailed email to the partners about
        it.

133.    After a while, Plaintiff learned that the Firm had decided to go forward with
        Google Ads, but the partners cut her out of the process entirely, and put a young male
        associate (Mr. Abbott) and a young male partner (Mr. Sluka) in charge – even though

                                              19

those young men had had zero involvement in contacting Google Ads and zero involvement in setting up the proposal or the budget.

134.     The Firm then used the Google Ads to advertise for new business in a *new area of law* that Mr. Abbott was *interested* in developing – even though Mr. Abbott had no experience in that field.

135.     Mr. Sluka told Plaintiff that Google Ads was "great," and that Mr. Abbott had expressed an interest in developing a practice in this area of law (which was new not just to Mr. Abbot but to the Firm), and that Mr. Abbott had already gotten a request and had scheduled a meeting with a prospective client.

136.     In sum, throughout Plaintiff's entire period of employment at the Firm, the Firm shut down every effort she made to build her practice, while supporting *any* effort of younger lawyers to develop their practices.

137.     The Firm refused to support the development of Plaintiff's practice due to her age.

138.     The Firm also created a hostile environment for Plaintiff due to her age.

### The Firm's Hostile Environment Toward People with Disabilities

139.     In addition to creating a hostile environment for Plaintiff due to her age, the Firm was an extremely hostile environment for anyone with any kind of disability.

140.     In fact, the Firm's environment for people with disabilities would more accurately be described as "toxic."

141.     All five of the Firm's partners built their legal careers on defending insurance carriers and employers against injured workers in worker's compensation cases.  Three of the five Firm partners practiced worker's compensation law exclusively.

142.     Demeaning comments about worker's compensation litigants and people with disabilities were the norm and an everyday practice at the Firm.

143.     The partners routinely made negative comments about injured employees, ranging from employees who were supposedly exaggerating their injury or claiming a false injury, and extending to workers who had serious, indisputable injuries whose cases – the partners claimed -- needed to be litigated especially vigorously because the potential financial exposure to the carrier was great.

144.     Mr. Boxer also made demeaning comments about individuals with disabilities in the cases he was handling which were not worker's compensation cases.

145.     The partners bragged about being particularly litigious in their defense of legitimate work-related injuries where the insurance carrier would "own the body part" if the injury was found compensable.

146.     Legitimate cases that were further defined by having the potential for "creep" – where an injury to one body part could extend to another – were particularly reviled and the partners bragged about the need to litigate "hard" the cases where compensable injuries had the potential for "creep."

147.     Mr. Blake specifically directed Plaintiff that she had to litigate a case "hard" where a back injury involving a certain part of the spine could extend to other parts of the spine after fusion surgery, and the carrier would be on the hook for the entire spine and multiple fusion surgeries over time.

148.     Demeaning and belittling comments about people with disabilities were routine throughout the office.

149.     The toxic environment at the Firm started with the partners routinely deriding the

disabilities of litigants, and extended to Firm employees with disabilities.

150.     One example is the Firm's annual Christmas dinner, which was held at a nearby

inn.

151.     Plaintiff did not want to attend because she had a life-threatening allergy to wheat

and she was concerned about possible exposure, but she felt compelled to attend and so

she went anyway, after speaking to people at the inn in advance to do everything possible

to limit her exposure.

152.     One Firm employee, however, who has celiac disease, refused to attend the

dinners because of her concern with gluten exposure.

153.     Mr. Ellis complained to Plaintiff that the other employee was refusing to go to the

dinner and derided the employee.

154.     Plaintiff explained that the employee had celiac disease and the employee felt she

could not risk it.

155.     Mr. Ellis continued in a hostile demeanor to berate the employee for not going.

156.     Mr. Ellis acknowledged that he knew that the employee had celiac disease, and

that she was not attending the dinner for that reason, but he pointed out that Plaintiff had

a gluten problem and was going to the dinner anyway.

157.     Because the pressure to go to the dinner was so extreme and unreasonable and

unforgiving even if the basis for not attending was a gluten allergy, and because Plaintiff

was afraid that the other employee's decision not to go on the basis of her disability

would affect her employment, Plaintiff was forced to defend the other employee's

22

decision by telling Mr. Ellis that the other employee's condition was worse than Plaintiff's – even though Plaintiff's wheat allergy was life-threatening.

158.     Plaintiff went to the dinners because she was pressured to do so despite her disability.

## The Injury

159.     Prior to going gluten free in 1999, Plaintiff required 22 doses a day of prescription medication for asthma – and still could not breathe.

160.     After going gluten free, the asthma became manageable, and was controlled by the occasional use of a rescue inhaler, and, sometimes, a steroid inhaler.

161.     Plaintiff's doctors listed her allergy to wheat as "critical" in her medical records.

162.     Many people at the Firm were aware that Plaintiff had a life-threatening allergy to wheat and/or that she maintained a gluten-free diet because of wheat allergy, including her supervisor, Mr. Ellis, his paralegal, Diane Drake (who also maintained a gluten-free diet), and the Office Manager.

163.     On December 4, 2017, Plaintiff was working with Diane Drake, as they both were preparing a client for a mediation in Mr. Ellis' office in Burlington.

164.     There was no time to go out for lunch, so Plaintiff asked Ms. Drake if she wanted to split a gluten-free pizza from a restaurant that Plaintiff had safely used many times before. They agreed that Plaintiff would pay for the pizza, and Ms. Drake would order it and pick it up. Plaintiff reminded Ms. Drake to get a gluten-free pizza, and Ms. Drake responded "Of course." Ms. Drake then left Mr. Ellis' office and ordered the pizza outside of Plaintiff's earshot.

165.    Approximately 20-30 minutes later, Ms. Drake brought the pizza into Mr. Ellis' office, where Plaintiff was still preparing the client for the mediation.

166.    While continuing to prepare the client, Plaintiff took three bites of the pizza before realizing that it was not gluten-free.

167.    Ms. Drake immediately apologized and became very upset.  She said she had forgotten to order a gluten-free pizza.

168.    The next day, Plaintiff reported the incident to the Office Manager, Denise Smith.

169.    Plaintiff became very ill beginning on December 5, 2018, first with severe abdominal pain, and then followed by – over the course of hours, days, weeks and months -- severe diarrhea, "acute on chronic sinusitis" and a "severe and sustained" exacerbation of her chronic sinusitis, "acute pharyngitis," exacerbated asthma, severe inflammatory back pain, severe joint pain, fluctuating autoimmune hearing loss that now requires hearing aids, chronic and painful inflammation in her ankles, a severe vitamin D deficiency (brought on or exacerbated by the months of severe diarrhea), a yeast infection in her throat, tachycardia, irregular heartbeats, a partially collapsed lung, a chronically-swollen axillary lymph node, severe sleep disturbance, periods of cognitive impairment, damage to the corneas of her eyes due to dryness caused by the new autoimmune disease, and multiple additional conditions.

170.    Beginning on December 5, 2017, Plaintiff experienced severe and ongoing pain that made it impossible for Plaintiff to sleep, and the severe sleep disturbance caused other physical ailments, including periods of cognitive impairment and heart problems.

171.     Testing at Massachusetts General Hospital would later determine that eating wheat in December of 2017 caused a severe exacerbation of Plaintiff's IgE allergic inflammatory cells.

172.     In October of 2018, Plaintiff's total IgE count was more than 23 times the highest level of "normal."

173.     In other words, in every drop of blood, Plaintiff had 23 times the normal rate of allergic inflammatory cells.

174.     In addition, in January of 2019, Plaintiff was first tested for IgE-Wheat antibodies.  That test was positive, which confirmed her allergy to wheat, and also indicated that her immune system had still not been able to rid her body of wheat antibodies that were caused in reaction to the accidental ingestion of wheat in December of 2017.

175.     In contrast, a year later, in January of 2020, Plaintiff's blood work determined that her body had finally gotten rid of the IgE-wheat antibodies (which were now undetectable), and that her total IgE had accordingly declined to only 9 times more than the highest range of "normal."

176.     Because Plaintiff's inflammatory response affected so many body parts, her worker's compensation case was the epitome of the kind of "creeping" case that the partners bragged about litigating fiercely, especially when the claim was legitimate, where multiple body parts were affected and the insurance carrier would "own" every body part and the costs would be high over the course of the claimant's life.

177.     Accordingly, the partners were highly motivated to do whatever they could to limit the Firm's liability in Plaintiff's situation.

178.     And, while the Firm had worker's compensation insurance, their carrier was also one of the Firm's biggest clients.

179.     Travelers Insurance ("Travelers") not only gave the Firm a significant portion of the Firm's worker's compensation cases, it also gave a number of large subrogation cases to Mr. Ellis.

180.     For this reason as well, the Firm was motivated to do whatever it could to limit the Firm's and Travelers' liability.

181.     The Firm engaged in much of the conduct described herein in order to protect Travelers' as well as the Firm's relationship with Travelers.

182.     Plaintiff currently has eight treating physicians at Massachusetts General Hospital and three at Dartmouth Hitchcock Medical Center who are treating various aspects of this inflammatory condition that began the day after she ate wheat on December 4, 2017.

183.     Prior to eating wheat in December of 2017, Plaintiff rarely went to her primary physician, and had not seen a specialist (other than routine gynecological and dermatology exams) in years.

184.     Now, nearly 2 ½ years after the injury, Plaintiff's condition is slowly improving, and, while the process has been lengthy, she is hopeful for a full recovery.

185.     In the worker's compensation case, the Firm does not dispute the fact that Plaintiff has been diagnosed with over 20 inflammatory medical conditions since December 4, 2017.

