U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2020 OCT -7  PM 4: 50**

CLERK

BY_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| **CHRISTINA RAINVILLE,** | : | |
| **Plaintiff** | : | **Case No. 2:20-cv-0051-cr** |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **BOXER BLAKE & MOORE PLLC,** | : | |
| **formerly d/b/a** | : | |
| **ELLIS BOXER & BLAKE, PLLC,** | : | |
| **and** | : | |
| **BOXER BLAKE MOORE &** | : | |
| **SLUKA PLLC,** | : | |
| **Defendant.** | : | |

---

## AMENDED COMPLAINT

---

Plaintiff Christina Rainville alleges as follows:

### NATURE OF THE CASE

1.  This action involves unlawful discrimination against a highly profitable attorney
    employee, with a combination of age discrimination and disability discrimination, and the
    resulting constructive discharge of employment, in addition to claims for breach of
    Plaintiff's employment contract, breach of the covenant of good faith and fair dealing,
    and fraud in the inducement.

2.  Plaintiff Christina Rainville was employed as Senior Counsel at Ellis Boxer & Blake
    PLLC (which, after Plaintiff left, changed its name to Boxer Blake Moore & Sluka,
    PLLC, and then again changed its name to Boxer Blake & Moore PLLC) (collectively

referred to as the "Firm"), from June 1, 2016 until November 9, 2018, when she resigned involuntarily after being constructively discharged.

3. The Firm discriminated against Plaintiff, who was born in 1962 and was over 50 years-old at all times relevant to this litigation, due to her age, by, among other things: forbidding her from engaging in the practice of criminal law (the only area of law that she had practiced previously in Vermont) due to a claimed "sort-of" conflict, while allowing a young associate with no criminal experience or training to take on a criminal representation; denying Plaintiff any and all opportunities to develop her law practice when those same opportunities were provided to all the younger lawyers; taking Plaintiff's work away; repeatedly lying to Plaintiff that there was insufficient work for her position and constructively discharging her – despite her being one of the most profitable lawyers at the Firm – because the Firm wanted what the managing partner described to her as a "newbie" lawyer instead of an older one; hiring a "newbie" young law school graduate immediately after Plaintiff's departure; and creating a hostile environment.

4. While the Firm was discriminating against Plaintiff due to her age, the Firm further discriminated against Plaintiff after she suffered a work-related injury on December 4, 2017, as her supervising partner and the managing partner strategically shut down all conversations about her disability, failed to offer a reasonable accommodation, and coerced her involuntary resignation based on their repeated lies that there was not enough work to support her position – all in order to gain an unfair and unlawful advantage in the worker's compensation case that they reasonably anticipated.

5.  After coercing Plaintiff to involuntarily resign from employment with their repeated lies that there was insufficient work to support her position, and taking all of her work away, the Firm used that resignation in its defense in the worker's compensation case.

6.  Because of Defendant's unlawful actions, Plaintiff has suffered not just lost wages and other losses typical in these cases, but also the loss of her reputation as a lawyer and her ability to ever be employed as a lawyer again.

7.  Plaintiff received a Right to Sue letter from the E.E.O.C., dated January 16, 2019, which is attached hereto.

## PARTIES

8.  Plaintiff Christina Rainville is a lawyer admitted to practice in the states of Vermont and Pennsylvania, who worked as Senior Counsel at Ellis Boxer & Blake from June 1, 2016 until she resigned on November 8, 2018.  At all times relevant to this dispute, Plaintiff was a resident of Jamaica, Vermont.

9.  Plaintiff is currently a resident of the State of Florida, at 1040 Highway 98 East, Unit 415, Destin, Florida 32541, and has been a resident of Florida since January of 2020.

10. Defendant Boxer Blake and Moore, PLLC (formerly d/b/a as "Ellis Boxer & Blake, PLLC" and "Boxer Blake Moore & Sluka, PLLC")  (the "Firm") is a law firm operating as a partnership limited liability corporation ("PLLC") under the laws of Vermont, at 24 Summer Hill Street in Springfield, Vermont.  The Firm was known as "Ellis Boxer & Blake, PLLC" until December 31, 2018, at which point the Firm was renamed "Boxer Blake Moore & Sluka PLLC"; after which partner Justin Sluka left, and the Firm was renamed "Boxer Blake & Moore PLLC."

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §1331, as the action arises under the laws of the United States.

12. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1), as the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

14. Venue in this Court is proper under 28 U.S.C. § 1391 as the Firm is a resident of this District and a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment at the Firm

15. Plaintiff began her employment at the Firm on Wednesday, June 1, 2016, as "Senior Counsel."

16. On information and belief, Plaintiff had had a second interview for the job just the day before, and while she had asked to not start until the following week as her daughter was graduating that weekend, Mr. Ellis was adamant that she had to start on June 1, 2020 because of his immediate and compelling need to have an experienced litigator to work on his pending matters.

17. At the time of her hire, Plaintiff was told that her role would be to manage partner Stephen Ellis' legal practice in the Springfield, Vermont area, while Mr. Ellis moved to

4

Burlington (to be near his girlfriend) and he worked to develop an additional practice in the Burlington area.

18. At the time Plaintiff joined the firm, she had a strong reputation in Vermont (and nationally) as a criminal lawyer in the Vermont State Courts.  She had tried 25 criminal jury trials in Vermont; handled 25 criminal appeals before the Vermont Supreme Court; had successfully argued a landmark criminal case before the United States Supreme Court; had published more than a dozen articles in the leading national journal for juvenile law (one of her articles was cited as authority by the U.S. Court of Appeals for the Seventh Circuit, by Judge Posner); had published in the Vermont Bar Journal; had conducted trainings relating to criminal proceedings for children, both in Vermont and around the country; had testified numerous times before the Vermont Legislature on criminal matters and protecting children; and had been honored by the Governor at a public bill-signing ceremony for her work with the legislature on changing the statute of limitations for sexual crimes committed against children.

19. In contrast, while Plaintiff had extensive experience in civil litigation many years earlier when she lived in Pennsylvania, Plaintiff had no experience in civil litigation in Vermont at any time since she joined the Vermont bar in 2007, except for criminal post-conviction cases (which are criminal cases that are processed pursuant to the Civil Rules).

20. In light of the fact that Plaintiff had never done civil litigation in Vermont, and had only practiced criminal law in Vermont as a prosecutor, Mr. Ellis repeatedly told Plaintiff – both at the time of hire and throughout her employment -- that developing her own practice would take "a long time" and "at least five years."

21. During her first eighteen months at the firm, from June 1, 2016 through the day prior to her injury on December 3, 2017, Plaintiff's work was so exemplary that she was given a substantial raise.

22. All of her employment reviews were excellent.

23. In addition, on information and belief, Plaintiff was a highly profitable lawyer at the firm.

24. Plaintiff worked very long hours, had high billable hours, high fee receipts, and, due to her level of experience and prominence in the field of law generally, she was able to command an hourly billing rate that far exceeded all of the associates' regular billing rates, and also far exceeded the normal billing rates of three or four of the five partners at the firm.

25. On information and belief, in terms of fee receipts compared to salary and expenses, Plaintiff was more profitable to the firm prior to her injury than any of the other non-partner lawyers, and, on information and belief, was more profitable than at least three of the five partners.

26. Multiple clients praised Plaintiff's work and wrote letters or emails to the partners praising her work prior to her injury.

27. One such email was sent to Plaintiff and Stephen Ellis just one month prior to Plaintiff's injury, on November, 3, 2017:

> Dear Tina,
>
> This is a formal thank you for helping us with the [redacted to protect client's identity] complaint.
>
> You are truly brilliant and we could not be more grateful for all the help that you gave us wading through the process and concluding with a beneficial outcome for all concerned.

Ellis, Boxer and Blake is so very fortunate to have you on board and the state of
Vermont is blessed to have you and your family living here.

With deepest gratitude,
[name redacted]

## Age Discrimination

28. Plaintiff's employment was subject to a written contract dated May 31, 2016.

29. The contract, which was drafted by the Firm, provided as follows:

> "Your job title will be 'Senior Counsel.' Initially, you will provide support for
> the other senior lawyers in the firm in specific matters assigned to you. **It is our
> expectation that you will assume primary responsibility for some matters in
> the very near future, and that you will work diligently to develop your own
> client base. You will also be expected to help train and mentor associate
> lawyers and support staff. We will endeavor to support you in these efforts.**
> So long as you remain employed by our firm, you will practice law exclusively on
> behalf of our firm and its clients."

(Emphasis added.)

30. While Plaintiff had joined the Firm planning to develop her own practice in addition to

managing Mr. Ellis' Springfield-area practice, the partners at the Firm immediately made

it impossible for her to do so, while they, in contrast, fully supported the efforts of all of

the younger lawyers to develop their practices.

31. The Firm's discriminatory treatment of Plaintiff due to her age began on or about the day

that she started at the Firm, on June 1, 2016 and continued until she left on November 9,

2018.

## The Firm Barred Plaintiff from Taking Criminal Cases for No Justifiable Reason

32. Immediately after Plaintiff started working at the Firm, the Managing Partner, William Blake, told Plaintiff that she could not represent any criminal clients in the state courts because he believed that the Firm had a conflict.

33. The purported conflict was that Mr. Blake handled a very small number of worker's compensation cases pursuant to a contract with the Attorney General's Office.

34. Plaintiff explained to Mr. Blake that that was not a conflict, but Mr. Blake disagreed.

35. Plaintiff explained that the Vermont Supreme Court had held that State's Attorney's Offices are County offices and that the employees are all county employees, and that there could not be a conflict with a contract with the Attorney General's Office because they were legally different entities.

36. Mr. Blake disagreed, and said something along the lines of it being a "sort-of conflict."

37. Plaintiff contacted Bar Counsel, Mike Kennedy, who advised her that there was no conflict that would bar Plaintiff from representing criminal defendants in the state courts.

38. Mr. Blake maintained his view that it was a "sort of" conflict despite Mr. Kennedy's opinion.

39. As a result, the Firm continued to bar Plaintiff from representing any criminal defendants in state courts.

40. Around the summer of 2017, partner Andrew Boxer met with Plaintiff to discuss the development of her practice.

41. Plaintiff told Mr. Boxer that the Firm's bar on handling criminal matters in state court was making it extremely difficult, and that Mr. Kennedy had said that such representation was not a conflict.

42. Mr. Boxer supported Mr. Blake's position, and suggested that Plaintiff could handle federal criminal cases.

43. Plaintiff explained that she was known as a state criminal lawyer, not a federal one, and that most lawyers who take on criminal work in the federal courts get known in the press for taking on defendants in high profile cases in state cases first.

44. Plaintiff also explained that she had never handled a federal criminal case and was unfamiliar with the rules.

45. Mr. Boxer suggested that Plaintiff apply for a position on the District Court's criminal defense panel.

46. Plaintiff said she would do so, but she told Mr. Boxer that it was unlikely she would get a position on the panel since she had never handled a criminal case in federal court and also because she was known as a prosecutor and not a defense lawyer.

47. Plaintiff applied for, but was not given a position on the District Court criminal defense panel.

### The Firm Paid to Advertise the Hiring of a New Associate
### When the Firm Had Not Done So for Plaintiff

48. Meanwhile, in approximately May of 2017 – a year after Plaintiff had been at the Firm -- the Firm hired a new associate, Stacey Adamski.

49. The Firm immediately paid to have cards printed that would be mailed out to members of the bar to announce that Ms. Adamski had joined the Firm.

50. The Firm had never done that for Plaintiff.

9

51. The Firm realized that the Firm was sending these cards to every member of the Bar in Vermont and that they had never done that for Plaintiff, so the Firm belatedly added Plaintiff's name on the card that they had printed for Adamski.

52. On information and belief, those cards were sent out one year after Plaintiff joined the Firm, and within weeks of Ms. Adamski joining the Firm.

53. Ms. Adamski, on information and belief, was under 40 years old. In any event, she was substantially younger than Plaintiff.

54. The Firm did not advertise Plaintiff's arrival at the Firm in a timely manner because of her age.

## Partner Andrew Boxer Berates and Humiliates Plaintiff in Front of a Young Associate for No Reason Other than Her Age

55. Sometime in mid-2017, Mr. Boxer called Plaintiff to his office to have a discussion about a contingency fee case where the Firm had withdrawn from the case and the Firm was now going to file a claim as a creditor in the former-client's bankruptcy case.

56. Plaintiff had worked on the contingency-fee case, which had been brought by Mr. Ellis prior to Plaintiff joining the Firm.

57. Plaintiff had determined in the scope of her work that the client had been dishonest in his representations to the Firm, had also destroyed material records, and that there was no possibility of the Firm getting any recovery on the contingency-fee case. It was Plaintiff's discovery that caused the Firm to withdraw from the case.

58. Plaintiff met with Mr. Boxer and associate Oliver Abbott. Mr. Abbott is a 2012 law graduate, who, on information and belief, was in his 20's at the time.

59. The purpose of the meeting was to discuss the preparation of the claim to be filed in the
    bankruptcy court on the Firm's behalf.

60. Although Plaintiff had done nothing wrong in the underlying case and had only saved the
    Firm from putting more time into a case that had no value as well as from public
    embarrassment, Mr. Boxer was extremely hostile to Plaintiff in the meeting and
    repeatedly berated her for no reason in front of Mr. Abbott.

61. In a vicious tone of voice, Mr. Boxer directed that all of the work on the bankruptcy
    claim would be done by Mr. Abbott and that Plaintiff – who knew all of the facts that
    would support the bankruptcy claim and could have written the necessary documents in
    far less time – was "not to spend one minute more" than was absolutely necessary on the
    matter, and that Mr. Abbott was going to do all the work.