186.     Nor does the Firm dispute the fact that Plaintiff accidentally ate wheat at work, as described above.

187.     The Firm does dispute causation.

188.     However, causation is clear, as Plaintiff explained in a January 27, 2020 email to

the Administrative Law Judge:

**1. <u>Status of the evidence of causation</u>**

As you may recall, multiple doctors have already opined that my various
symptoms were caused by eating a few bites of the wheat pizza (that was given
to me by the Ellis Boxer paralegal, during a work-meeting with the client, in
partner Stephen Ellis's office, after the paralegal had told me she was ordering a
gluten free pizza, which she forgot to do). I now have new supporting medical
opinions as well. Here is what I have so far:

**On December 3, 2018** — a year after the injury — Dr. Siddharthay
Parker, my gastroenterologist at Dartmouth Hitchcock Medical Center
("Dartmouth") who specializes in celiac disease and wheat allergy, examined me
for the ongoing abdominal pain, which started on December 5, 2017 and is still
ongoing to this day. Dr. Parker reported that: "She does carry a diagnosis of
wheat allergy. It is unclear to me at this time if this is celiac disease or an IgE
mediated wheat allergy. I favor the latter wheat allergy as opposed to celiac
disease. In either case avoiding wheat gluten in particular seems like a
reasonable plan. She appears to [have] done a good job with normal duodenal
biopsies [in 2015] suggesting that if she does have celiac disease [it] is under
good control with normal duodenal biopsies. . . . Given her history of asthma and
all her allergies I would favor an IgE mediated process or wheat allergy. Further
evaluation by allergy immunology may be helpful." Dr. Parker also noted that, "If
pain continues could consider CT Abd/Pel to rule out lymphoma (associated with
Celiac disease) versus repeat EGD/Colonoscopy."

**On June 21, 2019**, Dr. Daniel Hamilos, an allergy/immunologist at
Massachusetts General Hospital ("MGH") — who is world-renowned for his work
on chronic sinusitis — reached similar conclusions. **Dr. Hamilos is the Director
of Allergy Clinical and Translational Research at MGH, a professor at
Harvard Medical School, and his publications in the field of allergy
and sinusitis have been cited as authority 9,250
times.** *See* https://www.researchgate.net/profile/Daniel_Hamilos.

Dr. Hamilos wrote on June 21, 2019:

"Christina reiterated that she got very sick after eating wheat in 12/17. This
was the start of her sinus problems and prompted her initial visit with
me. Overall she is much improved since beginning the concentrated
budesonide rinse, but she still has difficulty sleeping, pain in the left upper
quadrant that can be triggered by eating wheat. She has been on a strict

gluten-free diet for 20 years.  She had one accidental exposure in 2015 and no further exposures until 12/17 at which time she accidentally ate 3 bites of a wheat-containing pizza and developed severe diarrhea for months.  This was so severe that she became vitamin D deficient (vitamin D level 6.4).  Her chronic rhinosinusitis went out of control within 48 hours after eating wheat and persisted for months thereafter until she began the concentrated budesonide rinse.  She took prednisone plus multiple antibiotics 8 times between 12/17 and 12/18.

"1/24/19 wheat IgE 0.42 (borderline positive)
"Assessment:

"Christina gives a remarkable story of wheat induced diarrhea and severe chronic rhinosinusitis.  I told her that I cannot explain the mechanism for the relationship between wheat intolerance and chronic rhinosinusitis, although it is clear from her history that accidentally eating wheat in 12/17 triggered a severe and sustained exacerbation of her chronic rhinosinusitis. Therapeutically, I recommend she continue a strictly gluten free diet."

On July 11, 2019, Dr. Stephanie Mathew, a rheumatologist at Dartmouth who specializes in sensorineural hearing loss, diagnosed me with a systemic inflammatory condition and inflammatory back pain.  Dr. Mathew wrote:

"Christina Rainville is a 57 y.o. Female who presents today with a history of wheat allergy, chronic rhinosinusitis, chronic abd pain, snhl [sensorineural hearing loss] and hla b27 pos along with what sounds fairly consistent with inflammatory back pain.

"I advised her that there is likely an overlap of each of these and there could be a contribution of the 2017 incident to her current symptoms.  And SHL, and joint pain have been reported with celiac alone as well.  At this time I think she warrants further evaluation esp given the reports of sig improvement in her symptoms with courses of corticosteroids."

On August 8, 2019, a CT scan of my abdomen and pelvis ruled out lymphoma as the cause on my ongoing conditions.

On September 19, 2019, Dr. Andrus, cardiologist at Dartmouth, advised me that the Holter monitor (which I had worn for 24 hours) showed that my heart was beating faster than it should, given what I was doing at the time (tachycardia).  In his notes, Dr. Andrus wrote that:

"[S]he wore a Holter monitor [in] the summer with symptoms correlating with sinus rhythm or sinus tachycardia but she did not have any of her strong

palpitations.  She has had no syncope.  She does wonder whether the budesonide may be somehow promoting the palpitations."

Dr. Andrus concluded:

"Palpitations:  I suspect her sympathetic nervous system is activated when she has stressed in the context of a flare of her autoimmune disease this is associated with some atrial or ventricular ectopy. I think it [would] be helpful to capture some of the stronger symptoms that she is experiencing as well as to be best able to counsel her.  We will set her up for a Zio Patch."

**On October 7, 2019**, Dr. Hamilos (MGH) discussed "12 different inflammatory conditions, including chronic sinusitis, asthma, diarrhea, fluctuating sensorineural hearing loss, palpitations/tachycardia, intermittent severe/chronic abdominal pain below the left bottom rib, inflammatory back pain, chronic pain in many other joints, cognitive issues, severe ongoing difficulty sleeping on a nightly basis, difficulty swallowing meat and rice at times, pre diabetes (diagnosed 9/19) and systemic inflammatory condition." Dr. Hamilos concluded that, "Her various inflammatory conditions could certainly have some commonality, but they are also very different problems needing to be addressed separately."

**On November 4, 2019**, Dr. Liliana Ramirez Gomez, a neurologist at MGH who specializes in inflammatory neurological problems, examined me, conducted a neurological assessment, and then wrote:

"Diagnosis is consistent with cognitive concerns
"At this point I recommend further evaluation to determine the extent and profile of her cognitive difficulties
"Etiology is likely to be multifactorial, including chronic difficulties with sleep and hearing loss."

**On November 13, 2019**, Dr. Bruce Andrus, cardiologist at Dartmouth, reviewed the results of a Zio Patch that had monitored my heart for 14 days.  Dr. Andrus reported "atrial and ventricular premature beats."  Dr. Andrus diagnosed me with heart palpitations, and he wrote:

"Not sure if they are associated with chronic inflammation
"I think it is likely that sleep deprivation contributes due to a sympathic nervous system activation"

**On November 18, 2019**, Dr. Kelsey Jordan, optometrist at Dartmouth, examined my eyes and diagnosed me with "Dry eye syndrome OU."  Dr. Jordan wrote that this is "Likely related to her inflammatory conditions."  A few weeks after this appointment, Dr. Jordan telephoned me and explained that she

diagnosed me with dry eye syndrome because she saw damage to the surface of both of my corneas, which she said is generally caused by a rheumatological condition.

**On November 22, 2019**, Dr. Hamilos (MGH) noted: "She is also wondering if she should risk walking down the bread aisle at the grocery store and I recommended against doing so given the severity of her symptoms."

**On December 2, 2019**, Dr. Robert Friday, my treating rheumatologist at MGH, who is also an instructor at Harvard Medical School, opined that, "We discussed at her initial visit and again today how she seems to have a sensitivity to inflammatory stimuli, such that a cascade of inflammatory disease symptoms are invoked by other immune stimuli. . . . It is conceivable that her sensitivity to gluten may trigger a cascade of inflammatory events upon exposure to gluten, as she reports occurred since inadvertent exposure to gluten in December of 2017."

**On December 19, 2019**, I saw Dr. Alessio Fasano at MGH.  **Dr. Fasano is the leading expert in the world on celiac disease, non-celiac gluten sensitivity and wheat allergy.  His current titles at Harvard Medical School and MGH include the following:**

> **W. Allan Walker Chair in Pediatric Gastroenterology and Nutrition**
> **Division Chief, Pediatric Gastroenterology and Nutrition**
> **Founder and Director, Center for Celiac Research**
> **Director, Mucosal Immunology and Biology Research Center**
> **Associate Chief for Basic, Clinical and Translational Research**
> **Professor of Pediatrics, Harvard Medical School**

**Dr. Fasano's publications have been cited as authority 24,569 times.**  *See* https://www.google.com/amp/s/www.researchgate.net/profile/Alessio_Fasano/amp

After reviewing my medical records in detail and examining me, **Dr. Fasano told me that my "belligerent" immune system was kept under control for many years by avoiding wheat and gluten, and that accidentally eating a small amount of wheat pizza in 2017 put my immune system "over the edge," such that it is now attacking "every part of [my] body."  Dr. Fasano also told me that he believes that my difficulty swallowing is caused by inflammation.**  Dr. Fasano asked me to follow up with Dr. Hamilos to conduct additional testing (most of which has now been completed, and the results further support Dr. Fasano's conclusion) and to follow up with Dr. Parker (gastroenterologist at Dartmouth) to rule out an allergic condition called "EOE" in my esophagus.  I have scheduled the appointment with Dr. Parker, and Dr. Parker may require an endoscopy.  My follow-up appointment with Dr. Fasano is

scheduled for <u>June 11th</u>, and I expect to have all of the additional testing he requested completed prior to that appointment.

**On January 2, 2020**, I discussed Dr. Fasano's opinion that eating a small amount of wheat in December of 2017 caused my immune system to go "over the edge" with Dr. Hamilos. (MGH). **Dr. Hamilos told me that he agreed with Dr. Fasano. In fact, Dr. Hamilos said that he had reached that same conclusion some time ago.**

In contrast, not a single doctor has opined that my systemic inflammatory condition was caused by something <u>other</u> than eating wheat in December of 2017.

(Emphasis in original.)

### **Periods of Cognitive Impairment**

189.     Immediately after becoming very ill on December 5, 2017, Plaintiff developed periods of cognitive impairment, and she started to make mistakes at work because of her illness.