62. Plaintiff had never before, and still has never, been spoken to by anyone in the hostile and
    demeaning manner that Mr. Boxer spoke to her during that meeting in front of Mr.
    Abbott.

63. Plaintiff had done absolutely nothing to deserve that belittling treatment by Mr. Boxer,
    and there was no reason to assign the matter to a young associate when Plaintiff knew the
    facts, had the records on hand, and could have put the claim together very quickly.

64. Nor was there any basis or purpose for Mr. Boxer to demean and humiliate Plaintiff in
    the presence of a young associate.

65. Plaintiff reported Mr. Boxer's demeaning treatment of her in that meeting to the Office
    Manager and others.

66. On information and belief, Mr. Abbott was also upset by Mr. Boxer's treatment of
    Plaintiff during that meeting.

67. After the meeting, Plaintiff was cut off from the bankruptcy matter in its entirety. She
    was never given any drafts to review to confirm that they were factually accurate, and
    was never advised of the status of the matter.

### Partner Andrew Boxer Attacks Plaintiff's Age in Second Hostile Meeting

68. In December of 2017, Mr. Boxer called Plaintiff down to his office again.

69. Mr. Boxer demanded to know, in a hostile voice, how old Plaintiff was.

70. Plaintiff hesitated.

71. Mr. Boxer glared at her until she responded that she was 56.

72. Mr. Boxer then complained in a hostile, loud and demeaning tone of voice that "You're
    even older than I am!"

73. Mr. Boxer then called Plaintiff "an over-priced associate," and complained that she had
    not brought any new cases to the Firm.

74. Plaintiff reminded Mr. Boxer that she had brought in one significant new discrimination
    matter for Mr. Boxer's biggest client, where the client's emails showed that the client (a
    major insurance company) was going to give the matter to another law firm but was so
    impressed with Plaintiff's work that they decided to give it to Plaintiff instead.

75. Mr. Boxer complained that others were handling many more "files." Plaintiff understood
    Mr. Boxer to be referring to two young associates who only handled worker's
    compensation cases – which typically generated a small amount of legal fees per case –
    and whose client development efforts were supported fully by the Firm.

76. Plaintiff again brought up the fact that she was a renowned criminal lawyer who was not being allowed to do criminal work even though Mike Kennedy had said there was no conflict.

77. Again, Mr. Boxer refused to allow Plaintiff to take on criminal work.

78. Plaintiff told Mr. Boxer that she had recently published an article in the *Vermont Bar Journal*.

79. Plaintiff's article in the *Vermont Bar Journal* was newsworthy and ground-breaking, and had been widely discussed in the press.

80. According to news reports, Plaintiff's article was discussed in publicly-held hearings by both the Vermont Legislature and the Vermont Agency of Education.

81. After hearing that Plaintiff had published this article, Mr. Boxer cut her off and nastily declared: "That's not how you get clients!"

82. Plaintiff started to tell Mr. Boxer that she had actually been contacted by a couple of different people about potential matters after the article had been published.

83. Mr. Boxer cut her off and angrily repeated, "That's not how you get clients!"

84. Plaintiff asked Mr. Boxer if the Firm would pay to have her advertise. He said, "Maybe."

85. Mr. Boxer became increasingly hostile, told Plaintiff that she had a year "to fix this," and ended the meeting.

86. After the meeting, Plaintiff was extremely upset and spoke to both the Managing Partner, William Blake, and her supervising attorney, Mr. Ellis.

87. Both men apologized for the things Mr. Boxer had said. One said Mr. Boxer had "no tact," and the other said, "Andy can really be an a-----e."

88. Mr. Ellis also reaffirmed his prior statements that it takes five years to develop a practice.

89. Mr. Ellis also noted that Plaintiff was very profitable for the Firm, was doing excellent work, was liked by everyone, and that there would be no reason to let her go.

90. Mr. Ellis also said that, if the Firm could not afford her salary because the Firm was having financial problems, they could ask her to take a pay cut.

91. Mr. Blake noted that Plaintiff was doing good work, that everyone liked her, and that there was no reason for her to be let go.

92. After being reassured by Mr. Ellis (her supervisor) and Mr. Blake (the managing partner) that her job was not in jeopardy as Mr. Boxer had described, Plaintiff researched how much it would cost to advertise online with the Bennington County newspapers.

93. Although the cost started as low as $125, the partners refused her request for money to advertise her practice as they deemed it not "cost effective."

### While Refusing to Allow Plaintiff to Take on Any Criminal Clients Because of a Non-existing Supposed "Conflict," the Firm Allowed a Young Lawyer with Zero Criminal Experience to Take on a Criminal Representation

94. At some point after Plaintiff started at the Firm, the Attorney General's Office did not renew Mr. Blake's contract.

95. Thus, the "sort-of" conflict that served to bar Plaintiff from representing criminal clients was gone, but the Firm's bar, inexplicably, remained.

96. Plaintiff then learned that the prohibition of her handling criminal cases did not apply to younger lawyers.

97. Sometime in approximately January of 2018, Plaintiff learned that the Firm was allowing associate Stacey Adamski – a much younger lawyer who had zero criminal law training or experience – to handle a criminal case in the state courts despite the fact that Plaintiff, an expert in criminal law, was not allowed to do the same.

98. Ms. Adamski had taken on the criminal representation of a Spanish-speaking immigrant and had represented this Firm client in a Relief from Abuse hearing, and she was now representing the client in a criminal matter where charges had been filed against him for violating the Temporary Relief from Abuse Order (the "Order") that had been issued at the hearing.

99. Plaintiff found out about this representation only because Ms. Adamski had no idea how to handle the matter, and she sought Plaintiff out for advice.

100.    Defendants at Relief from Abuse hearings are typically represented by criminal lawyers because the ramifications from the hearing are criminal in nature and very serious.

101.    Ms. Adamski was not competent to represent the client at the Relief from Abuse hearing.

102.    Although Ms. Adamski recognized that the client required an English-language interpreter, and she thus requested that the court make an interpreter available for the hearing, no interpreter was available at the hearing.

103.    Ms. Adamski agreed to go forward anyway – knowing that her client would be unable to understand the proceeding, and that there was no one present who could explain the resulting Order to the client.

104.    Thus, the Firm's client was unlawfully deprived of his constitutional right to understand what was being said in the hearing; unlawfully deprived of his constitutional right to defend himself; and unlawfully deprived of his constitutional right to understand the order that was ultimately issued against him.

105.     In addition, the Order was internally inconsistent in a common way that any criminal lawyer would have addressed with the court to fix before the hearing ended.

106.     The Order barred the client from having contact with his wife, but allowed contact with his young children who were in his wife's custody.  The Order did not explain how he was to contact his children (who were too young to have cell phones) without having unlawful contact with his wife.

107.     Shortly after the Order was issued, the Firm's client was arrested and charged for having non-threatening contact with his wife when he spoke to her to inquire about his child who was sick.

108.     Ms. Adamski told Plaintiff that the police had made a mistake in charging the client because he had not threatened his wife and that she would get the charge dismissed. She also said that she had spoken to, or was in the process of speaking to, the police officer who brought the charge to get it dismissed.

109.     Plaintiff advised Ms. Adamski that that was not the law, and that any and all contact was prohibited by the order, regardless of whether the contact was threatening in nature, and without regard to whether one of his children was sick.

110.     Plaintiff also explained to Ms. Adamski that, because the Firm's client was an immigrant, he would surely be deported if convicted of the offense, because a conviction for violating a relief from abuse order is cause for immediate deportation. Thus, the client's American-citizen children would likely never see him again if he were convicted.

111.     Having zero criminal experience, Ms. Adamski realized that she did not have the ability to represent the client going forward, and she asked Plaintiff to take over the representation.

16

112.     As Ms. Adamski's representation had created an unspeakable disaster for the

Firm's client, and a potential malpractice case for the Firm, Mr. Blake agreed to allow

Plaintiff to take over the representation to try to get the charge dismissed.

113.     Plaintiff successfully got the charge dismissed due to the lack of an interpreter at

the hearing and the internal inconsistency of the order, as well as additional evidence that

demonstrated the likely falsity of the allegations against the client and his actual

innocence of any type of abuse.

114.     The Firm did not explain to Plaintiff why Ms. Adamski was allowed to take on

criminal matters when she had zero criminal experience or training, yet Plaintiff had been

denied that opportunity for approximately 18 months, even after Mr. Blake's "sort-of"

conflict had long gone away.

115.     The Firm allowed Ms. Adamski to take on the criminal representation because she

was much younger than Plaintiff, and the Firm wanted to support the development of her

practice because of her age.

116.     Despite the egregious manner in which Ms. Adamski handled the matter, and

despite the very serious harm that the client suffered as a result – having criminal charges

brought against him – Adamski suffered no consequence by the Firm for her mistakes.

117.     On January 24, 2020, the Vermont Supreme Court suspended Ms. Adamski from

the practice of law after finding that, in another matter, she had engaged in "dishonest

and deceitful actions toward members of [the Firm], intended in large part to maximize

her own financial interests at the firm's expense."

**The Firm Supported All of Its Younger Lawyers in Their Efforts to Develop Law Practices, While Denying All of Those Opportunities to Plaintiff Because of Her Age.**

118.     It is inexplicable that the Firm would allow someone like Ms. Adamski to take on a criminal matter without any experience in that area, while denying Plaintiff the opportunity to do the same, other than the fact that Ms. Adamski was substantially younger in age.

119.     This was also consistent with the Firm's support of all of the young lawyers at the Firm.

120.     The Firm paid for every lawyer who did worker's compensation work, except Plaintiff, to attend all of the worker's compensation conferences in Burlington.

121.     The Firm viewed those conferences as essential opportunities for the young lawyers to meet with insurance carrier adjusters and to bring in new business to the Firm.

122.     While Plaintiff was at the Firm, the Firm paid to send Mr. Abbott and two younger female associates to these conferences each year.

123.     Although Plaintiff also handled worker's compensation cases, the Firm never sent Plaintiff to a single worker's compensation conference.

124.     The worker's compensation conference was viewed by the Firm as the most-important opportunity for the lawyers to get "face time" with the insurance adjusters who sent business to Vermont law firms.

125.     The firm scheduled lawyers' meetings both before and after the conferences, where partners Mr. Boxer and Mr. Ellis would advise the young associates on how to use the conference to bring in more work for the firm.

18

126.     Plaintiff attended the lawyer meetings, even though she was outwardly excluded from attending the conferences.

127.     In the December 2017 meeting with Mr. Boxer where Mr. Boxer complained that Plaintiff was "even older than I am," and he referred to the fact that two of the associates had brought in a higher number of "files," the two associates he referred to had been sent to multiple worker's compensation conferences at the Firm's expense, and the "files" that they brought to the firm were worker's compensation cases.

128.     On information and belief, the Firm did not send Plaintiff to the worker's compensation conferences because the Firm wanted to promote the young lawyers for client development opportunities and viewed Plaintiff as too old.

### **Plaintiff Worked to Develop Her Practice with Google Ads, But the Firm Took Over and Cut Her Out of the Process, and then Used Her Work with Google Ads to Promote a Young Lawyer in a Field Where He Had No Expertise.**

129.     Later in 2018, while Plaintiff was apparently still being barred from developing a criminal practice, Mr. Ellis asked Plaintiff to take on the representation of a family friend who was being investigated by the Vermont State Police on very serious criminal charges, with lengthy possible prison sentences.

130.     Plaintiff met with the client and quickly put together a detailed defense of deficiencies in the State's case, presented that information in writing to the Detective handling the investigation, and the investigation was closed without any charges being brought.

131.     Around this time, Plaintiff was hopeful that the Firm's bar on her doing criminal
         work would be released, and she began to explore Google Ads as a way that perhaps the
         Firm would allow her to advertise to develop her criminal practice.

132.     Plaintiff spoke at length to the Google Ad department over a period of days, and
         learned the complex structure of advertising on Google, which involved setting a budget
         (beginning at $300/month, which could be cancelled at any time) and then picking ad
         terms with varying and fluctuating prices.

133.     Plaintiff spoke to Mr. Ellis, and then spoke to all of the lawyers at a monthly
         lawyers' meeting, about Google Ads and how the process worked.

134.     Because Plaintiff believed that the Firm was unlikely to do any advertising for
         her, she put together a plan where the Firm could use Google Ads to advertise criminal
         work *and* employment law, with the hope that the Firm would allow some advertising for
         her as a part of the package.

135.     Mr. Ellis and others asked Plaintiff to look into it further, so she contacted Google
         Ads again, had more complex discussions, and sent a detailed email to the partners about
         it.

136.     After a while, Plaintiff learned that the Firm had decided to go forward with
         Google Ads, but the partners cut her out of the process entirely, and put a young male
         associate (Mr. Abbott) and a young male partner (Mr. Sluka) in charge – even though
         those young men had had zero involvement in contacting Google Ads and zero
         involvement in setting up the proposal or the budget.

137.    The Firm then used the Google Ads to advertise for new business in a *new area of law* that Mr. Abbott was *interested* in developing – even though Mr. Abbott had no experience in that field.

138.    Mr. Sluka told Plaintiff that Google Ads was "great," and that Mr. Abbott had expressed an interest in developing a practice in this area of law (which was new not just to Mr. Abbot but to the Firm), and that Mr. Abbott had already gotten a request and had scheduled a meeting with a prospective client.

139.    In sum, throughout Plaintiff's entire period of employment at the Firm, the Firm shut down every effort she made to build her practice, while supporting *any* effort of younger lawyers to develop their practices.

140.    The Firm refused to support the development of Plaintiff's practice due to her age.

141.    The Firm also created a hostile environment for Plaintiff due to her age.

## The Firm's Hostile Environment Toward People with Disabilities

142.    In addition to creating a hostile environment for Plaintiff due to her age, the Firm was an extremely hostile environment for anyone with any kind of disability.