190.     Plaintiff had never made mistakes like these before.

191.     To be clear, Plaintiff was generally able to perform at her normal, very high level.

192.     The periods of impairment were brief and intermittent, and the mistakes were few (approximately five mistakes in eleven months) and far between.

193.     Plaintiff knew that she had made these mistakes because she was in a lot of pain and not sleeping, and thus, that eating wheat – which had caused the pain, which, in turn, had made it impossible to sleep -- had caused the periods of cognitive impairment.

194.     Plaintiff has now been assessed by doctors at MGH, and at least three treating doctors have opined that the cognitive deficiencies (which are ongoing) are caused by sleep disturbance (which is also ongoing, but improving).

## Plaintiff's First Error Occurred Within Days After Eating the Wheat Pizza

195.     The mediation on December 4, 2017 involved an employment dispute where the Firm represented a client who alleged wrongful termination and a failure of her employer to pay overtime.

196.     Plaintiff had handled several similar cases in the past, and she was well aware that the law requires that all settlement proceeds in such cases are taxable.

197.     Prior to and during the mediation on December 4, 2017, Plaintiff repeatedly informed the client that the settlement proceeds would be taxable.

198.     However, after becoming ill on December 5, 2017, Plaintiff inexplicably informed the client that a portion of the settlement would not be taxable, even though Plaintiff had always known that the proceeds would be taxable and even though Plaintiff had drafted a settlement agreement that made clear that the proceeds would be taxable.

199.     Plaintiff cannot establish the date of her error because the Firm has refused to produce the records in the worker's compensation case, but, on information and belief, it was within days of eating the wheat pizza.

200.     At some point in January or February, the client received a Form 1099 from her former employer, and she was irate that that portion of the proceeds was being taxed.

201.     Plaintiff engaged in an exchange of emails with the client, and with opposing counsel, regarding Plaintiff's wrong belief at that time that a portion of the settlement proceeds should not be taxed.

202.     Plaintiff copied Mr. Ellis on some of those emails.

203.     Mr. Ellis was very upset, and emailed Plaintiff, telling her that the proceeds were
         taxable, and that he really wished that Plaintiff had spoken to him first before she got "so
         far into the weeds" – or words to that effect.

204.     Plaintiff recognized immediately after seeing Mr. Ellis' email that she had made a
         error.  She was extremely upset, as she had never made an error like that before, and she
         could not understand how she could have known the law clearly prior to the mediation
         and yet somehow become terribly confused immediately after the mediation.

205.     She realized that she had made the error because she was so ill from eating wheat
         and not sleeping.

206.     For a period of months following the injury, Plaintiff's pain was so severe during
         the night that she was unable to sleep except for short intermittent periods of 15-25
         minutes (for the first several weeks) and 30-45 minute intervals (for the next several
         months).  For many months, Plaintiff only got an average of 2 or 3 hours of sleep a night.

207.     This severe sleep disturbance continued throughout the time Plaintiff remained
         employed at the Firm.

208.     After realizing her error with the client, Plaintiff telephoned Mr. Ellis in his
         Burlington office to tell him how upset she was that she had made this mistake and to
         apologize.

209.     In that conversation, <u>Plaintiff expressly told Mr. Ellis that she had known that the
         proceeds were all taxable prior to the mediation and she had told the client that before
         and during the mediation, but she had "accidentally eaten wheat" on the day of the
         mediation, which made her very sick, and she was in a lot of pain and not sleeping and
         somehow became confused about the law.</u>

210.    As soon as Plaintiff mentioned her work injury and the severe debilitating effects

that followed, Ms. Ellis immediately cut her off and changed the subject, thereby making

it very clear that he did not want to discuss Plaintiff's illness. Because Mr. Ellis was

Plaintiff's supervisor, she was in no position to fight with him on that, and she was also

too sick to argue, so she did not provide further details.

211.    Plaintiff told Mr. Ellis that she would draft an email response to the client's angry

email, and send it first to Mr. Ellis for his review and approval. Mr. Ellis agreed.

212.    Mr. Ellis' conduct during that telephone conversation was consistent with Mr.

Ellis' recommendations to his clients, as Plaintiff had participated in a telephone call with

Mr. Ellis and a client (at a regional bank), where the client was seeking advice about an

employee who had disclosed a disability and the client wanted to know more about the

disability.

213.    Mr. Ellis stopped the conversation with the client to make a very firm point. Mr.

Ellis instructed the client, in words to the effect of:

> "You know, I'm going to tell you something that I tell all of my clients. When
> you are dealing with an employee who has a disability, you really don't want to
> know. You definitely do not ask the questions that you are thinking of to get
> more details. The less you know, the better, because then you can say that you
> never knew, and it reduces your risk of liability. So definitely don't ask anything,
> and change the subject or end the conversation. That's what you need to do."

214.    Immediately after that phone call with the bank client, Mr. Ellis spoke to Plaintiff

and explained how "very important" it is that employers do not ask questions to find out

about their employee's disability, because it only increases their risk of liability on a

disability claim.

215.     After the telephone call with Mr. Ellis about the tax error regarding settlement proceeds, Plaintiff prepared a draft email to the client, where Plaintiff admitted her mistake, apologized for her error, accepted responsibility, and, on information and belief, explained that she had gotten very ill after eating wheat (which had happened in front of the client and was a significant event at the time) and explained that Plaintiff had not been sleeping.

216.     Plaintiff sent that draft email to Mr. Ellis for approval to send to the client.

217.     **The Firm has apparently destroyed this email of Plaintiff's to Mr. Ellis as the Firm's counsel has repeatedly represented to the Administrative Law Judge in the worker's compensation case that the email "does not exist," despite the fact that its existence is proven by a later email.**

218.     Mr. Ellis called Plaintiff immediately after receiving the draft email.

219.     Mr. Ellis explained to Plaintiff that, when he was an associate at a law firm in Philadelphia, a partner had taught him that you never apologize, and never admit a mistake, "especially to a client."

220.     Plaintiff expressed disagreement with Mr. Ellis, as it was her practice to always accept responsibility, and she also told him that the email records clearly showed that she had made an error.

221.     Mr. Ellis reprimanded Plaintiff; told her that she had accepted responsibility in the past "to a fault"; and directed her to re-draft the email without admitting any mistake and without apologizing.

222.     Plaintiff prepared a revised email pursuant to Mr. Ellis' direction and sent it to him on February 9, 2018.

223.     The revised email clearly referenced the earlier email (which the Firm has now

apparently destroyed) and the discussion with Mr. Ellis whereby he instructed Plaintiff to

redraft the first email to not admit any mistake and to not apologize, as Plaintiff wrote:

> "I still kind of feel that maybe I should admit my mistake – as my emails clearly
> show my error – with the hope that it might appease her, but I have drafted this in
> the light that you and I discussed yesterday.  In this draft, I say I am sorry, but I
> never come out and say that I made a mistake."

(Emphasis added.)

224.     Mr. Ellis approved the revised email after removing one sentence, and Plaintiff

sent the revised email to the client.

225.     While employed at the Firm, Plaintiff developed significant concerns about some

of the partners at the Firm, such that she decided to forward potentially-important emails

to her personal email address on occasion because of her concerns that, if there were ever

a dispute, the records might "disappear."

226.     The fact that Plaintiff told Mr. Ellis that she made the tax mistake because she

was "in a lot of pain and not sleeping," is documented in written emails between Plaintiff

and Mr. Ellis in May of 2018 that Plaintiff forwarded to her personal email account at the

time.

227.     As Plaintiff anticipated, and as a part of the Firm's continuing bad faith conduct

in the worker's compensation case with the goal of obtaining a wrongful advantage in the

litigation, the Firm has wrongfully refused to produce any records at all, despite the

obvious relevancy, and despite Worker's Compensation Rule Rule 3.14000 that requires

all parties to produce relevant documents even before such records are requested.

228.    In April or May of 2018, Mr. Ellis asked Plaintiff to write something about the new marijuana law for the firm's website and possible publication (as Plaintiff had recently published an article in Vtdigger.org about a new employment-related law).

229.    Plaintiff drafted a proposed article and emailed it to Mr. Ellis.

230.    On May 9, 2018, Mr. Ellis telephoned Plaintiff in a rage. He was very angry about various things in the draft which he claimed were wrong. Rather than argue with her supervisor, Plaintiff accepted all blame (even though she believed she had not made any errors) and apologized.

231.    On May 9, 2018, Mr. Ellis sent Plaintiff an email, attacking Plaintiff's work on the article (**while admitting that he had not even read the new marijuana law**), and then he concluded:

> It appears that you wrote and gave me an article for publication without giving the issue the most basic analysis and that we would have published erroneous and misleading information if I had not questioned your analysis and conclusions. This is very troubling. **This is reminiscent of the incorrect assertions you made to the client regarding the taxation of her settlement. It makes we [sic?] question whether I can consistently rely on your legal analysis and judgment. I cannot conceive of any explanation that I would find very reassuring. . . . Clients will very quickly lose confidence in an attorney who provides erroneous legal advice. . . and confidence, once shaken, cannot be restored by retractions, revisions, explanations or apologies.**

(Emphasis added).

232.    The only reason Plaintiff has this email is because she forwarded it to her private email account.

233.    Plaintiff responded to Mr. Ellis by email on May 9, 2018, that she had accepted blame too quickly with regard to the article, that she had not made any mistakes in

interpreting the new law, and then she wrote the following about the tax mistake she had made shortly after eating the wheat pizza:

> **In terms of the other client, I have readily acknowledged my mistake, and I explained that I was in a lot of pain and not sleeping at the time, and of course, I have apologized.**

(Emphasis added.)

234.     The only reason Plaintiff has this email is because she forwarded it to her private email account.

235.     These email records are just two of countless records that the Firm has refused to produce in the worker's compensation litigation in the Firm's continuing course of bad faith conduct that began immediately after Plaintiff got ill.