143.    In fact, the Firm's environment for people with disabilities would more accurately be described as "toxic."

144.    All five of the Firm's partners built their legal careers on defending insurance carriers and employers against injured workers in worker's compensation cases.  Three of the five Firm partners practiced worker's compensation law exclusively.

145.    Demeaning comments about worker's compensation litigants and people with disabilities were the norm and an everyday practice at the Firm.

146.    The partners routinely made negative comments about injured employees, ranging from employees who were supposedly exaggerating their injury or claiming a false injury, and extending to workers who had serious, indisputable injuries whose cases – the partners claimed -- needed to be litigated especially vigorously because the potential financial exposure to the carrier was great.

147.    Mr. Boxer also made demeaning comments about individuals with disabilities in the cases he was handling which were not worker's compensation cases.

148.    The partners bragged about being particularly litigious in their defense of legitimate work-related injuries where the insurance carrier would "own the body part" if the injury was found compensable.

149.    Legitimate cases that were further defined by having the potential for "creep" – where an injury to one body part could extend to another – were particularly reviled and the partners bragged about the need to litigate "hard" the cases where compensable injuries had the potential for "creep."

150.    Mr. Blake specifically directed Plaintiff that she had to litigate a case "hard" where a back injury involving a certain part of the spine could extend to other parts of the spine after fusion surgery, and the carrier would be on the hook for the entire spine and multiple fusion surgeries over time.

151.    Demeaning and belittling comments about people with disabilities were routine throughout the office.

152.    The toxic environment at the Firm started with the partners routinely deriding the disabilities of litigants, and extended to Firm employees with disabilities.

153.    One example is the Firm's annual Christmas dinner, which was held at a nearby inn.

154.    Plaintiff did not want to attend because she had a life-threatening allergy to wheat and she was concerned about possible exposure, but she felt compelled to attend and so she went anyway, after speaking to people at the inn in advance to do everything possible to limit her exposure.

155.    One Firm employee, however, who has celiac disease, refused to attend the dinners because of her concern with gluten exposure.

156.    Mr. Ellis complained to Plaintiff that the other employee was refusing to go to the dinner and derided the employee.

157.    Plaintiff explained that the employee had celiac disease and the employee felt she could not risk it.

158.    Mr. Ellis continued in a hostile demeanor to berate the employee for not going.

159.    Mr. Ellis acknowledged that he knew that the employee had celiac disease, and that she was not attending the dinner for that reason, but he pointed out that Plaintiff had a gluten problem and was going to the dinner anyway.

160.    Because the pressure to go to the dinner was so extreme and unreasonable and unforgiving even if the basis for not attending was a gluten allergy, and because Plaintiff was afraid that the other employee's decision not to go on the basis of her disability would affect her employment, Plaintiff was forced to defend the other employee's decision by telling Mr. Ellis that the other employee's condition was worse than Plaintiff's – even though Plaintiff's wheat allergy was life-threatening.

161.     Plaintiff went to the dinners because she was pressured to do so despite her
disability.

## The Injury

162.     Prior to going gluten free in 1999, Plaintiff required 22 doses a day of prescription
medication for asthma – and still could not breathe.

163.     After going gluten free, the asthma became manageable, and was controlled by
the occasional use of a rescue inhaler, and, sometimes, a steroid inhaler.

164.     Plaintiff's doctors listed her allergy to wheat as "critical" in her medical records.

165.     Many people at the Firm were aware that Plaintiff had a life-threatening allergy to
wheat and/or that she maintained a gluten-free diet because of wheat allergy, including
her supervisor, Mr. Ellis, his paralegal, Diane Drake (who also maintained a gluten-free
diet), and the Office Manager.

166.     On December 4, 2017, Plaintiff was working with Diane Drake, as they both were
preparing a client for a mediation in Mr. Ellis' office in Burlington.

167.     There was no time to go out for lunch, so Plaintiff asked Ms. Drake if she wanted
to split a gluten-free pizza from a restaurant that Plaintiff had safely used many times
before.  They agreed that Plaintiff would pay for the pizza, and Ms. Drake would order it
and pick it up.  Plaintiff reminded Ms. Drake to get a gluten-free pizza, and Ms. Drake
responded "Of course."  Ms. Drake then left Mr. Ellis' office and ordered the pizza
outside of Plaintiff's earshot.

168.     Approximately 20-30 minutes later, Ms. Drake brought the pizza into Mr. Ellis'
office, where Plaintiff was still preparing the client for the mediation.

169.     While continuing to prepare the client, Plaintiff took three bites of the pizza before realizing that it was not gluten-free.

170.     Ms. Drake immediately apologized and became very upset.  She said she had forgotten to order a gluten-free pizza.

171.     The next day, Plaintiff reported the incident to the Office Manager, Denise Smith.

172.     Plaintiff became very ill beginning on December 5, 2018, first with severe abdominal pain, and then followed by – over the course of hours, days, weeks and months -- severe diarrhea, "acute on chronic sinusitis" and a "severe and sustained" exacerbation of her chronic sinusitis, "acute pharyngitis," exacerbated asthma, severe inflammatory back pain, severe joint pain, fluctuating autoimmune hearing loss that now requires hearing aids, chronic and painful inflammation in her ankles, a severe vitamin D deficiency (brought on or exacerbated by the months of severe diarrhea), a yeast infection in her throat, tachycardia, irregular heartbeats, a partially collapsed lung, a chronically-swollen axillary lymph node, severe sleep disturbance, periods of cognitive impairment, damage to the corneas of her eyes due to dryness caused by the new autoimmune disease, and multiple additional conditions.

173.     Beginning on December 5, 2017, Plaintiff experienced severe and ongoing pain that made it impossible for Plaintiff to sleep, and the severe sleep disturbance caused other physical ailments, including periods of cognitive impairment and heart problems.

174.     Testing at Massachusetts General Hospital would later determine that eating wheat in December of 2017 caused a severe exacerbation of Plaintiff's IgE allergic inflammatory antibodies.

175.    In October of 2018, Plaintiff's total IgE count was more than 23 times the highest level of "normal."

176.    In other words, in every drop of blood, Plaintiff had 23 times the normal rate of allergic inflammatory antibodies.

177.    In addition, in January of 2019, Plaintiff was first tested for IgE-Wheat antibodies. That test was positive, which confirmed her allergy to wheat, and also indicated that her immune system had still not been able to rid her body of wheat antibodies that were caused in reaction to the accidental ingestion of wheat in December of 2017.

178.    In contrast, a year later, in January of 2020, Plaintiff's blood work determined that her body had finally gotten rid of the IgE-wheat antibodies (which were now undetectable), and that her total IgE had accordingly declined to only 9 times more than the highest range of "normal."

179.    Overtime, Plaintiff's specialists at Dartmouth Hitchcock Medical Center and Massachusetts General Hospital diagnosed Plaintiff with a systemic inflammatory condition. Multiple doctors determined that, due to the wheat ingestion in December of 2017, her immune system was attacking every part of her body.

180.    Because Plaintiff's inflammatory response affected so many body parts, her worker's compensation case was the epitome of the kind of "creeping" case that the partners bragged about litigating fiercely, especially when the claim was legitimate, where multiple body parts were affected and the insurance carrier would "own" every body part and the costs would be high over the course of the claimant's life.

181.     Accordingly, the partners were highly motivated to do whatever they could to limit the Firm's liability in Plaintiff's situation.

182.     And, while the Firm had worker's compensation insurance, their carrier was also one of the Firm's biggest clients.

183.     Travelers Insurance ("Travelers") not only gave the Firm a significant portion of the Firm's worker's compensation cases, it also gave a number of large subrogation cases to Mr. Ellis.

184.     For this reason as well, the Firm was motivated to do whatever it could to limit the Firm's and Travelers' liability.

185.     The Firm engaged in much of the conduct described herein in order to protect Travelers' as well as the Firm's relationship with Travelers.

186.     Plaintiff currently has nine treating physicians at Massachusetts General Hospital, eight at Dartmouth Hitchcock Medical Center, and five in Florida (22 altogether) who are treating various aspects of this inflammatory condition that began the day after she ate wheat on December 4, 2017.

187.     Prior to eating wheat in December of 2017, Plaintiff rarely went to her primary physician, and had not seen a specialist (other than routine gynecological and dermatology exams) in years.

188.     Plaintiff's systemic inflammatory condition improved substantially during February, March and April of 2020, when the workers' compensation case was on hold, at her request, so she could focus on her health. However, as soon as the workers' compensation case heated up in May of 2020, and the obstruction and misconduct began

anew, her sleep disturbance deteriorated dramatically, and her overall health declined significantly.

189.     In the worker's compensation case, the Firm does not dispute the fact that Plaintiff has been diagnosed with over 25 inflammatory medical conditions since December 4, 2017.

190.     Nor does the Firm dispute the fact that Plaintiff accidentally ate wheat at work, as described above.

191.     The Firm does dispute causation.

192.     However, causation is clear, as multiple doctors who have treated Plaintiff -- including Plaintiff's primary doctor, and specialists at Massachusetts General Hospital and Dartmouth Hitchcock Medical Center -- have concluded that eating the wheat pizza caused both specific inflammation was well as the systemic inflammatory condition which she has had since December of 2017.

## **Periods of Cognitive Impairment**

193.     Immediately after becoming very ill on December 5, 2017, Plaintiff developed periods of cognitive impairment, and she started to make mistakes at work because of her illness.

194.     Plaintiff had never made mistakes like these before.

195.     To be clear, Plaintiff was generally able to perform at her normal, very high level.

196.     The periods of impairment were brief and intermittent, and the mistakes were few (approximately five mistakes in eleven months) and far between.

197.    Plaintiff knew that she had made these mistakes because she was in a lot of pain and not sleeping, and thus, that eating wheat – which had caused the pain, which, in turn, had made it impossible to sleep -- had caused the periods of cognitive impairment.

198.    Plaintiff has now been assessed by a neurologist and two neuro-psychologists at Massachusetts General Hospital, who opined in April of 2020, that the occasional cognitive lapses (which still occur) are caused by sleep disturbance, chronic pain, and affective stress.


### Plaintiff's First Error Occurred Within Days After Eating the Wheat Pizza

199.    The mediation on December 4, 2017 involved an employment dispute where the Firm represented a client who alleged wrongful termination and a failure of her employer to pay overtime.

200.    Plaintiff had handled several similar cases in the past, and she was well aware that the law requires that all settlement proceeds in such cases are taxable.

201.    Prior to and during the mediation on December 4, 2017, Plaintiff repeatedly informed the client that the settlement proceeds would be taxable.

202.    However, after becoming ill on December 5, 2017, Plaintiff inexplicably informed the client that a portion of the settlement would not be taxable, even though Plaintiff had always known that the proceeds would be taxable and even though Plaintiff had drafted a settlement agreement that made clear that the proceeds would be taxable.

203.    Plaintiff cannot establish the date of her error because the Firm has refused to produce the records in the worker's compensation case, but, on information and belief, it was within days of eating the wheat pizza.

204.     At some point in January or February, the client received a Form 1099 from her former employer, and she was irate that that portion of the proceeds was being taxed.

205.     Plaintiff engaged in an exchange of emails with the client, and with opposing counsel, regarding Plaintiff's wrong belief at that time that a portion of the settlement proceeds should not be taxed.

206.     Plaintiff copied Mr. Ellis on some of those emails.

207.     Mr. Ellis was very upset, and emailed Plaintiff, telling her that the proceeds were taxable, and that he really wished that Plaintiff had spoken to him first before she got "so far into the weeds" – or words to that effect.

208.     Plaintiff recognized immediately after seeing Mr. Ellis' email that she had made a error. She was extremely upset, as she had never made an error like that before, and she could not understand how she could have known the law clearly prior to the mediation and yet somehow become terribly confused immediately after the mediation.

209.     She realized that she had made the error because she was so ill from eating wheat and not sleeping.

210.     For a period of months following the injury, Plaintiff's pain was so severe during the night that she was unable to sleep except for short intermittent periods of 15-25 minutes (for the first several weeks) and 30-45 minute intervals (for the next several months). For many months, Plaintiff only got an average of 2 or 3 hours of sleep a night.

211.     This severe sleep disturbance continued throughout the time Plaintiff remained employed at the Firm.

212.    After realizing her error with the client, Plaintiff telephoned Mr. Ellis in his
Burlington office to tell him how upset she was that she had made this mistake and to
apologize.

213.    In that conversation, Plaintiff expressly told Mr. Ellis that she had known that the
proceeds were all taxable prior to the mediation and she had told the client that before
and during the mediation, but she had "accidentally eaten wheat" on the day of the
mediation, which made her very sick, and she was in a lot of pain and not sleeping and
somehow became confused about the law.

214.    As soon as Plaintiff mentioned her work injury and the severe debilitating effects
that followed, Ms. Ellis immediately cut her off and changed the subject, thereby making
it very clear that he did not want to discuss Plaintiff's illness. Because Mr. Ellis was
Plaintiff's supervisor, she was in no position to fight with him on that, and she was also
too sick to argue, so she did not provide further details.

215.    Plaintiff told Mr. Ellis that she would draft an email response to the client's angry
email, and send it first to Mr. Ellis for his review and approval. Mr. Ellis agreed.

216.    Mr. Ellis' conduct during that telephone conversation was consistent with Mr.
Ellis' recommendations to his clients, as Plaintiff had participated in a telephone call with
Mr. Ellis and a client (at a regional bank), where the client was seeking advice about an
employee who had disclosed a disability and the client wanted to know more about the
disability.