236.     Mr. Ellis responded to Plaintiff's May 9th email on May 9th, and did not dispute the fact that Plaintiff had reported to him, back in February of 2018, that she had told him that she had made a mistake because she was "in a lot of pain and not sleeping."

237.     In fact, just as he had done when Plaintiff raised her injury, difficulty sleeping, and ongoing illness with Mr. Ellis over the phone, Mr. Ellis again ignored her statement about her work-related injury when she put it in writing.

238.     Again, the only reason why Plaintiff has this critical email from Mr. Ellis is because she forwarded it to her personal email account.

239.     Mr. Ellis' ignoring the written statement about Plaintiff's injury and ongoing disability was consistent with his strategy of making sure that he "knew as little as possible" of Plaintiff's injury or illness in order to limit the Firm's and Traveler's liability.

240.     In contrast, a normal, compassionate employer would have expressed concern and/or support about an employee's repeated discussion of debilitating health problems – including, for example, wanting to know if her condition had improved.

241.     Mr. Ellis' reaction to the contrary shows that he <u>knew</u> that Plaintiff's health issues were caused by a work injury, and that he was concerned about potential liability and therefore felt it necessary to shut down the conversation, whether the conversation happened over the phone or by email.

242.     Again, Mr. Ellis did not raise any discussion of Plaintiff's possible need for accommodations., despite the obvious need for flexible hours to assist with the sleep deprivation.

243.     Mr. Ellis had previously granted a flexible-hours accommodation due to sleep disturbance to a young lawyer who worked for him prior to Plaintiff.

244.     Any reasonable employer that wished to be compliant with the law, when faced with an employee whose performance had suddenly changed after an injury or illness and who informed the employer that the change in performance was caused by difficulty sleeping, would have asked the employee if starting work an hour or so later would help the employee.

245.     Instead, Mr. Ellis intentionally and repeatedly shut down all conversations on the subject and thereby sent a strong message that Plaintiff was not to discuss the matter further.

246.     Plaintiff complied with Mr. Ellis' clear directive not to discuss the matter further.

### The Mistakes Continued

247.      In addition to the mistake regarding the tax issue, Plaintiff made a few other mistakes while she was very ill.

248.      Under pressure in a telephone call with Mr. Ellis, after her injury, Plaintiff misread a scheduling order.

249.      When Mr. Ellis directed Plaintiff to obtain an expert in a case that Mr. Ellis was handling, she correctly told Mr. Ellis that he had already missed the deadline for submitting an expert report. Mr. Ellis disagreed and asked Plaintiff to pull up the order on her computer. Plaintiff obtained the order on her computer, and then – feeling pressured by Mr. Ellis, who had already told her she was wrong – misread the order and told Mr. Ellis (incorrectly) that he was correct and the deadline had not yet passed.

250.      While she was ill, Plaintiff also sent two emails to the wrong lawyer. On information and belief, the emails contained a draft confidential settlement agreement that identified the client.

251.      In both instances, the lawyer immediately notified Plaintiff that he had received the email in error and was destroying it.

252.      Mr. Ellis was copied on both emails. Mr. Ellis responded in an email to Plaintiff: "???"

253.      Plaintiff also read a draft of something Mr. Ellis had prepared in another case, one day when she was home sick after attending a doctor's appointment. Plaintiff sent an email asking about something that did not appear to be in the draft when it was, in fact, in the draft. Ms. Drake sent an email pointing out where the matter was set forth in the

draft. Mr. Ellis was copied on all of these emails. Mr. Ellis knew what Plaintiff was home sick at the time.

254.     As the mistakes continued, Mr. Ellis intentionally never broached the subject of accommodations. He avoided the topic in order to be able to claim that he did not know that Plaintiff required accommodations, and to limit the Firm's and Traveler's liability.

### The Firm Knew Plaintiff Was Very Ill

255.     Mr. Ellis and the Firm were well aware that Plaintiff was very ill for the entire time following her injury on December 4, 2017 until she resigned on November 8, 2018.

256.     Mr. Ellis was fully aware of the extent of Plaintiff's illness. In addition to being told about it orally by Plaintiff in early 2018, and in writing on May 9, 2018, Plaintiff sent Mr. Ellis several emails about how she was not feeling well, not coming into the office and/or going to the doctor.

257.     Plaintiff also told Mr. Ellis that she was very sick with a sinus infection, that the infection was not responding to antibiotics and prednisone, and that her condition had gotten so severe that she was going to see a specialist at Mass General.

258.     Yet again, Ms. Ellis shut the conversation down and would not allow Plaintiff to provide any details of her illness beyond what she had quickly blurted out. He said he had to take another phone call – despite the fact that there was no indication of another call.

259.     Typically, when Mr. Ellis had another call, Plaintiff would hear either his office phone or his cell phone make a noise to indicate that there was another call, or the voice of his assistant telling him that he had another call. On this occasion, when Mr. Ellis said he had another call, there was no sound to indicate that there was another call.

41

260.     On information and belief, Mr. Ellis lied when he said he had another call in order
to stop the conversation before Plaintiff said anything more about her illness or injury, in
order to limit the Firm's and Traveler's liability.

261.     Anyone who was in contact with Plaintiff following the injury was aware of how
sick Plaintiff was, as her illness was so obvious in her voice and her demeanor that Ms.
Drake, after speaking to Plaintiff on the phone, told Plaintiff, "Oh my God, I told Steve
[Ellis] how sick you sounded on the phone.  Are you sure you are okay?  Shouldn't you
be home?"

262.     Partner Justin Sluka was also aware of all of the details of Plaintiff's injury and
illness.

263.     Mr. Sluka, whose office was next to Plaintiff and who spoke with Plaintiff nearly
every day, was aware of the fact that Plaintiff accidentally ate wheat on December 4,
2017, that the wheat pizza was given to her by Diane Drake, and that Plaintiff became
very ill immediately thereafter and remained very ill as long as she remained at the Firm.

264.     Plaintiff provided Mr. Sluka near-daily updates from December 5, 2017 until her
departure from the firm about how sick she was, what medications she was taking, what
tests her doctors had ordered to try to determine the cause of the ongoing abdominal pain,
the results of those tests, what doctors she was seeing, her difficulty sleeping, and about
her treatment at Mass General.

265.     On one occasion, Plaintiff shared with Mr. Sluka the fact that she had not slept a
single minute the night before.

266.     Mr. Sluka was well aware that Plaintiff was dramatically sicker than she had been
at any time while at the Firm prior to December 5, 2017.

42

267.    Mr. Sluka witnessed Plaintiff being extremely congested and coughing constantly for months.  Mr. Sluka witnessed Plaintiff holding her left upper abdomen as she demonstrated to him where the pain was.  Mr. Sluka witnessed Plaintiff having difficulty with her hearing.  Mr. Sluka might have also noticed frequent trips to the bathroom.

268.    Mr. Sluka was a partner at the time, and his knowledge constitutes knowledge of the Firm.

269.    Plaintiff also took daily walks (which are essential for her immune health, regardless of how sick Plaintiff felt at the time) with the Firm's office manager, Denise Smith.  During those walks, Plaintiff gave Ms. Smith regular updates about her condition, as the two were friendly and Ms. Smith understood the issues because Ms. Smith has celiac disease.

270.    Ms. Smith knew how sick Plaintiff was from December 5, 2017 until her departure from the firm; Ms. Smith knew it was a significant change from Plaintiff's condition before she ate wheat; and Ms. Smith was fully aware of all of Plaintiff's doctor appointment and the tests and details of those appointments.  Ms. Smith was personally aware of Plaintiff's ongoing complaints of severe abdominal pain, severe diarrhea, exacerbated asthma, chronic cough, tachycardia, severe sinus infection that stopped responding to antibiotics and prednisone, and the fluctuating hearing loss.  Ms. Smith also surely noticed that Plaintiff was severely congested and coughing for months on end.

271.    Ms. Smith was also aware that Plaintiff attributed all of these conditions to eating wheat on December 4, 2017.

272.    Ms. Smith was also aware that Plaintiff never complained of these medical conditions prior to December 5, 2017.

273.     Ms. Smith was the Firm's office manager at the time, and her knowledge constitutes knowledge of the Firm.

274.     Plaintiff also spoke to managing partner William Blake several times a week, as it was his practice to "check in" with her.  Mr. Blake surely noticed how Plaintiff was severely congested and coughing nonstop on multiple occasions, over the course of months, when they spoke.

275.     Indeed, on several occasions, Mr. Blake declined to step foot in Plaintiff's office, as he expressed fear of catching whatever it was she had – even though Plaintiff had told him that it was an immune disorder and she was not contagious.  Instead, Mr. Blake spoke to her from the hallway, or he closed her door to keep her "germs" from getting out into the hallway and did not speak to her at all after seeing and hearing how sick she was.

276.     During some of those conversations, Plaintiff also told Mr. Blake that she was very ill and having various tests and going to Mass General for treatment because her sinus infection was out of control.

277.     Just as Mr. Ellis made clear that he did not want to hear about Plaintiff's health issues, Mr. Blake similarly immediately stopped Plaintiff every time she attempted to share health information with him.  He changed the subject or ended the conversation by walking away.

### There Was an Accommodations Which Would Have Helped, and Plaintiff Would Have Taken a Medical Leave Rather than Resign, Absent the Firm's Fraudulent Scheme to Mislead Plaintiff

278.     As Plaintiff communicated to Defendant Ellis, Plaintiff knew that she was making mistakes because she was not sleeping.  Indeed, the mistakes tended to happen after particularly bad nights where Plaintiff got fewer than three hours of sleep.