217.    Mr. Ellis stopped the conversation with the client to make a very firm point. Mr.
Ellis instructed the client, in words to the effect of:

> "You know, I'm going to tell you something that I tell all of my clients. When
> you are dealing with an employee who has a disability, you really don't want to

31

know.  You definitely do not ask the questions that you are thinking of to get more details.  The less you know, the better, because then you can say that you never knew, and it reduces your risk of liability.  So definitely don't ask anything, and change the subject or end the conversation.  That's what you need to do."

218.    Immediately after that phone call with the bank client, Mr. Ellis spoke to Plaintiff and explained how "very important" it is that employers do not ask questions to find out about their employee's disability, because it only increases their risk of liability on a disability claim.

219.    After the telephone call with Mr. Ellis about the tax error regarding settlement proceeds, Plaintiff prepared a draft email to the client, where Plaintiff admitted her mistake, apologized for her error, accepted responsibility, and, on information and belief, explained that she had gotten very ill after eating wheat (which had happened in front of the client and was a significant event at the time) and explained that Plaintiff had not been sleeping.

220.    Plaintiff sent that draft email to Mr. Ellis for approval to send to the client.

221.    **The Firm has apparently destroyed this email of Plaintiff's to Mr. Ellis as the Firm's counsel has repeatedly represented to the Administrative Law Judge in the worker's compensation case that the email "does not exist," despite the fact that its existence is proven by a later email.**

222.    Mr. Ellis called Plaintiff immediately after receiving the draft email.

223.    Mr. Ellis explained to Plaintiff that, when he was an associate at a law firm in Philadelphia, a partner had taught him that you never apologize, and never admit a mistake, "especially to a client."

224.     Plaintiff expressed disagreement with Mr. Ellis, as it was her practice to always accept responsibility, and she also told him that the email records clearly showed that she had made an error.

225.     Mr. Ellis reprimanded Plaintiff; told her that she had accepted responsibility in the past "to a fault"; and directed her to re-draft the email without admitting any mistake and without apologizing.

226.     Plaintiff prepared a revised email pursuant to Mr. Ellis' direction and sent it to him on February 9, 2018.

227.     The revised email clearly referenced the earlier email (which the Firm has now apparently destroyed) and the discussion with Mr. Ellis whereby he instructed Plaintiff to redraft the first email to not admit any mistake and to not apologize, as Plaintiff wrote:

> "I still kind of feel that maybe I should admit my mistake – as my emails clearly show my error – with the hope that it might appease her, but I have drafted this in the light that you and I discussed yesterday.  In this draft, I say I am sorry, but I never come out and say that I made a mistake."

(Emphasis added.)

228.     Mr. Ellis approved the revised email after removing one sentence, and Plaintiff sent the revised email to the client.

229.     While employed at the Firm, Plaintiff developed significant concerns about some of the partners at the Firm, such that she decided to forward potentially-important emails to her personal email address on occasion because of her concerns that, if there were ever a dispute, the records might "disappear."

230.     The fact that Plaintiff told Mr. Ellis that she made the tax mistake because she was "in a lot of pain and not sleeping," is documented in written emails between Plaintiff

and Mr. Ellis in May of 2018 that Plaintiff forwarded to her personal email account at the time.

231.    As Plaintiff anticipated, and as a part of the Firm's continuing bad faith conduct in the worker's compensation case with the goal of obtaining a wrongful advantage in the litigation, the Firm has wrongfully refused to produce any records at all, despite the obvious relevancy, and despite Worker's Compensation Rule Rule 3.14000 that requires all parties to produce relevant documents even before such records are requested.

232.    In April or May of 2018, Mr. Ellis asked Plaintiff to write something about the new marijuana law for the firm's website and possible publication (as Plaintiff had recently published an article in Vtdigger.org about a new employment-related law).

233.    Plaintiff drafted a proposed article and emailed it to Mr. Ellis.

234.    On May 9, 2018, Mr. Ellis telephoned Plaintiff in a rage.  He was very angry about various things in the draft which he claimed were wrong.  Rather than argue with her supervisor, Plaintiff accepted all blame (even though she believed she had not made any errors) and apologized.

235.    On May 9, 2018, Mr. Ellis sent Plaintiff an email, attacking Plaintiff's work on the article (**while admitting that he had not even read the new marijuana law**), and then he concluded:

> It appears that you wrote and gave me an article for publication without giving the issue the most basic analysis and that we would have published erroneous and misleading information if I had not questioned your analysis and conclusions. This is very troubling. **This is reminiscent of the incorrect assertions you made to the client regarding the taxation of her settlement.  It makes we [sic?] question whether I can consistently rely on your legal analysis and judgment.  I cannot conceive of any explanation that I would find very reassuring. . . .  Clients will very quickly lose confidence in an attorney who provides erroneous legal advice. . . and confidence, once shaken, cannot be restored by retractions, revisions, explanations or apologies.**

(Emphasis added).

236.     The only reason Plaintiff has this email is because she forwarded it to her private
email account.

237.     Plaintiff responded to Mr. Ellis by email on May 9, 2018, that she had accepted
blame too quickly with regard to the article, that she had not made any mistakes in
interpreting the new law, and then she wrote the following about the tax mistake she had
made shortly after eating the wheat pizza:

> **In terms of the other client, I have readily acknowledged my mistake, and I
> explained that I was in a lot of pain and not sleeping at the time, and of
> course, I have apologized.**

(Emphasis added.)

238.     The only reason Plaintiff has this email is because she forwarded it to her private
email account.

239.     These email records are just two of countless records that the Firm has refused to
produce in the worker's compensation litigation in the Firm's continuing course of bad
faith conduct that began immediately after Plaintiff got ill.

240.     Mr. Ellis responded to Plaintiff's May 9th email on May 9th, and did not dispute
the fact that Plaintiff had reported to him, back in February of 2018, that she had told him
that she had made a mistake because she was "in a lot of pain and not sleeping."

241.     In fact, just as he had done when Plaintiff raised her injury, difficulty sleeping,
and ongoing illness with Mr. Ellis over the phone, Mr. Ellis again ignored her statement
about her work-related injury when she put it in writing.

242.	Again, the only reason why Plaintiff has this critical email from Mr. Ellis is because she forwarded it to her personal email account.

243.	Mr. Ellis' ignoring the written statement about Plaintiff's injury and ongoing disability was consistent with his strategy of making sure that he "knew as little as possible" of Plaintiff's injury or illness in order to limit the Firm's and Traveler's liability.

244.	In contrast, a normal, compassionate employer would have expressed concern and/or support about an employee's repeated discussion of debilitating health problems – including, for example, wanting to know if her condition had improved.

245.	Mr. Ellis' reaction to the contrary shows that he knew that Plaintiff's health issues were caused by a work injury, and that he was concerned about potential liability and therefore felt it necessary to shut down the conversation, whether the conversation happened over the phone or by email.

246.	Again, Mr. Ellis did not raise any discussion of Plaintiff's possible need for accommodations., despite the obvious need for flexible hours to assist with the sleep deprivation.

247.	Mr. Ellis had previously granted a flexible-hours accommodation due to sleep disturbance to a young lawyer who worked for him prior to Plaintiff.

248.	Any reasonable employer that wished to be compliant with the law, when faced with an employee whose performance had suddenly changed after an injury or illness and who informed the employer that the change in performance was caused by difficulty sleeping, would have asked the employee if starting work an hour or so later would help the employee.

249.    Instead, Mr. Ellis intentionally and repeatedly shut down all conversations on the subject and thereby sent a strong message that Plaintiff was not to discuss the matter further.

250.    Plaintiff complied with Mr. Ellis' clear directive not to discuss the matter further.

### The Mistakes Continued

251.    In addition to the mistake regarding the tax issue, Plaintiff made a few other mistakes while she was very ill.

252.    Under pressure in a telephone call with Mr. Ellis, after her injury, Plaintiff misread a scheduling order.

253.    When Mr. Ellis directed Plaintiff to obtain an expert in a case that Mr. Ellis was handling, she correctly told Mr. Ellis that he had already missed the deadline for submitting an expert report. Mr. Ellis disagreed and asked Plaintiff to pull up the order on her computer. Plaintiff obtained the order on her computer, and then – feeling pressured by Mr. Ellis, who had already told her she was wrong – misread the order and told Mr. Ellis (incorrectly) that he was correct and the deadline had not yet passed.

254.    While she was ill, Plaintiff also sent two emails to the wrong lawyer. On information and belief, the emails contained a draft confidential settlement agreement that identified the client.

255.    In both instances, the lawyer immediately notified Plaintiff that he had received the email in error and was destroying it.

256.    Mr. Ellis was copied on both emails. Mr. Ellis responded in an email to Plaintiff: "???"

257.     Plaintiff also read a draft of something Mr. Ellis had prepared in another case, one

day when she was home sick after attending a doctor's appointment. Plaintiff sent an

email asking about something that did not appear to be in the draft when it was, in fact, in

the draft. Ms. Drake sent an email pointing out where the matter was set forth in the

draft. Mr. Ellis was copied on all of these emails. Mr. Ellis knew what Plaintiff was

home sick at the time.

258.     As the mistakes continued, Mr. Ellis intentionally never broached the subject of

accommodations. He avoided the topic in order to be able to claim that he did not know

that Plaintiff required accommodations, and to limit the Firm's and Traveler's liability.

### The Firm Knew Plaintiff Was Very Ill

259.     Mr. Ellis and the Firm were well aware that Plaintiff was very ill for the entire

time following her injury on December 4, 2017 until she resigned on November 8, 2018.

260.     Mr. Ellis was fully aware of the extent of Plaintiff's illness. In addition to being

told about it orally by Plaintiff in early 2018, and in writing on May 9, 2018, Plaintiff

sent Mr. Ellis several emails about how she was not feeling well, not coming into the

office and/or going to the doctor.

261.     On July 24, 2018, Ms. Rainville sent an email to Mr. Ellis, Mr. Blake and others,

stating that: "My sinus infection has gotten much worse despite being on powerful

antibiotics and prednisone. I now also have a fever. I have to go to the doctor and don't

feel up to coming in. I will be working from home."

262.     Consistent with the firm's policy of shutting down all communications with an

employee about a significant illness, neither Mr. Ellis nor Mr. Blake responded to this

email or other emails about Plaintiff being sick and seeking treatment at Massachusetts
General Hospital.

263.    Plaintiff also told Mr. Ellis that she was very sick with a sinus infection, that the
infection was not responding to antibiotics and prednisone, and that her condition had
gotten so severe that she was going to see a specialist at Mass General.

264.    Yet again, Ms. Ellis shut the conversation down and would not allow Plaintiff to
provide any details of her illness beyond what she had quickly blurted out. He said he
had to take another phone call – despite the fact that there was no indication of another
call.

265.    Typically, when Mr. Ellis had another call, Plaintiff would hear either his office
phone or his cell phone make a noise to indicate that there was another call, or the voice
of his assistant telling him that he had another call. On this occasion, when Mr. Ellis said
he had another call, there was no sound to indicate that there was another call.

266.    On information and belief, Mr. Ellis lied when he said he had another call in order
to stop the conversation before Plaintiff said anything more about her illness or injury, in
order to limit the Firm's and Traveler's liability.

267.    Anyone who was in contact with Plaintiff following the injury was aware of how
sick Plaintiff was, as her illness was so obvious in her voice and her demeanor that Ms.
Drake, after speaking to Plaintiff on the phone, told Plaintiff, "Oh my God, I told Steve
[Ellis] how sick you sounded on the phone. Are you sure you are okay? Shouldn't you
be home?"

268.    Partner Justin Sluka was also aware of all of the details of Plaintiff's injury and
illness.

269.     Mr. Sluka, whose office was next to Plaintiff and who spoke with Plaintiff nearly
         every day, was aware of the fact that Plaintiff accidentally ate wheat on December 4,
         2017, that the wheat pizza was given to her by Diane Drake, and that Plaintiff became
         very ill immediately thereafter and remained very ill as long as she remained at the Firm.

270.     Plaintiff provided Mr. Sluka near-daily updates from December 5, 2017 until her
         departure from the firm about how sick she was, what medications she was taking, what
         tests her doctors had ordered to try to determine the cause of the ongoing abdominal pain,
         the results of those tests, what doctors she was seeing, her difficulty sleeping, and about
         her treatment at Mass General.

271.     On one occasion, Plaintiff shared with Mr. Sluka the fact that she had not slept a
         single minute the night before.

272.     Mr. Sluka was well aware that Plaintiff was dramatically sicker than she had been
         at any time while at the Firm prior to December 5, 2017.

273.     Mr. Sluka witnessed Plaintiff being extremely congested and coughing constantly
         for months.  Mr. Sluka witnessed Plaintiff holding her left upper abdomen as she
         demonstrated to him where the pain was.  Mr. Sluka witnessed Plaintiff having difficulty
         with her hearing.  Mr. Sluka might have also noticed frequent trips to the bathroom.

274.     Mr. Sluka was a partner at the time, and his knowledge constitutes knowledge of
         the Firm.

275.     Plaintiff also took daily walks (which are essential for her immune health,
         regardless of how sick Plaintiff felt at the time) with the Firm's office manager, Denise
         Smith.  During those walks, Plaintiff gave Ms. Smith regular updates about her condition,

as the two were friendly and Ms. Smith understood the issues because Ms. Smith has celiac disease.

276.     Ms. Smith knew how sick Plaintiff was from December 5, 2017 until her departure from the firm; Ms. Smith knew it was a significant change from Plaintiff's condition before she ate wheat; and Ms. Smith was fully aware of all of Plaintiff's doctor appointment and the tests and details of those appointments.  Ms. Smith was personally aware of Plaintiff's ongoing complaints of severe abdominal pain, severe diarrhea, exacerbated asthma, chronic cough, tachycardia, severe sinus infection that stopped responding to antibiotics and prednisone, and the fluctuating hearing loss.  Ms. Smith also surely noticed that Plaintiff was severely congested and coughing for months on end.