44

279.     Had Mr. Ellis or the Firm advised Plaintiff that she was going to be terminated

due to her mistakes, or even allowed her to engage in a conversation about whether there

were any accommodations which could help her performance, Plaintiff would have

requested a simple accommodation that she be allowed to work flexible hours so she

could sleep in and start a few hours late, and, if necessary, that she be excused from work

on the days when she was unable to get a sufficient amount of sleep even with the

accommodation.

280.     If the accommodations had failed to improve her performance, Plaintiff would

have taken a medical leave and immediately filed a worker's compensation complaint

rather than resign.

281.     Despite knowing about Plaintiff's disabling condition, which had been caused by

eating wheat at work, the Firm never offered Plaintiff accommodations at any time, until

after she submitted her resignation.

282.     After accepting Plaintiff's November 8, 2018 resignation, Defendant Ellis finally

offered, in his November 8, 2018 email, to have a conversation about accommodations:

"Please let us know if you require any accommodations for your condition during the

remaining period of your employment."

283.     Mr. Ellis' email proves that the Firm *could have, and should have,* offered

Plaintiff accommodations in the prior 11 months, and knowingly failed to do so.

284.     The Firm offered Plaintiff accommodations only after getting what it had hoped to

accomplish with its scheme, described below, of falsely representing that there was

insufficient work to support her position:  her resignation.

285.     The Firm then repeatedly used that resignation in its defense in the worker's

compensation litigation, claiming that Plaintiff was not entitled to lost wages because she

resigned.

## The Firm Falsely Coerced Plaintiff's Resignation by Repeatedly Telling Her that the Firm Did Not Have Enough Work, and Constructively Discharged Her by Taking Her Work Away and Demeaning Plaintiff by Giving her Paralegal Work and Taking that Away

286.     After the May 9, 2018 email exchange where Defendant Ellis complained again

about the mistake Plaintiff had made in December of 2014, and concluded that, "I cannot

conceive of any explanation that I would find very reassuring. . . . ," Mr. Ellis told

Plaintiff that "the next time there is a lull" in his work, that he "would have to let her go."

287.     He then started to greatly reduce the work that he gave her, thereby creating the

"lull."

288.     Then, in order to prevent Plaintiff from requesting accommodations or filing a

worker's compensation claim, the Firm concocted a scheme whereby the partners

repeatedly lied to Plaintiff to let her believe that the Firm had insufficient work to support

her position, and that she was being let go for that reason – which falsely made her

believe that the decision to terminate her had nothing to do with her performance or her

illness.

289.     On information and belief, the Firm's records will show that Mr. Ellis' billable

hours increased while Plaintiff's billable hours decreased, compared to the prior year,

because Defendant Ellis was handling work that he previously would have given to

Plaintiff.

290.     Similarly, in the fall of 2018, Managing Partner William Blake took back two worker's compensation cases that he had given to Plaintiff to handle many months before.  Plaintiff did not understand why Mr. Blake was taking the cases away when she needed work.

291.     Mr. Blake explained that he was taking the cases back because Plaintiff would be leaving when she became State's Attorney and that he should transition the cases back with the client before then.

292.     Plaintiff had asked for permission to run for State's Attorney because the firm had made it explicitly clear that her employment was going to be terminated, she was therefore applying for jobs and finding it difficult to obtain new employment due to her age (56), and running for State's Attorney was a job opportunity when her termination was imminent.

293.     Plaintiff told Mr. Blake that she did not think that she would win the election, and, even if she did, she would not take office until January.  Mr. Blake indicated that that didn't matter, he was taking the cases back.

294.     Mr. Blake thus made very clear that Plaintiff had no future at the firm regardless of whether she won the election, and that his excuse about taking the cases back because she was going to become State's Attorney was false.

295.     Plaintiff told Mr. Blake that she had no work, so Mr. Blake's stated reason for taking the cases back especially made no sense and was obviously not truthful.

296.     It made no sense for the Firm to pay Plaintiff to sit there and do nothing, but that was the position that Mr. Blake, Mr. Ellis, and the Firm created for Plaintiff to force her resignation.

297.    Mr. Blake must have then communicated that Plaintiff had no work to partner Jennifer Moore, who then angrily came to Plaintiff's office and gave her an assignment.

298.    Ms. Moore humiliated and demeaned Plaintiff by telling Plaintiff that she was giving Plaintiff work that she would normally give to a paralegal, but that the paralegal was busy.

299.    Ms. Moore later sent Plaintiff an email telling her to stop work on the assignment. Ms. Moore did not give a reason for stopping work.

300.    When Plaintiff resigned on November 8, 2018, Defendant Ellis sent her an email stating that, "the current volume of work cannot support your position":

> I understand from Bill that you approached him yesterday and acknowledged that the current volume of work cannot support your position, but requested that you be permitted to resign voluntarily at the end of November and that your health insurance continue until the end of the year. Bill has asked me to respond, as your primary supervising attorney. Your proposal is acceptable. In fact, I had been intending to have this conversation with you, but had deferred it in light your political campaign.

(Emphasis added).

301.    Notably, Mr. Ellis' email also clearly stated that Plaintiff was "permitted to resign voluntarily" by agreement, which shows that her resignation was not voluntary at all.

302.    Shortly after Plaintiff left the Firm, Mr. Ellis' paralegal, Diane Drake, told Plaintiff that Mr. Ellis had told her, in the summer of 2018, that he was going to terminate Plaintiff's employment because Plaintiff was making too many mistakes, and that he was going to terminate Plaintiff at the end of the year (2018).

## The Firm's Effort to Recruit a "Newbie" Lawyer

303.     Mr. Ellis' statement about the Firm not having the "volume of work" necessary to support her position was patently false at the time he wrote it, as the Firm had been actively recruiting for a younger lawyer to replace Plaintiff for more than a month, and re-advertised for the position on the day Plaintiff asked to resign voluntarily – November 8, 2019.

304.     In the early fall of 2018, Plaintiff learned that the Firm was advertising to hire a new associate. Plaintiff saw the ads online.

305.     On October 17, 2018, or earlier, the Firm started interviewing young lawyers for Plaintiff's position.

306.     The Firm's recruitment ads expressly stated that the Firm would accept someone with no experience if the candidate had good academic credentials.

307.     On October 17, 2018, partner Jennifer Moore sent an email to everyone at the firm, stating that: "There is a woman coming in today to interview at 9:30 a.m."

308.     The woman was clearly interviewing for Plaintiff's position, as there were no other positions which needed to be filled and the firm had advertised that it was looking for a lawyer. Plaintiff was told by paralegals who met the woman in the lobby that the woman being interviewed was a lawyer.

309.     On information and belief, the woman who interviewed for Plaintiff's position on October 17, 2018 did not work out.

310.     Plaintiff, who was very ill, was confused about why the Firm could be recruiting a lawyer when the partners had told her that there was not enough work for her, and she assumed that the Firm would not go forward with the hire.

311.     After seeing an ad for the new associate position, Plaintiff spoke to Mr. Blake, and offered to take a reduction in salary so that she would be paid the same as a new junior associate with no experience.

312.     This was in accordance with Mr. Ellis's suggestion back in December, before Mr. Ellis was aware of Plaintiff's injury, illness and disability.

313.     Mr. Blake declined Plaintiff's offer to be paid the same as a new hire.

314.     Mr. Blake said: "We want a newbie.  You know, someone we can train."

315.     Mr. Blake's admission demonstrates that age discrimination was a material factor in the Firm's decision to terminate Plaintiff's employment.

316.     On November 8, 2018, the very same day that Mr. Ellis sent Plaintiff an email proclaiming that "the current volume of work cannot support your position" (emphasis added), the Firm re-advertised for the young lawyer position on Indeed.

317.     Plaintiff received an email from Indeed about the opening.

318.     The Firm promptly hired a new associate, who started shortly after Plaintiff left the Firm.

319.     On information and belief, the new associate had just recently graduated from law school.

### The Firm Created a False Document to Support Their Defense to the Worker's Compensation Case

320.     Mr. Ellis sent the patently untruthful November 8, 2018 email stating that the Firm did not have the "volume" of work to support Plaintiff's position in order to create a false record which would support the Firm's false position that the Firm was terminating Plaintiff's employment for reasons that were unrelated to her age or her illness.

321.     Mr. Ellis knew the email was false at the time he sent it.

322.  In sending that email, Mr. Ellis assisted the Firm's effort to cover up the fact that the Firm had decided to terminate Plaintiff's employment because of her age and disability, all while intending to replace her with a much younger lawyer.

## The Firm Then Used This False Defense in the Worker's Compensation Case

323.  In worker's compensation cases, parties are obligated to turn over all relevant documents without any documents even being requested. *See* Rule 3.14000.

324.  Despite this, the Firm has refused to turn over a single document, other than Plaintiff's medical records, which Plaintiff can obtain on her own, and two emails which the Firm was ordered to produce.

325.  Plaintiff specifically requested documents relating to the mistakes she made at work, and the Firm's decision to terminate her employment and refusal to provide a reference.

326.  The Firm has refused to produce any records, even though Plaintiff's first formal written report of injury expressly listed "brain fog" as a part of her disability, and identified mistakes she had made at work.

327.  The Firm submitted a response to Plaintiff's appeal of the denial of the claim which contained numerous false statements, including the following:

> "The claimant exhibited no outward signs to her employer that she was suffering any symptoms from December 4, 2017 through her voluntary resignation from employment on November 8, 2018."

> That claimant's resignation was "voluntary"

> "The claimant reported no work injury until November 8, 2018."

> "There was no evidence at the time that claimant was suffering from debilitating symptoms . . . ."

> "Whatever hires the employer made in the ensuing months reflected personnel needs which arose at that time. These needs were independent of the lack of work for the claimant. . . ."

328.     The Firm was unaware that Plaintiff, who anticipated that her employer would withhold or destroy documents and then make false arguments in court, had forwarded important records in her possession to her private email, in order to protect the truth in case a dispute ever arose.