277.     Ms. Smith was also aware that Plaintiff attributed all of these conditions to eating wheat on December 4, 2017.

278.     Ms. Smith was also aware that Plaintiff never complained of these medical conditions prior to December 5, 2017.

279.     Ms. Smith was the Firm's office manager at the time, and her knowledge constitutes knowledge of the Firm.

280.     Plaintiff also spoke to managing partner William Blake several times a week, as it was his practice to "check in" with her.  Mr. Blake surely noticed how Plaintiff was severely congested and coughing nonstop on multiple occasions, over the course of months, when they spoke.

281.     Indeed, on several occasions, Mr. Blake declined to step foot in Plaintiff's office, as he expressed fear of catching whatever it was she had – even though Plaintiff had told him that it was an immune disorder and she was not contagious.  Instead, Mr. Blake

41

spoke to her from the hallway, or he closed her door to keep her "germs" from getting out
into the hallway and did not speak to her at all after seeing and hearing how sick she was.

282.    During some of those conversations, Plaintiff also told Mr. Blake that she was
very ill and having various tests and going to Mass General for treatment because her
sinus infection was out of control.

283.    Just as Mr. Ellis made clear that he did not want to hear about Plaintiff's health
issues, Mr. Blake similarly immediately stopped Plaintiff every time she attempted to
share health information with him.  He changed the subject or ended the conversation by
walking away.

## There Was an Accommodations Which Would Have Helped, and Plaintiff Would Have Taken a Medical Leave Rather than Resign, Absent the Firm's Fraudulent Scheme to Mislead Plaintiff

284.    As Plaintiff communicated to Defendant Ellis, Plaintiff knew that she was making
mistakes because she was not sleeping.  Indeed, the mistakes tended to happen after
particularly bad nights where Plaintiff got fewer than three hours of sleep.

285.    While the sleep disturbance began due to systemic inflammation and the pain
caused by that condition, the sleep disturbance was greatly aggravated by the Firm's
conduct set forth herein.  The Firm's conduct toward Plaintiff and her illness caused
Plaintiff severe stress, which, in turn, made it even more difficult to sleep.

286.    The aggravation of the sleep disturbance, caused by the Firm's conduct, further
impaired Plaintiff's immune system and prolonged her recovery.

287.    Had Mr. Ellis or the Firm advised Plaintiff that she was going to be terminated
due to her mistakes, or even allowed her to engage in a conversation about whether there
were any accommodations which could help her performance, Plaintiff would have

requested a simple accommodation that she be allowed to work flexible hours so she
could sleep in and start a few hours late, and, if necessary, that she be excused from work
on the days when she was unable to get a sufficient amount of sleep even with the
accommodation.

288.     If the accommodations had failed to improve her performance, Plaintiff would
have taken a medical leave and immediately filed a worker's compensation complaint
rather than resign.

289.     An accommodation of flexible hours for sleep disturbance would have also
benefitted Plaintiff's health and increased the pace of her recovery.  The immune system
-- and certainly Plaintiff's immune system -- requires reasonable amounts of sleep to
function properly.

290.     Despite knowing about Plaintiff's disabling condition, which had been caused
initially by eating wheat at work but was aggravated by the Firm's conduct, the Firm
never offered Plaintiff accommodations at any time, until after she submitted her
resignation.

291.     After accepting Plaintiff's November 8, 2018 resignation, Defendant Ellis finally
offered, in his November 8, 2018 email, to have a conversation about accommodations:
"Please let us know if you require any accommodations for your condition during the
remaining period of your employment."

292.     Mr. Ellis' email proves that the Firm *could have, and should have,* offered
Plaintiff accommodations in the prior 11 months, and knowingly failed to do so.

293.     The Firm offered Plaintiff accommodations only after getting what it had hoped to accomplish with its scheme, described below, of falsely representing that there was insufficient work to support her position: her resignation.

294.     The Firm then repeatedly used that resignation in its defense in the worker's compensation litigation, claiming that Plaintiff was not entitled to lost wages because she resigned.

## The Firm Falsely Coerced Plaintiff's Resignation by Repeatedly Telling Her that the Firm Did Not Have Enough Work, and Constructively Discharged Her by Taking Her Work Away and Demeaning Plaintiff by Giving her Paralegal Work and Taking that Away

295.     After the May 9, 2018 email exchange where Defendant Ellis complained again about the mistake Plaintiff had made in December of 2014, and concluded that, "I cannot conceive of any explanation that I would find very reassuring. . . . ," Mr. Ellis told Plaintiff that "the next time there is a lull" in his work, that he "would have to let her go."

296.     He then started to greatly reduce the work that he gave her, thereby creating the "lull."

297.     Then, in order to prevent Plaintiff from requesting accommodations or filing a worker's compensation claim, the Firm concocted a scheme whereby the partners repeatedly lied to Plaintiff to let her believe that the Firm had insufficient work to support her position, and that she was being let go for that reason – which falsely made her believe that the decision to terminate her had nothing to do with her performance or her illness.

298.     On information and belief, the Firm's records will show that Mr. Ellis' billable hours increased while Plaintiff's billable hours decreased, compared to the prior year,

because Defendant Ellis was handling work that he previously would have given to Plaintiff.

299.    Similarly, in the fall of 2018, Managing Partner William Blake took back two worker's compensation cases that he had given to Plaintiff to handle many months before. Plaintiff did not understand why Mr. Blake was taking the cases away when she needed work.

300.    Mr. Blake explained that he was taking the cases back because Plaintiff would be leaving when she became State's Attorney and that he should transition the cases back with the client before then.

301.    Plaintiff had asked for permission to run for State's Attorney because the firm had made it explicitly clear that her employment was going to be terminated, she was therefore applying for jobs and finding it difficult to obtain new employment due to her age (56), and running for State's Attorney was a job opportunity when her termination was imminent.

302.    Plaintiff told Mr. Blake that she did not think that she would win the election, and, even if she did, she would not take office until January. Mr. Blake indicated that that didn't matter, he was taking the cases back.

303.    Mr. Blake thus made very clear that Plaintiff had no future at the firm regardless of whether she won the election, and that his excuse about taking the cases back because she was going to become State's Attorney was false.

304.    Plaintiff told Mr. Blake that she had no work, so Mr. Blake's stated reason for taking the cases back especially made no sense and was obviously not truthful.

305.    It made no sense for the Firm to pay Plaintiff to sit there and do nothing, but that was the position that Mr. Blake, Mr. Ellis, and the Firm created for Plaintiff to force her resignation.

306.    Mr. Blake must have then communicated that Plaintiff had no work to partner Jennifer Moore, who then angrily came to Plaintiff's office and gave her an assignment.

307.    Ms. Moore humiliated and demeaned Plaintiff by telling Plaintiff that she was giving Plaintiff work that she would normally give to a paralegal, but that the paralegal was busy.

308.    Ms. Moore later sent Plaintiff an email telling her to stop work on the assignment. Ms. Moore did not give a reason for stopping work.

309.    In November of 2018, in a conversation in Plaintiff's office, Mr. Blake said to Plaintiff, "I feel bad about this."

310.    Ms. Rainville assumed Mr. Blake was talking about firing her, so she asked why he felt bad, hoping that maybe he would change his mind.

311.    Instead, Mr. Blake explained that he felt bad that the Firm had hired her in the first place.

312.    Mr. Blake said that, "When you hire someone, you have to recognize that that person is turning down other opportunities to be here."

313.    And then he explained that Mr. Ellis had been all "gung-ho"-- or words to that effect -- about how he needed someone right away, and that Mr. Blake was concerned at the time that Mr. Ellis' work tended to ebb and flow, that Mr. Ellis' workload was "really slow" at times in the past, that Mr. Blake had been concerned that there might not

be enough work for Plaintiff beyond that initial crunch period (or words to that effect),

and that this "has happened before."

314.    When Plaintiff resigned on November 8, 2018, Defendant Ellis sent her an email

stating that, "the current volume of work cannot support your position":

> I understand from Bill that you approached him yesterday and <u>acknowledged that
> the current volume of work cannot support your position</u>, but <u>requested that you
> be permitted to resign voluntarily at the end of November</u> and that your health
> insurance continue until the end of the year.  Bill has asked me to respond, as your
> primary supervising attorney.  Your proposal is acceptable.  <u>In fact, I had been
> intending to have this conversation with you, but had deferred it in light your
> political campaign.</u>

(Emphasis added).

315.    Notably, Mr. Ellis' email also clearly stated that Plaintiff was "permitted to resign

voluntarily" by agreement, which shows that her resignation was not voluntary at all.

316.    <u>Shortly after Plaintiff left the Firm, Mr. Ellis' paralegal, Diane Drake, told

Plaintiff that Mr. Ellis had told her, in the summer of 2018, that he was going to terminate

Plaintiff's employment because Plaintiff was making too many mistakes, and that he was

going to terminate Plaintiff at the end of the year (2018).</u>

## The Firm's Effort to Recruit a "Newbie" Lawyer

317.    Mr. Ellis' statement about the Firm not having the "volume of work" necessary to

support her position was patently false at the time he wrote it, as the Firm had been

actively recruiting for a younger lawyer to replace Plaintiff for more than a month, and

re-advertised for the position on the day Plaintiff asked to resign voluntarily – November

8, 2019.

47

318.    In the early fall of 2018, Plaintiff learned that the Firm was advertising to hire a new associate. Plaintiff saw the ads online.

319.    On October 17, 2018, or earlier, the Firm started interviewing young lawyers for Plaintiff's position.

320.    The Firm's recruitment ads expressly stated that the Firm would accept someone with no experience if the candidate had good academic credentials.

321.    On October 17, 2018, partner Jennifer Moore sent an email to everyone at the firm, stating that: "There is a woman coming in today to interview at 9:30 a.m."

322.    The woman was clearly interviewing for Plaintiff's position, as there were no other positions which needed to be filled and the firm had advertised that it was looking for a lawyer. Plaintiff was told by paralegals who met the woman in the lobby that the woman being interviewed was a lawyer.

323.    On information and belief, the woman who interviewed for Plaintiff's position on October 17, 2018 did not work out.

324.    Plaintiff, who was very ill, was confused about why the Firm could be recruiting a lawyer when the partners had told her that there was not enough work for her, and she assumed that the Firm would not go forward with the hire.

325.    After seeing an ad for the new associate position, Plaintiff spoke to Mr. Blake, and offered to take a reduction in salary so that she would be paid the same as a new junior associate with no experience.

326.    This was in accordance with Mr. Ellis's suggestion back in December, before Mr. Ellis was aware of Plaintiff's injury, illness and disability.

327.    Mr. Blake declined Plaintiff's offer to be paid the same as a new hire.

48

328.    Mr. Blake said: "We want a newbie.  You know, someone we can train."

329.    Mr. Blake's admission demonstrates that age discrimination was a material factor in the Firm's decision to terminate Plaintiff's employment.

330.    On November 8, 2018, the very same day that Mr. Ellis sent Plaintiff an email proclaiming that "the current volume of work cannot support your position" (emphasis added), the Firm re-advertised for the young lawyer position on Indeed.

331.    Plaintiff received an email from Indeed about the opening.

332.    The Firm promptly hired a new associate, who started shortly after Plaintiff left the Firm.

333.    On information and belief, the new associate had just recently graduated from law school.

### The Firm Created a False Document to Support Their Defense to the Worker's Compensation Case

334.    Mr. Ellis sent the patently untruthful November 8, 2018 email stating that the Firm did not have the "volume" of work to support Plaintiff's position in order to create a false record which would support the Firm's false position that the Firm was terminating Plaintiff's employment for reasons that were unrelated to her age or her illness.

335.    Mr. Ellis knew the email was false at the time he sent it.

336.    In sending that email, Mr. Ellis assisted the Firm's effort to cover up the fact that the Firm had decided to terminate Plaintiff's employment because of her age and disability, all while intending to replace her with a much younger lawyer.

**The Firm Then Used This False Defense in the Worker's Compensation Case**

337.     In worker's compensation cases, parties are obligated to turn over all relevant

documents without any documents even being requested. *See* Rule 3.14000.

338.     Despite this, the Firm has refused to turn over a single document, other than

Plaintiff's medical records, which Plaintiff can obtain on her own, and two emails which

the Firm was ordered to produce.

339.     Plaintiff specifically requested documents relating to the mistakes she made at

work, and the Firm's decision to terminate her employment and refusal to provide a

reference.

340.     The Firm has refused to produce any records, even though Plaintiff's first formal

written report of injury expressly listed "brain fog" as a part of her disability, and

identified mistakes she had made at work.

341.     The Firm submitted a response to Plaintiff's appeal of the denial of the claim

which contained numerous false statements, including the following:

> "The claimant exhibited no outward signs to her employer that she was suffering
> any symptoms from December 4, 2017 through her voluntary resignation from
> employment on November 8, 2018."

> That claimant's resignation was "voluntary"

> "The claimant reported no work injury until November 8, 2018."

> "There was no evidence at the time that claimant was suffering from debilitating
> symptoms . . . ."

> "Whatever hires the employer made in the ensuing months reflected personnel
> needs which arose at that time. These needs were independent of the lack of work
> for the claimant. . . ."

342.    The Firm was unaware that Plaintiff, who anticipated that her employer would withhold or destroy documents and then make false arguments in court, had forwarded important records in her possession to her private email, in order to protect the truth in case a dispute ever arose.

343.    Thus, Plaintiff had some records, as described above, to prove the falsity of the Firm's statements, including Mr. Ellis' emails from May 9, 2018 and November 8, 2018, records of the Firm's advertising for the position and interviewing a candidate in the month prior to Plaintiff's resignation, and a copy of Plaintiff's first formal written report of her injury.