329.     Thus, Plaintiff had some records, as described above, to prove the falsity of the Firm's statements, including Mr. Ellis' emails from May 9, 2018 and November 8, 2018, records of the Firm's advertising for the position and interviewing a candidate in the month prior to Plaintiff's resignation, and a copy of Plaintiff's first formal written report of her injury.

330.     The Firm admitted to the Administrative Law Judge that Plaintiff's records were authentic – the Firm stated that Plaintiff had "diverted" documents to her private email, *see* August 5, 2019 Objection to Motion to Compel Discovery, at 2, and the Firm offered no explanation for why these highly-relevant documents were not disclosed.

331.     The Firm is continuing to refuse to produce any and all records other than medical records which Plaintiff can obtain on her own.

332.     The Firm's continuing refusal to produce any and all records relating to Plaintiff, including specifically those records which concern her periods of cognitive impairment and the Firm's decision to terminate her employment, and even her first written full report of the injury, is a part of the continuing coverup of the real reason why the Firm terminated her employment: in order to evade liability in the worker's compensation

case, to protect the Firm's relationship with Travelers, and to replace Plaintiff with a younger lawyer.

333.     If the Firm truly terminated Plaintiff because there was insufficient work to support her position, the records would show that, and the Firm would have produced them.

334.     If Mr. Ellis had somehow miraculously overcome his concern about Plaintiff's mistakes that began when she became ill from her worker's compensation injury, and if he had never told Diane Drake that he was going to fire Plaintiff at the end of the year because there were "too many mistakes," the records would show that and the Firm would have produced those records.

335.     The reality is clear: the records prove that the Firm terminated Plaintiff's employment, that her resignation was not voluntary, that the Firm lied about not have sufficient work to support her position and further acted to coerce her resignation, and then falsely argued to the Department of Labor that she resigned voluntarily. *See* The Firm's August 5, 2019 Objection to Motion to Compel Discovery, at 4.

336.     The truth is that the Firm did all that to cover up the fact that the Firm was terminating Plaintiff's employment because she was ill and the partners wanted someone younger, and to prevent Plaintiff from asking for accommodations or filing a worker's compensation claim.

337.     The Firm is still covering that up, despite their legal obligation under the Worker's Compensation Rules to produce the records.

338.     The evidence is clear that the Firm always had sufficient work to support Plaintiff's position, and that the Firm stopped giving one of its most profitable lawyers

work. The only explanations for that was Mr. Ellis' and the Firm's concern that Plaintiff
might require accommodations and they wanted someone younger.

339.      Mr. Ellis and the Firm lied to Plaintiff, repeatedly, about the reason for her
termination in order to prevent her from requesting an accommodation, and to create a
false record of an alternative reason for her termination.

340.      Mr. Ellis and the Firm actively worked to coerce Plaintiff into resigning, by
taking work away, humiliating her with paralegal work, and refusing to give her work –
all while they had enough work to hire a new young attorney right out of law school.

341.      The Firm constructively discharged Plaintiff by taking all of her work away,
humiliating her by giving her paralegal work, and then taking that work away as well –
leaving her with no work at all.

342.      It does not make any sense that a firm would fire one of its most profitable
lawyers when it had adequate work to support a new lawyer, absent age discrimination
and disability discrimination.

### The Firm's Refusal to Provide a Reference for Plaintiff

343.      After Plaintiff had tendered her resignation orally to Mr. Blake, Plaintiff asked
Mr. Blake whether the firm would serve as a reference for Plaintiff for a future employer.

344.      Mr. Blake told Plaintiff that the firm had a policy and did not give references, and
that Stephen Ellis, "the employment law guru," said they should not give references for
anyone.

345.      That statement was patently false. There was no such written policy, there was no
such informal policy, and the Firm gave references to future employers as a matter of
course.

346.    Indeed, Mr. Ellis had previously told Plaintiff that a prior associate who worked

for him had asked for a reference, and that he had agreed to serve as a reference even

though there were "a lot of problems" with that associate.

347.    In addition, Mr. Ellis' assistant found a good job after getting laid off, with a good

law firm in Burlington. It is highly unlikely that a law firm would have hired a paralegal

without conducting basic due diligence, including speaking to someone at the Firm as a

reference since she had worked there for the last 5+ years and was made to leave

involuntarily in a layoff.

348.    The only explanation for the Firm's conduct is that the Firm decided to terminate

Plaintiff's employment due to the mistakes she made because of her work-related injury

and illness.

## Plaintiff's First Formal Written Report of her Injury

349.    No one at the Firm asked Plaintiff to write up her worker's compensation claim,

until after she offered to resign on November 8, 2018.

350.    At that point, having obtained the outcome that the Firm was trying to achieve,

Mr. Blake asked Plaintiff to write up the worker's compensation claim in an email, which

she sent to him later that day.

351.    In that First Report of Injury, submitted to Mr. Blake on November 8, 2018,

Plaintiff alleged that eating wheat on December 4, 2017 caused the following conditions:

"considerable" abdominal pain, sometimes a 10 on a scale of 1-10; severe pain in spine

and many joints and bones; difficulty sleeping; "brain fog" which caused mistakes at

work; severe vitamin D deficiency (6.4); collapse of immune system; severe sinus

infection that was not responding to antibiotics or prednisone; tachycardia; a decline in

hearing; and a "cascading of immunological problems."

352.     The written First Report of Injury is one of many documents that the Firm has

refused to produce in the Worker's Compensation case, despite its obvious relevancy to

the matter.

353.     The only reason Plaintiff has a copy of the First Report of Injury is because she

forwarded a copy to her personal email on November 8, 2018.

354.     Mr. Blake spoke to Plaintiff after reading her First Report of Injury to tell her that

the carrier would likely deny the claim.

355.     The Firm's ongoing acts of misconduct and obstruction in the worker's

compensation litigation are admissible in this case to prove motive, lack of mistake or

accident, and a continuing course of conduct that began immediately after the Firm

became aware of her injury and disability.

## The Firm's Continuing Course of Bad Faith in the
## Worker's Compensation Case

356.     On December 5, 2018 – a year after the injury – a representative from Travelers,

Mr. Kelly, arrived at Plaintiff's home to interview her about the injury for the worker's

compensation case.

357.     While standing in the doorway of Plaintiff's home, before the interview began,

Plaintiff advised Mr. Kelly that she was on the autism spectrum and would require

accommodations for her disability for the interview.

358.     Without even finding out what the requested accommodations were, Mr. Kelly

agreed to whatever accommodations Plaintiff wanted.

359.     Plaintiff told Mr. Kelly that she also required that the recording have that

agreement on the record, and Mr. Kelly agreed.

360.     The audio recording shows that the following discussion took place:

Q:     My name is James Kelly. It's J-A-M-E-S, K-E-L-L-Y. I'm an investigator with
Travelers Insurance. Today is December 5th, 2018. And I am currently at the
residence of Ms. Christina Rainville which is located at 431 Elm Street in
Chester, Vermont. And Christine, be --- before I go any further, I just want to
make sure that I have our permission to record the interview?

A:     Yes, you do.

Q:     And there was something that you would like to say prior to any questions?

A:     I would just like to say that I'm on the autism spectrum and sometimes that can
cause me difficulty and challenges in back and forth conversations, that I don't
process them -- uh -- right, and in terms of a formal statement, I might misspeak
or I might misinterpret something. So I would like if it is okay to have the
opportunity to review it just to make sure it is accurate.

Q:     Absolutely.  Absolutely.

361.     This agreement was understood by both Plaintiff and Travelers to be a condition

precedent to the interview.

362.     Plaintiff had twice previously been granted a nearly identical accommodation

when she was a fact witness in a criminal case before Judge Kainen, and when she was a

fact witness in a Professional Responsibility Board case involving Stacey Adamski, the

former Ellis Boxer & Blake association who was found to have engaged in unethical

conduct.

363.     Both Mr. Kelly, and the Travelers adjuster, Roberta Jordan, communicated with

Plaintiff by email and had Plaintiff's email address, yet neither of them provided Plaintiff

a copy of her statement to review.

364.    Despite the clear and unambiguous language in the recorded agreement, the
Firm's counsel sent a transcript of the interview to the Specialist at the Vermont
Department of Labor who was deciding the initial claim for purposes of an interim order,
without affording Plaintiff the opportunity to review the transcript.

365.    In an email to the Department of Labor, the Firm's counsel made clear that the
decision to disregard the clear and unambiguous recorded agreement for accommodations
under the ADA was deliberate rather than an inadvertent error, as he claimed that
Plaintiff "did not specify, nor did we agree, that such opportunity would be afforded
prior to the statement being submitted to the Department of Labor."

366.    After first making that preposterous argument, the Firm changed course and made
an equally ludicrous argument, that "The claimant sought a review of the statement so
she could determine its accuracy, not so she could change answers actually given."

367.    This is yet another example of the Firm's ongoing deliberate wrongful acts to gain
an unfair advantage in the worker's compensation litigation.

368.    Similarly, in January of 2020, after Plaintiff requested an extension of the
deadlines in the worker's compensation case because she needed to focus on her health
after the number of inflammatory/immune-related medical issues had increased to over
20 separate medical conditions, which had necessitated 24 out-of-state medical
appointments at Dartmouth and MGH in the course of 48 business days.

369.    The Firm, in another act of bad faith, refused to extend the deadlines, provided no
reason to support its position, which made clear that the extension would have had no
effect whatsoever on the Firm's defense of the litigation.

370. The Firm's refusal to grant a reasonable request for extension was <u>after</u> Plaintiff had agreed to the Firm's request for an extension earlier in the proceeding.

371. In other words, the Firm's continuing course of willful wrongful misconduct, which is a calculated attempt to gain an unfair advantage in the worker's compensation litigation, has continued non-stop for the entire time that the claim has been pending, and provides further support to establish the motive for the unlawful conduct at issue in this case.