344.    The Firm admitted to the Administrative Law Judge that Plaintiff's records were authentic – the Firm stated that Plaintiff had "diverted" documents to her private email, *see* August 5, 2019 Objection to Motion to Compel Discovery, at 2, and the Firm offered no explanation for why these highly-relevant documents were not disclosed.

345.    The Firm is continuing to refuse to produce material records other than medical records which Plaintiff can obtain on her own.

346.    The Firm's continuing refusal to produce any and all records relating to Plaintiff, including specifically those records which concern her periods of cognitive lapses and the Firm's decision to terminate her employment, and even her first written full report of the injury, is a part of the continuing coverup of the real reason why the Firm terminated her employment: in order to evade liability in the worker's compensation case, to protect the Firm's relationship with Travelers, and to replace Plaintiff with a younger lawyer.

347.    In addition, Plaintiff learned in September of 2020, that the Firm had destroyed partner Justin Sluka's emails in mid-Janjary of 2019.

51

348.     The Firm's obstructive tactics in the workers' compensation litigation were also a
purposeful effort to conceal the destruction of Mr. Sluka's emails.

349.     If the Firm truly terminated Plaintiff because there was insufficient work to
support her position, the records would show that, and the Firm would have produced
them.

350.     If Mr. Ellis had somehow miraculously overcome his concern about Plaintiff's
mistakes that began when she became ill from her worker's compensation injury, and if
he had never told Diane Drake that he was going to fire Plaintiff at the end of the year
because there were "too many mistakes," the records would show that and the Firm
would have produced those records.

351.     The reality is clear: the records prove that the Firm terminated Plaintiff's
employment, that her resignation was not voluntary, that the Firm lied about not having
sufficient work to support her position and further acted to coerce her resignation, and
then falsely argued to the Department of Labor that she resigned voluntarily. *See* The
Firm's August 5, 2019 Objection to Motion to Compel Discovery, at 4.

352.     The truth is that the Firm did all that to cover up the fact that the Firm was
terminating Plaintiff's employment because she was ill and the partners wanted someone
younger, and to prevent Plaintiff from asking for accommodations or filing a worker's
compensation claim.

353.     The evidence is clear that the Firm always had sufficient work to support
Plaintiff's position, and that the Firm stopped giving one of its most profitable lawyers
work.  The only explanations for that was Mr. Ellis' and the Firm's concern that Plaintiff
might require accommodations and they wanted someone younger.

354.     Mr. Ellis and the Firm lied to Plaintiff, repeatedly, about the reason for her
termination in order to prevent her from requesting an accommodation, and to create a
false record of an alternative reason for her termination.

355.     Mr. Ellis and the Firm actively worked to coerce Plaintiff into resigning, by
taking work away, humiliating her with paralegal work, and refusing to give her work –
all while they had enough work to hire a new young attorney right out of law school.

356.     The Firm constructively discharged Plaintiff by taking all of her work away,
humiliating her by giving her paralegal work, and then taking that work away as well –
leaving her with no work at all.

357.     It does not make any sense that a firm would fire one of its most profitable
lawyers when it had adequate work to support a new lawyer, absent age discrimination
and disability discrimination.

## The Firm's Refusal to Provide a Reference for Plaintiff

358.     After Plaintiff had tendered her resignation orally to Mr. Blake, Plaintiff asked
Mr. Blake whether the firm would serve as a reference for Plaintiff for a future employer.

359.     Mr. Blake told Plaintiff that the firm had a policy and did not give references, and
that Stephen Ellis, "the employment law guru," said they should not give references for
anyone.

360.     That statement was patently false.  There was no such written policy, there was no
such informal policy, and the Firm gave references to future employers as a matter of
course.

361.    Indeed, Mr. Ellis had previously told Plaintiff that a prior associate who worked

for him had asked for a reference, and that he had agreed to serve as a reference even

though there were "a lot of problems" with that associate.

362.    In addition, Mr. Ellis' assistant found a good job after getting laid off, with a good

law firm in Burlington. It is highly unlikely that a law firm would have hired a paralegal

without conducting basic due diligence, including speaking to someone at the Firm as a

reference since she had worked there for the last 5+ years and was made to leave

involuntarily in a layoff.

363.    The only explanation for the Firm's conduct is that the Firm decided to terminate

Plaintiff's employment due to the mistakes she made because of her work-related injury

and illness.

## Plaintiff's First Formal Written Report of her Injury

364.    Although Plaintiff reported her injury to the office manager on December 5, 2017

-- the day after eating wheat -- no one at the Firm asked Plaintiff to write up her worker's

compensation claim until after she offered to resign on November 8, 2018.

365.    At that point, having obtained the outcome that the Firm was trying to achieve,

Mr. Blake asked Plaintiff to write up the worker's compensation claim in an email, which

she sent to him later that day.

366.    In that First Report of Injury, submitted to Mr. Blake on November 8, 2018,

Plaintiff alleged that eating wheat on December 4, 2017 caused the following conditions:

"considerable" abdominal pain, sometimes a 10 on a scale of 1-10; severe pain in spine

and many joints and bones; difficulty sleeping; "brain fog" which caused mistakes at

work; severe vitamin D deficiency (6.4); collapse of immune system; severe sinus

infection that was not responding to antibiotics or prednisone; tachycardia; a decline in hearing; and a "cascading of immunological problems."

367.    The written First Report of Injury is one of many documents that the Firm refused to produce in the Worker's Compensation case, despite its obvious relevancy to the matter.

368.    The only reason Plaintiff had a copy of the First Report of Injury is because she forwarded a copy to her personal email on November 8, 2018. Defendant did not produce that extremely important document in the workers' compensation case until nearly two years later -- when it was produced pursuant to the ALJ's order on September 10, 2020.

369.    Mr. Blake spoke to Plaintiff after reading her First Report of Injury to tell her that the carrier would likely deny the claim.

370.    The Firm's ongoing acts of misconduct and obstruction in the worker's compensation litigation are admissible in this case to prove motive, lack of mistake or accident, and a continuing course of conduct that began immediately after the Firm became aware of her injury and disability.

371.    In addition, the Firm's ongoing acts of misconduct and obstruction in the workers' compensation case have greatly aggravated Plaintiff's sleep disturbance as the Firm's actions keep her awake at night, and the aggravation of the sleep disturbance has, in turn, affected her immune system and prolonged her recovery.

## The Firm's Continuing Course of Bad Faith in the
## Worker's Compensation Case

372.    On November 9, 2018, the Firm filed a patently false "Form 1" -- the Employer's

First Report of Injury, in which the Firm falsely claimed that the injury did not occur on

the Firm's premises when the Firm knew that the injury occurred in Mr. Ellis' office on

the Firm's premises in Burlington.

373.    The Firm's counsel, in emails with Plaintiff, admitted that the statement on the

form is false, but nonetheless, refused to correct it.  As of the date of this Amended

Complaint, nearly two years after the false Form 1 was filed, the Firm still has not

corrected it.

374.    On December 5, 2018 – a year after the injury – a representative from Travelers,

Mr. Kelly, arrived at Plaintiff's home to interview her about the injury for the worker's

compensation case.

375.    While standing in the doorway of Plaintiff's home, before the interview began,

Plaintiff advised Mr. Kelly that she was on the autism spectrum and would require

accommodations for her disability for the interview.

376.    Without even finding out what the requested accommodations were, Mr. Kelly

agreed to whatever accommodations Plaintiff wanted.

377.    Plaintiff told Mr. Kelly that she also required that the recording have that

agreement on the record, and Mr. Kelly agreed.

378.    The audio recording shows that the following discussion took place:

Q:    My name is James Kelly.  It's J-A-M-E-S, K-E-L-L-Y.  I'm an investigator with
      Travelers Insurance.  Today is December 5th, 2018.  And I am currently at the
      residence of Ms. Christina Rainville which is located at 431 Elm Street in

56

> Chester, Vermont. And Christine, be --- before I go any further, I just want to make sure that I have our permission to record the interview?

A:     Yes, you do.

Q:     And there was something that you would like to say prior to any questions?

A:     I would just like to say that I'm on the autism spectrum and sometimes that can cause me difficulty and challenges in back and forth conversations, that I don't process them -- uh -- right, and in terms of a formal statement, I might misspeak or I might misinterpret something. So I would like if it is okay to have the opportunity to review it just to make sure it is accurate.

Q:     Absolutely. Absolutely.

379.     This agreement was understood by both Plaintiff and Travelers to be a condition precedent to the interview.

380.     Plaintiff had twice previously been granted a nearly identical accommodation when she was a fact witness in a criminal case before Judge Kainen, and when she was a fact witness in a Professional Responsibility Board case involving Stacey Adamski, the former Ellis Boxer & Blake association who was found to have engaged in unethical conduct.

381.     Both Mr. Kelly, and the Travelers adjuster, Roberta Jordan, communicated with Plaintiff by email and had Plaintiff's email address, yet neither of them provided Plaintiff a copy of her statement to review.

382.     Despite the clear and unambiguous language in the recorded agreement, the Firm's counsel sent a transcript of the interview to the Specialist at the Vermont Department of Labor who was deciding the initial claim for purposes of an interim order, without affording Plaintiff the opportunity to review the transcript.

383.     In an email to the Department of Labor, the Firm's counsel made clear that the decision to disregard the clear and unambiguous recorded agreement for accommodations

under the ADA was deliberate rather than an inadvertent error, as he claimed that Plaintiff "did not specify, nor did we agree, that such opportunity would be afforded prior to the statement being submitted to the Department of Labor."

384.     After first making that preposterous argument, the Firm changed course and made an equally ludicrous argument, that "The claimant sought a review of the statement so she could determine its accuracy, not so she could change answers actually given."

385.     This is yet another example of the Firm's ongoing deliberate wrongful acts to gain an unfair advantage in the worker's compensation litigation.

386.     The Firm has consistently and knowingly made false claims to the Department of Labor.

387.     As just one example, the Firm has repeatedly stated that Plaintiff never reported her injury until her November 8, 2018 email to Mr. Blake, while knowing that Plaintiff immediately reported her injury and her developing illness to the office manager the very next day after Plaintiff had eaten wheat -- on December 5, 2017 -- and that she had provided regular updates on her declining health to the office manager from that point on until she left the Firm in November of 2018.

388.     The bad faith conduct, however, goes far beyond making false claims in court and obstructing discovery.

389.     For example, in January of 2020, Plaintiff requested a three-month extension of the deadlines in the worker's compensation case because she needed to focus on her health after the number of inflammatory/immune-related medical issues had increased to over 20 separate medical conditions, and had necessitated 24 out-of-state medical

appointments at Dartmouth and Massachusetts General Hospital in the course of 48 business days.

390.     The Firm refused to extend the deadlines, and provided no reason to support its position, which made clear that the extension would have had no effect whatsoever on the Firm's defense of the litigation.

391.     The Firm's January 2020 refusal to grant a reasonable request for extension was after Plaintiff had agreed to the Firm's request for an extension earlier in the proceeding.

392.     The ALJ granted Plaintiff's request and Plaintiff's health improved significantly during the extension, at least in part, because she did not have to endure the ongoing bad-faith conduct that kept her awake at night.

393.     Then, after the case heated up again in May of 2020, the Firm, in a reverse course of sheer malice, unilaterally declared that the December 2020 hearing date would have to be extended until May of 2021, and then continued to refuse to engage in any discovery at all.

394.     Yet again, Plaintiff had to seek intervention from the Administrative Law Judge.

395.     Meanwhile, the Firm demanded that Plaintiff travel 1400 miles to have an Independent Medical Examination by the Firm's "go to" defense neuropsychologist in Boston, despite the fact that the workers' compensation rules provide that a claimant cannot be made to travel more than 200 miles for such an examination. Plaintiff's refusal to travel 1400 miles (in the midst of a pandemic, no less) was one of the false reasons Defendant claimed that the case had to be postponed.

396.    The Firm also refused to produce its only expert for deposition, offering a litany
of false and bad faith excuses and demands, over a period of 84 days, during which time
Plaintiff had to twice seek intervention from the Administrative Law Judge.

397.    While refusing to produce its expert for deposition, the Firm relied on the report
of this expert in its motion for summary judgment.

398.    The Firm knew at the time that it had failed to provide the expert with the key
medical records which refuted his opinions.

399.    By refusing to produce their own expert for deposition for 84 days, the Firm
successfully prevented Plaintiff from being able to point out the failings of his opinion in
a deposition prior to the summary judgment motion process, and instead she was required
to present those facts in her response to defendant's motion -- after which, Defendant had
its expert modify his report.

400.    Meanwhile, in September of 2020, the Firm first disclosed the fact that partner
Justin Sluka's emails had been destroyed -- one year and eight months after the emails
were destroyed in January of 2019.

401.    In an apparent effort to cover up the fact that partner Justin Sluka's emails were
destroyed in mid-January of 2019, the Firm refused to produce a single email voluntarily
(and, as of the date of this Amended Complaint, still has not produced a single email
voluntarily).

402.    Mr. Sluka's emails were destroyed less than ten weeks after Plaintiff put the Firm
on Notice in her November 8, 2018 email describing her injury, that she had spoken to
Mr. Sluka about her illness.

403.     The Firm made no effort to identify and preserve any relevant emails that Mr.
Sluka might have had despite being put on notice that he potentially had relevant emails.

404.     The Firm's continuing course of willful wrongful misconduct, which is a
calculated attempt to gain an unfair advantage in the worker's compensation litigation,
has continued non-stop for the entire time that the claim has been pending (with the
exception of the three-month stay), and provides further support to establish the motive
for the unlawful conduct at issue in this case.

405.     In addition, the Firm's continuing course of willful misconduct in the workers'
compensation case has caused Plaintiff considerable ongoing stress, which has greatly
aggravated her sleep disturbance, affected her health, and prolonged her illness.