### Plaiontiff's Age Was Also a Material Factor in the Firm's Acts of Disability Discrimination

372. Age discrimination was a material factor in every decision the Firm made regarding Plaintiff's mistakes, workload, refusal to accommodate her disability while she was an employee, and her ultimate discharge.

373. But for Plaintiff's age, the mistakes would not have led to discharge.

374. But for Plaintiff's age, Plaintiff's disability would not have led to discharge.

375. But for Plaintiff's age, the Firm would not have stopped giving Plaintiff work.

376. When Plaintiff – whose illness was readily apparent to everyone who saw her in person or spoke to her on the phone – explained that she made a mistake because she was having difficulty sleeping, Mr. Ellis cut the conversation dead in its tracks and made very clear that he did not want to discuss it.

377. In contrast, Mr. Ellis and the Firm had previously offered flexible hours to a young lawyer, who had been showing up for work hours late, and, when reprimanded for doing so by Mr. Blake, had claimed that she had a mental health disability that made it difficult for her to sleep.

378.    While Plaintiff was terminated because of mistakes, the Firm routinely tolerated

mistakes by younger lawyers without consequence.

379.    For example, after Ms. Adamski had represented the Spanish-speaking client in a

court hearing with catastrophic criminal repercussions by not requiring an interpreter, and

providing the client a copy of the Order which she knew he could not understand because

it was in English, no one at the Firm ever took any action against Ms. Adamski or even

reprimanded her about her very grievous errors.

380.    For example, after the Firm found out that Ms. Adamski had diverted a settlement

check to her home and had erased documents from the Firm's computer system that

showed that the check had been received, the Firm did not discharge her employment but

only suspended her (whereupon she quit).

381.    For example, when Mr. Ellis became frustrated with the mistakes that another

young associate made and refused to work with her, other partners at the Firm provided

her work and she was not discharged.

382.    For example, when the Firm learned that a young litigation associate who had

been with the Firm for a number of years was calculating due dates wrong and had no

understanding of how to calculate due dates properly despite calculating them (wrong)

for years, the Firm took no action against the associate.

### Damages

383.    After leaving the Firm, Plaintiff initially was applying for jobs and had had a

second interview. However, after learning from Ms. Drake that Mr. Ellis had decided to

fire Plaintiff due to her mistakes, Plaintiff realized that she was still too ill to work as a

lawyer, and she stopped seeking employment because she was still experiencing cognitive issues and still having severe difficulty sleeping.

384.    Plaintiff expects that – like allergic reactions she has had in the past which were not as severe – this extended inflammatory response will one day diminish and her life can return to what it was before she ate the pizza, and that she will be able to work again.

385.    However, the way that the Firm ended her employment has made future employment as a lawyer impossible.  Plaintiff is now 58 years-old, which alone makes future employment unlikely, and now she has the additional problem of knowing that she was terminated due to mistakes.

386.    In addition, the Firm's refusal to provide a reference makes future employment impossible.

387.    No one will hire a lawyer at Plaintiff's age under these circumstances.  The damage has clearly ended Plaintiff's 30-year legal career.

388.    Furthermore, the Firm's actions have destroyed Plaintiff's reputation as a lawyer, as she will have to disclose the fact that the Firm terminated her due to mistakes to any prospective employer.

389.    Plaintiff cannot, as a lawyer, withhold this information from any entity that would consider hiring her as a lawyer.

390.    The Firm's handling of Plaintiff's disability will also bar her from federal employment.

391.    Lawyer applicants for federal employment are required to fill out a form, under oath, declaring whether then have been terminated from employment in the past and the reasons for the termination.

392.     Plaintiff, who previously worked as a high-level lawyer for the federal government managing litigation for the Securities and Exchange Commission in Philadelphia, had numerous interviews for potential federal law jobs from 2016-2018.

393.     Federal employment as a lawyer is no longer possible for Plaintiff, as Plaintiff will have to advise potential federal employers that she was terminated because she made mistakes and that the Firm will not give her a reference.

394.     In contrast, had the Firm complied with the law and offered Plaintiff the accommodation of working flexible hours, that accommodation would have resolved the problem quickly, especially since Plaintiff only made approximately five mistakes in an eleven-month period.

395.     Plaintiff's treatment provider at MGH for the sleep disturbance has advised that sleep disturbance, if not addressed promptly, often becomes ingrained and difficult to treat.

396.     Because the Firm did not offer the sleep accommodation, Plaintiff spent 11 months working without the accommodation, and the sleep disturbance became ingrained as a result.

397.     Indeed, because the Firm failed to offer a flexible-hours accommodation, Plaintiff suffered medical ailments from prolonged loss of sleep, including but not limited to, heart problems and ongoing cognitive issues.

398.     The Firm's refusal to have a conversation about the disability and offer a flexible-hours arrangement caused Plaintiff's medical condition to only get worse.

399.    The stress of being terminated, while Plaintiff was very ill with an immunological condition, further exacerbated Plaintiff's inability to sleep and further weakened her immune condition and overall health.

400.    The Firm could have easily accommodated flexible work hours for Plaintiff, as 99% of her work involved research, reviewing records, and writing – all of which could be done at any hour of the day.

401.    Moreover, if the Firm had been honest, and advised Plaintiff that she was going to be terminated because of mistakes in her work, Plaintiff would have requested an immediate accommodation that she be permitted to work flexible hours so that she could sleep in when she had a particularly bad night, or work on a different day.

402.    Instead, knowing that Plaintiff would request such an accommodation, the Firm created a false narrative that there was not enough work for Plaintiff in order to prevent Plaintiff from requesting an accommodation and/or filing a worker's compensation claim.

403.    Also, had the Firm put Plaintiff on medical leave or terminated her expressly because her disability made her unable to perform her work, her reputation would not be damaged because she would be able to accurately explain to future employers that she was terminated because her illness made her temporarily unable to perform her job.

404.    Plaintiff's mistakes were very few in number, and she continued to perform at her usual outstanding level despite the mistakes.

405.    For example, during 2018, Plaintiff conducted a group of depositions where opposing counsel informed Mr. Ellis that she had never seen anyone conduct depositions like that, and that Plaintiff's deposition work was extraordinary.

406.     The lawyer told Plaintiff that she had told Mr. Ellis about Plaintiff's extraordinary work on the depositions in the case.  Mr. Ellis acknowledged to Plaintiff that he had been told about that, but he offered no praise to Plaintiff.

407.     Plaintiff also did extraordinary work for Mr. Boxer on two different cases during 2018.

408.     Mr. Boxer asked Plaintiff to assist him in defending a former state employee in a very high profile case involving alleged mistreatment and discrimination of an inmate with disabilities.

409.     Mr. Boxer told the client that he needed Plaintiff to work on the case because it was a subject area in which he had no knowledge.

410.     Plaintiff drafted two extraordinary summary judgment motions in that case.

411.     The first summary judgment motion was filed prior to discovery, and argued that half of the counts against the Firm's client had to be dismissed as a matter of law, regardless of what discovery might reveal.

412.     That motion was so compelling that the opposing lawyer agreed to dismiss those counts without even responding to the motion.

413.     The second motion, filed after discovery closed, set forth extraordinary factual detail in a voluminous filing, covering many years of history, and Plaintiff argued that there was no factual basis to support the claim that the Firm's client had done anything wrong, much less anything for which he could be liable, and all of the remaining counts should be dismissed.

414.     After the second summary judgment motion was filed, opposing counsel agreed to dismiss all charges against the Firm's client without receiving anything at all from the Firm's client.

415.     Mr. Boxer filed both of these motions without any material edits or changes from the draft that Plaintff provided to him, except that, in the second motion, Mr. Boxer asked Plaintiff to add an additional argument of a few sentences.

416.     Mr. Boxer did not inform Plaintiff of either of these extraordinary outcomes that Plaintiff obtained singlehandedly with her brief writing and factual analysis.   Instead, Plaintiff learned that the counts had been dismissed from Mr. Boxer's secretary.

417.     On information and belief, Mr. Boxer communicated about the successes in his cases when Mr. Boxer's young associate had done the work.

418.     Plaintiff also assisted Mr. Boxer in a complicated potential civil case involving an allegation of child sexual abuse – another area where no one else at the Firm had Plaintiff's expertise.

### The Firm Acted with Actual Malice

419.     The Firm's actions set forth above were calculated, purposeful and done with actual malice.

420.     The Firm's actions manifested personal ill will and were carried out in circumstances evidencing reckless or wanton disregard of Plaintiff's rights.

421.     The Firm's actions constituted morally culpable conduct to the degree of outrage frequently associated with crime.

422.     The Firm's conduct was wrongful and outrageously reprehensible.

423.    The Firm's conduct was with malice, bad motive, ill will, personal spite, hatred, and reckless disregard toward Plaintiff.

424.    The Firm's conduct was especially egregious because the Firm knew that Plaintiff was very, very ill at the time and not in a condition where she could defend herself.

425.    At least four of the five partners (Mr. Ellis, Mr. Blake, Mr. Boxer and Jennifer. Moore) acted individually with actual malice toward Plaintiff as set forth above.

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq.*

426.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

427.    The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

428.    As of December 5, 2017, through the time of her involuntary resignation on May 8, 2018, as least one of Plaintiff's major life activities was limited due to her illness, and she was therefore an individual with a disability under the ADA.

429.    Plaintiff was fully qualified and could perform all of the essential functions of the position.

430.     The Firm is a covered employer to which the ADA applies.

431.     Plaintiff's mistakes were caused by her disability.

432.     Allowing Plaintiff to work flexible hours would have enabled Plaintiff to get sufficient sleep and not make mistakes.

433.     The Firm terminated Plaintiff on the basis of her disability in violation of the ADA.

434.     The Firm's failure to make an individualized assessment to determine whether a reasonable accommodation would enable Plaintiff to be employed violated the ADA.

435.     The Firm's scheme whereby it created a false narrative that there was not enough work for Plaintiff was an effort to side-step the requirements of the ADA and was, in and of itself, a violation of the ADA.