### Plaintiff's Age Was Also a Material Factor in the Firm's Acts of Disability Discrimination

406.     Age discrimination was a material factor in every decision the Firm made
regarding Plaintiff's mistakes, workload, refusal to accommodate her disability while she
was an employee, and her ultimate discharge.

407.     But for Plaintiff's age, the mistakes would not have led to discharge.

408.     But for Plaintiff's age, Plaintiff's disability would not have led to discharge.

409.     But for Plaintiff's age, the Firm would not have stopped giving Plaintiff work.

410.     When Plaintiff – whose illness was readily apparent to everyone who saw her in
person or spoke to her on the phone – explained that she made a mistake because she was
having difficulty sleeping, Mr. Ellis cut the conversation dead in its tracks and made very
clear that he did not want to discuss it.

411.     In contrast, Mr. Ellis and the Firm had previously offered flexible hours to a young lawyer, who had been showing up for work hours late, and, when reprimanded for doing so by Mr. Blake, had claimed that she had a mental health disability that made it difficult for her to sleep.

412.     While Plaintiff was terminated because of mistakes, the Firm routinely tolerated mistakes by younger lawyers without consequence.

413.     For example, after Ms. Adamski had represented the Spanish-speaking client in a court hearing with catastrophic criminal repercussions by not requiring an interpreter, and providing the client a copy of the Order which she knew he could not understand because it was in English, no one at the Firm ever took any action against Ms. Adamski or even reprimanded her about her very grievous errors.

414.     For example, after the Firm found out that Ms. Adamski had diverted a settlement check to her home and had erased documents from the Firm's computer system that showed that the check had been received, the Firm did not discharge her employment but only suspended her (whereupon she quit).

415.     For example, when Mr. Ellis became frustrated with the mistakes that another young associate made and refused to work with her, other partners at the Firm provided her work and she was not discharged.

416.     For example, when the Firm learned that a young litigation associate who had been with the Firm for a number of years was calculating due dates wrong and had no understanding of how to calculate due dates properly despite calculating them (wrong) for years, the Firm took no action against the associate.

## Damages

417.     After leaving the Firm, Plaintiff initially was applying for jobs and had had a

second interview. However, after learning from Ms. Drake that Mr. Ellis had decided to

fire Plaintiff due to her mistakes, Plaintiff realized that she was still too ill to work as a

lawyer, and she stopped seeking employment because she was still experiencing

cognitive lapses and still having severe difficulty sleeping.

418.     Plaintiff expects that – like allergic reactions she has had in the past which were

not as severe – this extended inflammatory response will one day diminish and her life

can return to what it was before she ate the pizza, and that she will be able to work again.

419.     However, the Firm's ongoing bad-faith conduct has aggravated the sleep

disturbance, which has had a deleterious effect on her immune system, and has prolonged

her recovery.

420.     In addition, the way that the Firm ended her employment has made future

employment as a lawyer impossible.  Plaintiff is now 58 years-old, which alone makes

future employment unlikely, and now she has the additional problem of knowing that she

was terminated due to mistakes.

421.     In addition, the Firm's refusal to provide a reference makes future employment

impossible.

422.     No one will hire a lawyer at Plaintiff's age under these circumstances.  The

damage has clearly ended Plaintiff's 30-year legal career.

423.     Furthermore, the Firm's actions have destroyed Plaintiff's reputation as a lawyer,

as she will have to disclose the fact that the Firm terminated her due to mistakes to any

prospective employer.

424.    Plaintiff cannot, as a lawyer, withhold this information from any entity that would consider hiring her as a lawyer.

425.    The Firm's handling of Plaintiff's disability will also bar her from federal employment.

426.    Lawyer applicants for federal employment are required to fill out a form, under oath, declaring whether then have been terminated from employment in the past and the reasons for the termination.

427.    Plaintiff, who previously worked as a high-level lawyer for the federal government managing litigation for the Securities and Exchange Commission in Philadelphia, had numerous interviews for potential federal law jobs from 2016-2018.

428.    Federal employment as a lawyer is no longer possible for Plaintiff, as Plaintiff will have to advise potential federal employers that she was terminated because she made mistakes and that the Firm will not give her a reference.

429.    In contrast, had the Firm complied with the law and offered Plaintiff the accommodation of working flexible hours, that accommodation would have resolved the problem quickly, especially since Plaintiff only made approximately five mistakes in an eleven-month period.

430.    Plaintiff's treatment provider at Massachusetts General Hospital for the sleep disturbance has advised that sleep disturbance, if not addressed promptly, often becomes ingrained and difficult to treat.

431.    Because the Firm did not offer the sleep accommodation, Plaintiff spent 11 months working without the accommodation, and the sleep disturbance became ingrained as a result.

432.     Indeed, because the Firm failed to offer a flexible-hours accommodation, Plaintiff suffered medical ailments from prolonged loss of sleep, including but not limited to, heart problems and ongoing cognitive issues.

433.     The Firm's refusal to have a conversation about the disability and offer a flexible-hours arrangement caused Plaintiff's medical condition to get materially worse.

434.     The stress of being terminated, and lied to, and being told that she would not be given a reference -- among other things -- all while Plaintiff was very ill with an immunological condition, further exacerbated Plaintiff's inability to sleep and further weakened her immune condition and overall health.

435.     The Firm could have easily accommodated flexible work hours for Plaintiff, as 99% of her work involved research, reviewing records, and writing – all of which could be done at any hour of the day.

436.     Moreover, if the Firm had been honest, and advised Plaintiff that she was going to be terminated because of mistakes in her work, Plaintiff would have requested an immediate accommodation that she be permitted to work flexible hours so that she could sleep in when she had a particularly bad night, or work on a different day.

437.     Instead, knowing that Plaintiff would request such an accommodation, the Firm created a false narrative that there was not enough work for Plaintiff in order to prevent Plaintiff from requesting an accommodation and/or filing a worker's compensation claim.

438.     Also, had the Firm put Plaintiff on medical leave or terminated her expressly because her disability made her unable to perform her work, her reputation would not be damaged because she would be able to accurately explain to future employers that she was terminated because her illness made her temporarily unable to perform her job.

439.    Plaintiff's mistakes were very few in number, and she continued to perform at her usual outstanding level despite the mistakes.

440.    For example, during 2018, Plaintiff conducted a group of depositions where opposing counsel informed Mr. Ellis that she had never seen anyone conduct depositions like that, and that Plaintiff's deposition work was extraordinary.

441.    The lawyer told Plaintiff that she had told Mr. Ellis about Plaintiff's extraordinary work on the depositions in the case. Mr. Ellis acknowledged to Plaintiff that he had been told about that, but he offered no praise to Plaintiff.

442.    Plaintiff also did extraordinary work for Mr. Boxer on two different cases during 2018.

443.    Mr. Boxer asked Plaintiff to assist him in defending a former state employee in a very high-profile case involving alleged mistreatment and discrimination of an inmate with disabilities.

444.    Mr. Boxer told the client that he needed Plaintiff to work on the case because it was a subject area in which he had no knowledge.

445.    Plaintiff drafted two extraordinary summary judgment motions in that case.

446.    The first summary judgment motion was filed prior to discovery, and argued that half of the counts against the Firm's client had to be dismissed as a matter of law, regardless of what discovery might reveal.

447.    That motion was so compelling that the opposing lawyer agreed to dismiss those counts without even responding to the motion.

448.    The second motion, filed after discovery closed, set forth extraordinary factual detail in a voluminous filing, covering many years of history, and Plaintiff argued that

66

there was no factual basis to support the claim that the Firm's client had done anything wrong, much less anything for which he could be liable, and all of the remaining counts should be dismissed.

449.     After the second summary judgment motion was filed, opposing counsel agreed to dismiss all charges against the Firm's client without receiving anything at all from the Firm's client.

450.     Mr. Boxer filed both of these motions without any material edits or changes from the draft that Plaintiff provided to him, except that, in the second motion, Mr. Boxer asked Plaintiff to add an additional argument of a few sentences.

451.     Mr. Boxer did not inform Plaintiff of either of these extraordinary outcomes that Plaintiff obtained singlehandedly with her brief writing and factual analysis.   Instead, Plaintiff learned that the counts had been dismissed from Mr. Boxer's secretary.

452.     On information and belief, Mr. Boxer communicated about the successes in his cases when Mr. Boxer's young associate had done the work.

453.     Plaintiff also assisted Mr. Boxer in a complicated potential civil case involving an allegation of child sexual abuse – another area where no one else at the Firm had Plaintiff's expertise.

454.     Plaintiff also did exceptional work for Mr. Ellis during this time period, which he acknowledged in emails that he sent to her.

## The Firm Acted with Actual Malice

455.     The Firm's actions set forth above were calculated, purposeful and done with actual malice.

456.        The Firm's actions manifested personal ill will and were carried out in circumstances evidencing reckless or wanton disregard of Plaintiff's rights.

457.        The Firm's actions constituted morally culpable conduct to the degree of outrage frequently associated with crime.

458.        The Firm's conduct was wrongful and outrageously reprehensible.

459.        The Firm's conduct was with malice, bad motive, ill will, personal spite, hatred, and reckless disregard toward Plaintiff.

460.        The Firm's conduct was especially egregious because the Firm knew that Plaintiff was very, very ill at the time and not in a condition where she could defend herself.

461.        At least four of the five partners (Mr. Ellis, Mr. Blake, Mr. Boxer and Jennifer. Moore) acted individually with actual malice toward Plaintiff as set forth above.

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq.*

462.        Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

463.        The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

464.    As of December 5, 2017, through the time of her involuntary resignation on May

8, 2018, as least one of Plaintiff's major life activities was limited due to her illness, and

she was therefore an individual with a disability under the ADA.

465.    Plaintiff was fully qualified and could perform all of the essential functions of the

position.

466.    The Firm is a covered employer to which the ADA applies.

467.    Plaintiff's mistakes were caused by her disability.

468.    Allowing Plaintiff to work flexible hours would have enabled Plaintiff to get

sufficient sleep and not make mistakes.

469.    The Firm terminated Plaintiff on the basis of her disability in violation of the

ADA.

470.    The Firm's failure to make an individualized assessment to determine whether a

reasonable accommodation would enable Plaintiff to be employed violated the ADA.

471.    The Firm's scheme whereby it created a false narrative that there was not enough

work for Plaintiff was an effort to side-step the requirements of the ADA and was, in and

of itself, a violation of the ADA.

472.    The Firm's scheme of preventing Plaintiff from discussing her illness and her

disability violated the ADA.

69

473.     The Firm's continuing course of misconduct that began in early 2017 and which
continues to this day in the worker's compensation litigation is an effort to unlawfully
obstruct and deny Plaintiff's rights because of her disability.

474.     As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer
both economic and non-economic harm.

## COUNT II – BREACH OF CONTRACT

475.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation
above as if fully set forth in detail herein.

476.     The Firm breached the employment contract dated May 31, 2016.

477.     The Firm had promised in the contract to "endeavor to support" Plaintiff as she
"worked diligently to develop [her] own client base."

478.     Rather than support Plaintiff's diligent efforts, the Firm actively obstructed every
effort Plaintiff made to develop her practice.

479.     The Firm created a false conflict and then wrongly maintained the bar on criminal
cases even after Mr. Blake's "sort-of" conflict had terminated.

480.     The Firm further actively obstructed Plaintiff's efforts by, among other things,
refusing to send out notices of her arrival at the Firm until she had been at the Firm for a
year and then only including her name on Ms. Adamski's cards as an afterthought; not
allowing Plaintiff to attend the worker's compensation conferences; belittling the efforts
she made to market herself; belittling her publication in the *Vermont Bar Journal*;
refusing to pay $300 for print ads for her; and cutting her out of the Google Ads program
she had developed to market herself.

481.     As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT III – AGE DISCRIMINATION IN VIOLATION OF VERMONT'S FAIR EMPLOYMENT PRACTICES ACT

482.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

483.     Vermont's Fair Employment Practices Act, 21 V.S.A. § 495 (a) provides that "It shall be an unlawful employment practice . . .

> (a) For any employer. . . to discriminate against any individual because of . . . age or against a qualified individual with a disability."

484.     Plaintiff was 54 years-old at the time that she began at the Firm in June of 2016.

485.     Plaintiff was a qualified individual with a disability as of December 5, 2017.

486.     The Firm engaged in multiple acts of age discrimination and ultimately discharged Plaintiff due to her age.

487.     The Firm discriminated against Plaintiff on the basis of her age, by, among other things:

    a. Refusing to provide support for her efforts to develop her practice while providing unlimited support to all the young lawyers;

    b. Barring Plaintiff (an expert in criminal law) from practicing criminal law, due to a non-existent conflict, all while allowing an inexperienced young lawyer to take on a criminal case;

    c. Not sending out cards announcing her arrival at the Firm until she had been at the Firm for a year, while issuing the cards immediately for a young new hire;

d.   Berating her without cause in a meeting with a young associate;

e.   Taking her work away;

f.   Complaining that she was "even older" than Mr. Boxer was;

g.   Not sending her to the worker's compensation conferences despite the fact that she did worker's compensation work and while sending all the young lawyers to the conferences;

h.   Recruiting and hiring a "newbie" lawyer that the Firm "could train" while lying repeatedly to Plaintiff that the Firm had insufficient work to support her position;

i.   Rejecting Plaintiff's offer to work for the same money that a "newbie" lawyer would be paid;

j.   Refusing to pay even minimal amounts ($300) to advertise her practice;

k.   Cutting her out of the Google Ads process and using Google Ads instead to promote a new line of work for a young associate with no experience in that area of law;

l.   Refusing to serve as a reference to future employers and lying to Plaintiff that the decision was pursuant to a policy which did not exist;

m.   Constructively discharging Plaintiff's employment;

n.   Taking Plaintiff's work away and constructively discharging her because of her mistakes, while, at the same time, tolerating serious mistakes made by younger lawyers without imposing any consequences;

o.   Failing to provide a flexible-hours accommodation for Plaintiff's sleep disturbance despite having provided such an accommodation to a young lawyer who worked for Mr. Ellis just a few years earlier;

p.   Refusing to serve as a reference for Plaintiff despite agreeing to serve as a reference for a young lawyer who had significant work problems, got along with no one, and was given a flexible-hours accommodation.