436.     The Firm's scheme of preventing Plaintiff from discussing her illness and her disability violated the ADA.

437.     The Firm's continuing course of misconduct that began in early 2017 and which continues to this day in the worker's compensation litigation is an effort to unlawfully obstruct and deny Plaintiff's rights because of her disability.

438.     As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT II – BREACH OF CONTRACT

439.  Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

440.  The Firm breached the employment contract dated May 31, 2016.

441.  The Firm had promised in the contract to "endeavor to support" Plaintiff as she "worked diligently to develop [her] own client base."

442.  Rather than support Plaintiff's diligent efforts, the Firm actively obstructed every effort Plaintiff made to develop her practice.

443.  The Firm created a false conflict and then wrongly maintained the bar on criminal cases even after Mr. Blake's "sort-of" conflict had terminated.

444.  The Firm further actively obstructed Plaintiff's efforts by, among other things, refusing to send out notices of her arrival at the Firm until she had been at the Firm for a year and then only including her name on Ms. Adamski's cards as an afterthought; not allowing Plaintiff to attend the worker's compensation conferences; belittling the efforts she made to market herself; belittling her publication in the *Vermont Bar Journal*; refusing to pay $300 for print ads for her; and cutting her out of the Google Ads program she had developed to market herself.

445.  As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT III – VIOLATION OF VERMONT'S
## FAIR EMPLOYMENT PRACTICES ACT

446.  Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

447.     Vermont's Fair Employment Practices Act, 21 V.S.A. § 495 (a) provides that "It shall be an unlawful employment practice . . .

> (a) For any employer. . . to discriminate against any individual because of . . . age or against a qualified individual with a disability."

448.     Plaintiff was 54 years-old at the time that she began at the Firm in June of 2016.

449.     Plaintiff was a qualified individual with a disability as of December 5, 2017.

450.     The Firm engaged in multiple acts of age discrimination and ultimately discharged Plaintiff due to her age.

451.     The Firm discriminated against Plaintiff on the basis of her age, by, among other things:

    a.  Refusing to provide support for her efforts to develop her practice while providing unlimited support to all the young lawyers;

    b.  Barring Plaintiff (an expert in criminal law) from practicing criminal law, due to a non-existent conflict, all while allowing an inexperienced young lawyer to take on a criminal case;

    c.  Not sending out cards announcing her arrival at the Firm until she had been at the Firm for a year, while issuing the cards immediately for a young new hire;

    d.  Berating her without cause in a meeting with a young associate;

    e.  Taking her work away;

    f.  Complaining that she was "even older" than Mr. Boxer was;

    g.  Not sending her to the worker's compensation conferences despite the fact that she did worker's compensation work and while sending all the young lawyers to the conferences;

    h.   Recruiting and hiring a "newbie" lawyer that the Firm "could train" while lying repeatedly to Plaintiff that the Firm had insufficient work to support her position;

    i.   Rejecting Plaintiff's offer to work for the same money that a "newbie" lawyer would be paid;

    j.   Refusing to pay even minimal amounts ($300) to advertise her practice;

    k.   Cutting her out of the Google Ads process and using Google Ads instead to promote a new line of work for a young associate with no experience in that area of law;

    l.   Refusing to serve as a reference to future employers and lying to Plaintiff that the decision was pursuant to a policy which did not exist;

    m.  Constructively discharging Plaintiff's employment;

    n.   Taking Plaintiff's work away and constructively discharging her because of her mistakes, while, at the same time, tolerating serious mistakes made by younger lawyers without imposing any consequences;

    o.   Failing to provide a flexible-hours accommodation for Plaintiff's sleep disturbance despite having provided such an accommodation to a young lawyer who worked for Mr. Ellis just a few years earlier;

    p.   Refusing to serve as a reference for Plaintiff despite agreeing to serve as a reference for a young lawyer who had significant work problems, got along with no one, and was given a flexible-hours accommodation.

452.       The Firm engaged in multiple acts of disability discrimination, including but not limited to:

a.  Preventing Plaintiff from discussing her illness and disability with partners Stephen Ellis and William Blake when employees were free to discuss anything other than illness and disability with those partners;

b.  Taking her work away, and without providing Plaintiff a truthful reason why – in order to prevent her from filing a worker's compensation claim and/or requesting an accommodation;

c.  Repeatedly lying to Plaintiff that there was insufficient work for her position (all while they were actively recruiting her replacement) and coercing her into resigning;

d.  Failing to engage in a meaningful discussion of her disability and potential accommodations;

e.  Terminating her employment because she made a few mistakes when the Firm knew that the mistakes were caused by her worker's compensation injury, subsequent illness and sleep disturbance;

f.  Failing to provide a flexible-hours accommodation for sleep disturbance that the Firm had previously provided to a younger employee and which would have resolved the performance issue;

g.  Constructively discharging Plaintiff's employment.

453.    As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT IV – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

454.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

455.    At the time that Plaintiff accepted the position at the Firm and after she started her employment, the Firm had indicated in various ways that Plaintiff would have job security and would be treated fairly.

456.    The Firm breached the covenant of good faith and fair dealing by, among other things:

    a.  Refusing to support Plaintiff's efforts to develop her practice while supporting the efforts of young lawyers to develop their practices;

    b.  Belittling Plaintiff and demeaning her in the meetings with Mr. Boxer, refusing to give her work, taking her work away, giving her paralegal work and taking that work away;

    c.  Barring her from practicing criminal law – the only area of law for which she had an established reputation in Vermont -- due to a non-existing conflict, while allowing a completely-inexperienced young lawyer to take on a criminal case;

    d.  Repeatedly lying to Plaintiff that there was insufficient work to support her position – all while the Firm was actively recruiting her replacement – in order to get her to resign rather than ask for an accommodation that would allow her to sleep more;

    e.  Refusing to provide Plaintiff with a reference, and lying that the Firm had a policy not to provide references when the Firm had always given references in the past

(even to unsuccessful employees) and continued to provide references after Plaintiff left;

f.   Encouraging Plaintiff to learn as much as possible about Google Ads and then using Google Ads to the Firm's and a young associate's benefit while excluding Plaintiff from the process;

g.   Coercing Plaintiff to resign on false pretenses, and by taking her work away and demeaning her;

h.   Telling a paralegal the truth in the summer of 2018 (approximately six months prior to Plaintiff's resignation), that Plaintiff was going to be fired at the end of the year due to her mistakes, while keeping that information secret from Plaintiff and repeatedly lying to Plaintiff that she was going to be let go because there was not enough work to support Plaintiff's position;

i.   Using Plaintiff's coerced resignation as a defense in the worker's compensation case and making false representations to the Department of Labor that the resignation was voluntary – defenses which the Firm reasonably anticipated using at the time that the Firm was lying to Plaintiff about not having sufficient work for her and was trying to coerce her into resigning;

j.   Continuing to engage in bad faith conduct in the worker's compensation case;

k.   Destroying a material email which the Firm would have known was important to Plaintiff's worker's compensation case at the time that Mr. Ellis received it in February of 2018;

l.    Doing all of the above things, and more, despite the fact that Plaintiff was highly profitable to the Firm, worked hard, was well-liked, and did outstanding work throughout the entire time she was employed.

457.    The Firm actively operated to undermine and destroy Plaintiff's efforts to develop her law practice.

458.    Plaintiff's expectation that the Firm would support her efforts to develop her practice were justified.

459.    The Firm failed to act in good faith and to deal fairly and consistently with Plaintiff.

460.    The Firm's conduct violated community standards of decency, fairness, or reasonableness.

461.    The Firm evaded the spirit of the bargain and willfully harmed Plaintiff.

462.    The Firm abused its power over Plaintiff.

463.    As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT V – FRAUDULENT  INDUCEMENT

464.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

465.    At the time that the Firm entered into the employment contract with Plaintiff, the Firm intentionally made a false statement about a material fact.

466.    The Firm never had any intention of fulfilling its obligation to "endeavor to support" Plaintiff's efforts to develop her own client base, and the Firm knew that that statement was false at the time that it entered into the contract.

467.    The Firm's false representation in the employment contract went to the core of the employment contract.

468.    The condition that the Firm "endeavor to support" Plaintiff's client development efforts was a material term of the contract.

469.    The Firm made that false promise in order to fraudulently induce Plaintiff into accepting the position.

470.    Using deceit, the Firm fraudulently induced Plaintiff to sign the contract and take on employment at the Firm.

471.    Plaintiff reasonably relied on the Firm's promise of support when she entered into the contract.

472.    Plaintiff would not have entered into the contract without the Firm's promise of support of her efforts to develop clients.

473.    Plaintiff did not know, and could not have reasonably known, that the Firm's statement of its intent was false and that the Firm had no intention of supporting her efforts.

474.    Plaintiff lost potential employment opportunities in reliance on Defendant's fraudulent promise.

475.    But for being fraudulently induced into the contract, Plaintiff would not have become a Firm employee and would not have suffered her injury and subsequent disability and illness.

476.    As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in her favor and against Defendant for the following relief:

    a.  Past wages and benefits in an amount to be determined at trial;

    b.  Front pay and benefits in an amount to be determined at trial;

    c.  Damages for the permanent harm to Plaintiff's reputation;

    d.  Compensatory and consequential damages including for emotional distress;

    e.  Compensation for all medical and psychological aspects of her injury in the event that the Firm prevails in its argument in the worker's compensation case that her injury did not "arise out of" and "in the course of" her employment, as Plaintiff would not have been at the Firm to be injured but for the fraud in inducement;

    f.  Punitive damages to the full extent allowed by law;

    g.  Pre-judgment and post-judgment interest at the rate allowed by law;

    h.  Attorney's fees and costs; and

    i.  Any such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

Christina Rainville, Esquire
*Pro Se*
1040 Highway 98 East, Unit #415
Destin, Florida 32541
(267) 250-0686