488.   As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF VERMONT'S FAIR EMPLOYMENT PRACTICES ACT

489.   Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

490.   The Firm engaged in multiple acts of disability discrimination, including but not limited to:

a.   Preventing Plaintiff from discussing her illness and disability with partners Stephen Ellis and William Blake when employees were free to discuss anything other than illness and disability with those partners;

b.   Taking her work away, and without providing Plaintiff a truthful reason why – in order to prevent her from filing a worker's compensation claim and/or requesting an accommodation;

c.   Repeatedly lying to Plaintiff that there was insufficient work for her position (all while they were actively recruiting her replacement) and coercing her into resigning;

d.   Failing to engage in a meaningful discussion of her disability and potential accommodations;

e.  Terminating her employment because she made a few mistakes when the Firm knew that the mistakes were caused by her worker's compensation injury, subsequent illness and sleep disturbance;

f.  Failing to provide a flexible-hours accommodation for sleep disturbance that the Firm had previously provided to a younger employee and which would have resolved the performance issue;

g.  Constructively discharging Plaintiff's employment.

491.    As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

## COUNT V – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

492.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

493.    At the time that Plaintiff accepted the position at the Firm and after she started her employment, the Firm had indicated in various ways that Plaintiff would have job security and would be treated fairly.

494.    The Firm breached the covenant of good faith and fair dealing by, among other things:

a.  Refusing to support Plaintiff's efforts to develop her practice while supporting the efforts of young lawyers to develop their practices;

b.  Intentionally failing to disclose the facts around Mr. Ellis' history of a fluctuating workload which could not reasonably be expected to support a lawyer, prior to Plaintiff's acceptance of the Firm's offer of employment.

c. Intentionally failing to disclose that the last time the Firm had hired an older lawyer, the Firm forced her out within approximately 13 months.

d. Limiting and prohibiting Plaintiff's ability to work on contingency fee matters, and failing to disclose this during her interview process.

e. Actively operating to undermine and destroy Plaintiff's efforts to develop her law practice.

f. Belittling Plaintiff and demeaning her in the meetings with Mr. Boxer, refusing to give her work, taking her work away, giving her paralegal work and taking that work away;

g. Barring her from practicing criminal law – the only area of law for which she had an established reputation in Vermont -- due to a non-existing conflict, while allowing a completely-inexperienced young lawyer to take on a criminal case;

h. Repeatedly lying to Plaintiff that there was insufficient work to support her position – all while the Firm was actively recruiting her replacement – in order to get her to resign rather than ask for an accommodation that would allow her to sleep more;

i. Refusing to provide Plaintiff with a reference, and lying that the Firm had a policy not to provide references when the Firm had always given references in the past (even to unsuccessful employees) and continued to provide references after Plaintiff left;

j. Encouraging Plaintiff to learn as much as possible about Google Ads and then using Google Ads to the Firm's and a young associate's benefit while excluding Plaintiff from the process;

  k. Coercing Plaintiff to resign on false pretenses, and by taking her work away and demeaning her;

  l. Telling a paralegal the truth in the summer of 2018 (approximately six months prior to Plaintiff's resignation), that Plaintiff was going to be fired at the end of the year due to her mistakes, while keeping that information secret from Plaintiff and repeatedly lying to Plaintiff that she was going to be let go because there was not enough work to support Plaintiff's position;

  m. Using Plaintiff's coerced resignation as a defense in the worker's compensation case and making false representations to the Department of Labor that the resignation was voluntary – defenses which the Firm reasonably anticipated using at the time that the Firm was lying to Plaintiff about not having sufficient work for her and was trying to coerce her into resigning;

  n. Continuing to engage in bad faith conduct in the worker's compensation case;

  o. Destroying a material email which the Firm would have known was important to Plaintiff's worker's compensation case at the time that Mr. Ellis received it in February of 2018;

  p. Doing all of the above things, and more, despite the fact that Plaintiff was highly profitable to the Firm, worked hard, was well-liked, and did outstanding work throughout the entire time she was employed.

495. Plaintiff's expectation that the Firm would support her efforts to develop her practice and otherwise act in good faith were justified.

496. The Firm failed to act in good faith and to deal fairly and consistently with Plaintiff.

497.    The Firm's conduct violated community standards of decency, fairness, or reasonableness.

498.    The Firm evaded the spirit of the bargain and willfully harmed Plaintiff.

499.    The Firm abused its power over Plaintiff.

500.    As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer both economic and non-economic harm.

### COUNT VI – FRAUDULENT  INDUCEMENT

501.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation above as if fully set forth in detail herein.

### The Employment Agreement Contained a Known False Statement of Material Fact

502.    At the time that the Firm entered into the employment contract with Plaintiff, the Firm intentionally made a false statement about a material fact.

503.    The Firm never had any intention of fulfilling its obligation to "endeavor to support" Plaintiff's efforts to develop her own client base, and the Firm knew that that statement was false at the time that it entered into the contract.

504.    The Firm's intention to never comply with its promises in the employment contract is further demonstrated by the language the Firm added to the contract in an effort to obliterate any responsibility the Firm had agreed to: "In addition, the Firm may change any of the terms and conditions of employment, at the Firm's sole discretion."

505.    Despite this language, Plaintiff reasonably relied on the Firm's promises pursuant to the covenant of good faith and fair dealing.

506.    The Firm demonstrated that it never intended to support Plaintiff's efforts to develop its practice immediately after Plaintiff started at the Firm, by, among other

things, prohibiting her (immediately) from representing criminal clients, and not promoting Plaintiff by sending out postcards to announce that she had joined the Firm.

507.   The Firm's false representation in the employment contract went to the core of the employment contract.

508.   The condition that the Firm "endeavor to support" Plaintiff's client development efforts was a material term of the contract.

509.   The Firm made that false promise in order to fraudulently induce Plaintiff into accepting the position.

510.   The motive behind this fraud was that partner Stephen Ellis was desperate to hire a lawyer immediately, as he had an abundance of work with upcoming deadlines, and his current associate was leaving the Firm within the next day or two.

511.   Mr. Ellis required an experienced litigator who could get up to speed immediately.

512.   Indeed, Mr. Ellis sent Plaintiff an email on her first day, June 1, 2016, asking her to draft a reply for a summary judgment motion that was pending.

513.   Using a combination of deceit and intentionally withholding material facts from Plaintiff, the Firm fraudulently induced Plaintiff to sign the contract and take on employment at the Firm.

514.   Plaintiff reasonably relied on the Firm's promise of support in the development of her practice when she entered into the contract.

515.   Plaintiff would not have entered into the contract without the Firm's promise of support of her efforts to develop clients.

516.     Plaintiff did not know, and could not have reasonably known, that the Firm's statement of its intent was false and that the Firm had no intention of supporting her efforts.

**The Firm Wrongfully and Intentionally Failed to Disclose Material Facts**

517.     The Firm also failed to disclose a number of material facts during Plaintiff's interview process, which, had they disclosed **any one of these facts**, would have resulted in Plaintiff rejecting the offer of employment.

518.     The Firm failed to disclose to Plaintiff that it had no present intention of supporting her effort to develop her practice.

519.     Plaintiff would not have accepted the offer of employment had the Firm disclosed that it had no present intention of supporting her efforts to develop her practice.

520.     In addition, the Firm intentionally failed to disclose that: (1) Mr. Ellis' workload had historically ebbed and flowed and thus, there was a substantial risk -- if not a known guarantee -- that his workload would not be able to consistently support Plaintiff, and; (2) that this situation whereby there was not enough work to sustain a lawyer who had been hired to support Mr. Ellis had occurred in the past.

521.     The Firm also failed to disclose to Plaintiff that the Firm had previously hired a highly-experienced lawyer who was substantially older than the younger partners at the Firm, and that the Firm had forced her out within approximately 13 months, despite the fact that she was (and remains) an esteemed member of the Vermont bar.

522.     Prior to accepting the Firm's offer, Plaintiff interviewed with William Blake, who knew that Stephen Ellis' workload had failed to support a second lawyer in the past, and

who was reluctant to hire Plaintiff, and who recognized that Plaintiff would lose other opportunities if she accepted the Firm's offer.

523.    Nonetheless, Mr. Blake intentionally failed to disclose the facts surrounding Mr. Ellis' history of not being able to provide enough work to support the lawyers that the Firm had hired to support Mr. Ellis' practice.

524.    All of the Firm's partners were aware of this history, and all of them intentionally failed to disclose these material facts to Plaintiff when they interviewed her.

525.    Plaintiff would not have accepted the offer of employment had the Firm disclosed *any* of the facts set forth in Paragraphs above.

526.    Plaintiff also understood at the time of her offer that she would be working on two substantial contingency fee cases that Mr. Ellis was handling, that had been approved by the Firm.  Indeed, Mr. Ellis had spent a substantial amount of time talking about those two contingency-fee cases in Plaintiff's interviews.

527.    Shortly after Plaintiff started at the Firm, Andrew Boxer and other partners complained to Mr. Ellis that Plaintiff should not be working on contingency fee cases, because, they claimed, those cases were not bringing immediate money to the Firm and the recovery of fees in the contingency fee cases was contingent on winning the case or a successful negotiated resolution.  For this reason, they demanded that Plaintiff only work on client matters which could be billed (and paid) monthly.

528.    This position made no sense, as Plaintiff worked whatever hours were required of her, and her work on contingency-fee matters would not affect the number of hours she billed on immediate-pay matters.

529.     Nonetheless, the partners required Mr. Ellis to reduce Plaintiff's time on
contingency fee cases, and, on information and belief, demanded that she not work on
those cases at all.

530.     On information and belief, the younger lawyer who had worked for Mr. Ellis prior
to Plaintiff had not had her practice restricted in this manner.

531.     Had Plaintiff known that the Firm intended to obstruct her ability to work on
contingency-fee matters, which were an essential and substantial part of Mr. Ellis'
practice, Plaintiff would not have accepted the offer of employment.

532.     Mr. Blake and all of the other partners at the Firm had a duty to disclose material
facts that they knew would likely cause a reasonable person (and Plaintiff) to reject the
Firm's offer.

533.      The Firm and its partners had substantial opportunity to disclose all of the above
material facts to Plaintiff prior to her acceptance of the offer, as each partner met with her
individually, and they all intentionally withheld all of this information and failed to
disclose all of the above material facts.

534.     A reasonable person would have considered each of the above intentionally-
withheld facts, both independently and taken as a whole, as material facts which were
essential to any decision by someone in Plaintiff's position to accept employment with
the Firm.

535.     Plaintiff lost potential employment opportunities as a result of accepting the offer
of employment in reliance on Defendant's fraudulent promise.

536.    Plaintiff lost potential employment opportunities as a result of accepting the offer

of employment based on the wrongful and intentional withholding of the material facts

set forth above.

537.    But for being fraudulently induced into the contract, Plaintiff would not have

become a Firm employee and would not have suffered her injury and subsequent

disability and illness.

538.    As a result of the Firm's actions, Plaintiff has suffered and will continue to suffer

both economic and non-economic harm.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in her favor

and against Defendant for the following relief:

      a. Past wages and benefits in an amount to be determined at trial;

      b. Front pay and benefits in an amount to be determined at trial;

      c. Damages for the permanent harm to Plaintiff's reputation;

      d. Damages for lost opportunities;

      e. Compensatory and consequential damages including for emotional distress;

      f. Compensatory and consequential damages for the misconduct and

mistreatment which aggravated Plaintiff's sleep disturbance and caused a

corresponding deleterious effect on her immune system and overall health

while Plaintiff was employed at the Firm;

      g. Compensation for all medical and psychological aspects of her injury in the

event that the Firm prevails in its argument in the worker's compensation case

that her injury did not "arise out of" and "in the course of" her employment, as

Plaintiff would not have been at the Firm to be injured but for the fraud in inducement;

h.  Compensation for medical costs, emotional distress, the aggravation of the sleep disturbance, and the deleterious effect on her health after November 9, 2018, when the Firm filed its patently false Employer's First Report of Injury and thus began the long course of misconduct in the workers' compensation case that further aggravated Plaintiff's sleep disorder and her health;

i.  Punitive damages to the full extent allowed by law;

j.  Pre-judgment and post-judgment interest at the rate allowed by law;

k.  Attorney's fees and costs; and

l.  Any such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated this 6th day of October, 2020 at Destin, Florida.

Respectfully submitted,

Christina Rainville, Esquire
*Pro Se*
1040 Highway 98 East, Unit #415
Destin, Florida 32541
(267) 250-0686

Certificate of Service

I hereby certify that on October 6, 2020, the foregoing Amended Complaint was served on Defendant's counsel: F. David Harlow, by Federal Express, at the following address:

> F. David Harlow, Esquire
> 28 Vernon Street, Suite 501
> Brattleboro, VT 05301

Plaintiff notes that the Amended Complaint was served by Federal Express rather than the U,S. Postal Service because the Postal Service requires that packages that are more than ½ in thick must be mailed in person, by going into a post office, and that Plaintiff -- who has five underlying medical conditions that put her at risk of complications of COVID -- cannot safely enter the post office, but can safely print FedEx labels and drop the package off at a FedEx drop-off box without risk of getting COVID.

A copy was also emailed to F. David Harlow on October 6, 2020.

Christina Rainville